## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALEX REINIG,** *individually and on* | : | **Case No. 2:15-CV-01042-AJS** |
| *behalf of all others similarly situated,* | : | |
| | : | |
| **v.** | : | |
| | : | **FIRST REPORT REGARDING** |
| **RBS CITIZENS, N.A.** | : | **CERTIFICATION MOTIONS** |
| | : | **AND CROSS-MOTIONS FOR** |
| | : | **SUMMARY JUDGMENT AS TO** |
| | : | **RECAPTURE CLAIMS** |

In this wage-and-hour lawsuit, 12 individual named Plaintiffs sue Citizens, N.A. (referred to in the Amended Complaint as "RBS Citizens, N.A.") to recover compensation allegedly owed them for work as non-exempt Mortgage Loan Officers ("MLOs"). In a thirteen-count Amended Complaint, Plaintiffs assert claims resting on two general theories of liability.

First, with their "Recapture Claims," Plaintiffs allege Citizens adopted commission payment policies that worked to unlawfully "recapture," "claw back," or "deduct" previously-earned hourly wages and overtime from earned commissions, in violation of federal and State law. Second, in their "Off-the-Clock Claims," Plaintiffs assert Citizens maintained an unofficial policy requiring MLOs to perform work "off the clock" in excess of forty hours per week, without paying overtime, in violation of federal and State law. Moreover, the 12 named Plaintiffs allege these two policies also affected all other current and former MLOs. Thus, Plaintiffs seek to recover their own allegedly-withheld salary, overtime, and commissions, and also to lead certified classes of current and former MLOs who suffered the same alleged injuries.

The issues in this case have now ripened to where the Court must decide which claims will

proceed to trial.  Plaintiffs have moved for certification of their Recapture Claims for class action treatment, and also moved for summary judgment on their Recapture Claims.  Conversely, Citizens has moved for summary judgment as to both the Recapture and Off-the-Clock Claims, and also asks the Court to decertify the collective action the Court earlier certified conditionally under Section 216(b) of the Fair Labor Standards Act ("FLSA").

The Court appointed the undersigned to issue recommended rulings on the motion for class certification, the motion for decertification, and the cross-motions for summary judgment.  *See Appointment Order* (docket no. 86).  As explained more fully below, this Report addresses aspects of every one of the referred motions, but only to the extent the motions relate to Plaintiffs' Recapture Claims.  Plaintiffs' Off-the-Clock Claims will be addressed in a *Second Report*.

For the reasons stated below, the Special Master now **RECOMMENDS** the Court:

- **GRANT** Plaintiffs' motion for class certification of Plaintiffs' State-law Recapture Claims;

- **GRANT** final certification of Plaintiffs' federal-law Recapture Claims;

- **DENY** Plaintiffs' motion for partial summary judgment on the Recapture Claims; and

- **GRANT** Citizens' motion for summary judgment on the Recapture Claims.


I.      **Procedural Background.**

   A.      **Case History and Plaintiffs' Claims.**

Plaintiffs filed this action on November 23, 2015, alleging violations of federal and State law.  *See* Complaint (docket no. 1).  In May of 2016, this Court conditionally certified Plaintiffs' federal-law claims, ordering that a collective action notice be issued to proposed members with instructions on how to "opt in."  *See* Order granting conditional certification (docket no. 57).

2

Plaintiffs sent notices to more than 1,000 MLOs, and 351 MLOs responded by opting in.  *See* Citizens decertification motion at 11 (docket no. 112).[1]

The parties have pursued extensive discovery, but their efforts did not extend to each of the individual opt-in Plaintiffs.  Rather, the parties agreed to limit discovery to 59 persons: the 12 named Plaintiffs, 37 randomly selected opt-in Plaintiffs, 5 opt-in Plaintiffs chosen by Plaintiffs, and 5 opt-in Plaintiffs chosen by Citizens.  *See* Broderick decl. exh. 2 (docket no. 112-1, Exhibit 1).  Of these 59 persons, only the 12 named Plaintiffs and 29 opt-in Plaintiffs responded to written discovery propounded by Citizens.  *See* Etter decl. at 2, ¶4 (docket no. 112-1).  The parties exchanged written discovery and took 37 depositions—Citizens deposed 20 named or opt-in Plaintiffs, while Plaintiffs questioned Citizens' corporate witness, pursuant to Fed. R. Civ. P. 30(b)(6), and various current or former managerial employees.  *Id.* at 2, ¶¶4-5.

On December 21, 2016, Plaintiffs filed an Amended Complaint, which serves as the operative pleading for the present motions.  *See* Amended complaint (docket no. 85).  The Amended Complaint contains three categories of claims:

> (1) claims under the FLSA, asserted by the named Plaintiffs for themselves and all opt-in Plaintiffs.  These FLSA claims allege Citizens failed to pay the federal minimum wage, and also failed to properly calculate and pay time-and-a-half for overtime (Counts I & II);
>
> (2) claims under ten different State wage-and-hour statutes, all of which are analogs of the FLSA and depend on the same alleged bad acts (Counts III-VI and VIII-XIII).  As pled in the Amended Complaint, the named Plaintiffs assert these claims on their own behalf and on behalf of ten State-specific classes; and
>
> (3) claims under the "State wage payment" laws of the same ten States, which allege Citizens failed to pay MLOs all earned compensation (Counts III-VII and IX-XIII).

---

[1] When available, citations in this Report refer to a document's ECF pagination.  When ECF pagination is not available, the Report cites to a document's Bates numbering.

In the Amended Complaint, the named Plaintiffs assert these claims on their own behalf and on behalf of ten State-specific classes.[2]

In Plaintiffs' Amended Complaint, each Count mixes different categories of claims.[3] A chart diagraming the specific claims asserted in each Count, and the proposed classes for each claim, is attached as Appendix A.

This chart reveals that, while Plaintiffs seek to litigate all claims on a representative basis, the procedure for doing so differs by Count. Counts I and II may be class-certified for trial, if at all, pursuant to 29 U.S.C. §216(b), which allows representative plaintiffs to bring a "collective action" on behalf of all other "similarly-situated" parties who file opt-in requests. *See Knepper v. Rite Aid Corp.*, 675 F.3d 249, 257 (3rd Cir. 2012). Every other Count is subject to class certification, if at all, pursuant to Federal Rule of Civil Procedure 23. The certification standard applicable to each claim is shown in the chart at Exhibit A with yellow or blue shading.

And while all of Plaintiffs' claims fundamentally allege Citizens failed to pay its MLOs all

---

[2] With the exception of the Pennsylvania claims, which are pled separately in Counts VII and VIII, Plaintiffs pled all other of a given State's claims in a single Count. Because of this somewhat unconventional approach to pleading claims, there is not (for example) one Count setting forth a claim under the Illinois Wage Payment and Collection Act, and a separate Count setting forth a claim under the Illinois Minimum Wage Act. Both claims are pled in a ***single*** Count. *See* Amended complaint at 39, ¶¶214-221 (docket no. 85) (Count IV, alleging violations of the "Illinois Wage Laws"); *see also id.* at 5, ¶13 (defining "Illinois Wage Laws" as including claims under the Illinois Wage Payment and Collection Act and the Illinois Minimum Wage Act).

[3] This is because each Count seeks two different types of damages for an alleged violation of the same statute, as a result of ***both*** the commissions policy ***and*** the alleged off-the-clock policy. *See, e.g.*, Amended complaint at 43, ¶253 (docket no. 85) ("Defendant's violations of the Pennsylvania Minimum Wage Act, include, but are not limited to: failing to pay for overtime worked"—a reference to the off-the-clock policy—and "unlawfully evading the overtime and minimum wage requirements of the Pennsylvania Minimum Wage Act by deducting from Plaintiffs' and National Collective Plaintiffs' wages previously earned"—a reference to the "recapturing" of previously-made payments through the commissions-calculation process).

earned compensation, Plaintiffs allege two basic reasons for this failure. First, Plaintiffs contend Citizens had an unofficial policy or practice requiring MLOs to work "off the clock" more than forty hours per week—meaning, MLOs were not permitted to report (and thus were not paid for) the overtime they worked. These are the "Off-the-Clock Claims" (listed in columns 2 and 3 of the chart).

Second, Plaintiffs allege Citizens maintained a compensation policy—described in more detail below—whereby Citizens (a) paid MLOs minimum wage and overtime, but then (b) subsequently recaptured those payments by deducting them from the MLOs' commissions. Plaintiffs assert the effect of the subsequent commission deductions was that Citizens failed to: (i) pay MLOs the minimum wage, (ii) pay MLOs their reported overtime, and (iii) calculate overtime pay correctly. These are the "Recapture Claims" (listed in columns 4 through 6 of the chart).

In order to address like claims together, this Report examines only Plaintiffs' Recapture Claims. The Special Master will issue a *Second Report* that examines Plaintiffs' Off-the-Clock Claims.

Immediately below, this Report addresses the question of certification of the Recapture Claims, under Section 216(b) (Counts I and II) and Federal Civil Rule 23 certification (Counts III through XIII). Then, this Report addresses the cross-motions for summary judgment regarding the Recapture Claims.

### B.    A Threshold Issue—Defining the FLSA Collective and the Rule 23 Classes.

Plaintiffs seek final certification under the FLSA of Counts I and II, and define the collective to include all MLOs employed by Citizens nationwide within the past three years who have filed

opt-in notices.  *See* Amended complaint at 10-11, ¶¶39-45 (docket no. 85).  As noted above, 351 persons have filed opt-in notices.

Plaintiffs also seek certification of various classes under Federal Civil Rule 23; but as Citizens notes, the proposed definition for at least one of these classes is far from clear.  Plaintiffs' submissions contain conflicting statements as to the structure of the classes proposed for certification under Federal Civil Rule 23, *see* Citizens' certification response at 11-12 (docket no. 125), and these conflicting statements must be resolved before this Court issues any certification order.  *See* Federal Civil Rule 23(c)(1)(B) ("An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).").  The conflicting statements made by Plaintiffs relate to the definition of the "Pennsylvania class."  Plaintiffs provide one definition for this class in their Amended Complaint, and a different definition in their motion for class certification.

Specifically, in addition to describing the FLSA nationwide collective and nine ***other*** State classes—with each State class asserting its respective "State wage law" claims[4]—the Amended Complaint also describes a Pennsylvania class.  The Amended Complaint states that the representatives of the Pennsylvania class "seek to represent a class of all persons who worked for Defendant as [MLOs] . . . in the last three years ***in Pennsylvania*** from the date of the filing of the original complaint."  Amended complaint at 11, ¶48 (docket no. 85) (emphasis added).  In other words, the Pennsylvania Class, as pled in the Amended Complaint, includes all MLOs who worked

---

[4] These nine States are Connecticut (Amended complaint at 13-14, ¶¶55-63 (docket no. 85), New York (*id*. at 14-16, ¶¶64-72), Massachusetts (*id*. at 16-18, ¶¶73-81), Rhode Island (*id*. at 18-19, ¶¶82-90), Illinois (*id*. at 19-21, ¶¶91-99), Michigan (*id*. at 21-23, ¶¶100-108), New Hampshire (*id*. at 23-24, ¶¶109-117), North Carolina (*id*. at 24-26, ¶¶118-126), and Ohio (*id*. at 26-28, ¶¶127-135).

6

for Citizens at locations *in Pennsylvania*.  This State-specific class includes claims under the Pennsylvania Wage Payment and Collection Law ("PWCPL"), as well as the Pennsylvania Minimum Wage Act. *See id*. at 12, ¶50.  Thus, the Amended Complaint describes: (1) a nationwide FLSA collective, and (2) ten State-specific classes, including a Pennsylvania class.  Similarly, Plaintiffs assert, in support of their certification motion, that there exists a "Pennsylvania sub-class"—as opposed to a nationwide class—and Plaintiffs' numerosity analysis for this "Pennsylvania sub-class" appears to include only MLOs who worked for Citizens in locations *in Pennsylvania*. Plaintiffs' class certification motion at 5, 31 (docket no. 118) (stating the "ten sub-classes number 1052 putative class members" with the  "Pennsylvania Class" accounting for 188 MLOs).

In contrast, Plaintiffs' motion for class certification describes a "nationwide" Pennsylvania class.  More specifically, in addition to nine State-specific subclasses, the motion seeks certification of a class of "all current and former MLOs who worked for Citizens *throughout the United States* for violations of Pennsylvania law."  Plaintiffs' motion for class certification at 1 (docket no. 110) (emphasis added); *see also* Plaintiffs' certification motion at 33 (docket no. 118) (mentioning a "Nationwide Pennsylvania class").  This is a meaningful difference.  Under this alternative definition of the proposed class structure, not only does the purported Rule 23 nationwide class include the members of the nine State-specific subclasses, the Rule 23 class would also include current or former MLOs who are or were employed by Citizens in *all other* States (including Pennsylvania).  For example, the Pennsylvania class definition used by Plaintiffs in their motion for class certification would encompass Pennsylvania-law claims on behalf of MLOs who worked in Florida, while the Pennsylvania class definition Plaintiffs used in their Amended Complaint would not.

This alternative proposed class structure raises an issue not meaningfully addressed by the

7

parties—the extraterritorial application of Pennsylvania statutory causes of action to MLOs who did not work for Citizens in Pennsylvania.  Plaintiffs' motion for class certification contains no discussion of the PWCPL's extraterritorial application, and Plaintiffs' motion for partial summary judgment contains only the statement—unsupported by case law authority—that "[b]ecause Citizens employed individuals in the Commonwealth of Pennsylvania, it is thus an employer under the [PWCPL] statute and is required to comply with the statute with respect to the entire [nationwide] Pennsylvania class."  Plaintiffs' summary judgment motion at 24 (docket no. 107).  Also, no party has addressed the supposed extraterritorial application of the Pennsylvania Minimum Wage Act.

Ordinarily, the undersigned would evaluate a motion for class certification based on the class definitions spelled out in the motion, as that is a plaintiff's most recent statement of its position. In light of the contradictions and un-discussed issues noted above, however, the undersigned recommends the Court consider the motion for certification on the basis of the ten State-specific classes set forth in the Amended Complaint, each asserting application of the respective State law claims on behalf of all persons who for worked for Citizens as an MLO in that State.  *See* Amended complaint at 5-6, ¶13; 11, ¶48; 13, ¶57; 15, ¶66; 16, ¶75; 18, ¶84; 20, ¶93; 21, ¶102; 23, ¶111; 25, ¶120; 26, ¶129 (docket no. 85); *see also Bouaphakeo v. Tyson Foods, Inc*., 564 F. Supp.2d 870, 906 (N.D. Iowa 2008) ("It is well within the court's authority to redefine Plaintiffs' proposed class."). These class definitions ensure all of the Counts pled in the Amended Complaint are considered for certification, while accounting for the contradictions and inadequacies in Plaintiffs' briefs. Accordingly, this Report examines below the propriety of Rule 23 certification of ten State-specific classes.

8

## II.    Factual Background.

### A.    Overview of the MLO's Compensation Plan.

Plaintiffs are all current or former MLOs.  An MLO essentially acts as a salesperson for Citizens' mortgage loan products.  This work includes generating customer leads, taking loan applications, obtaining loan pre-approvals, and working with the various real estate professionals who have a hand in closing the sales of residential homes.  *See* Dal Pino depo. at 27 (docket no. 115, tab V).  MLOs are non-exempt employees, meaning they are entitled to time-and-a-half-pay, calculated at the "regular rate" defined by law, for each hour worked in excess of forty in a workweek.

Citizens paid MLOs in three ways.  First, MLOs received base hourly pay of $11.50. Second, MLOs received overtime pay, according to a two-step calculation process described below. And third, MLOs were eligible to receive commissions on the loan products they sold. Commissions were calculated monthly, but paid the following month; thus, a loan that closed and funded in June of 2013 would count as a credit toward commissions for June, but the actual commission (if any) would be paid to the MLO in July of 2013.

Citizens applied to all MLOs the same rules governing hourly pay, overtime, and commissions.  *See* Mathieson depo. at 29 (docket no. 115, tab C).  These rules were set forth (in part) in annual compensation plans ("Comp-Plans").  *See generally* Citizens' Collected Comp-Plans (docket no. 115, tab D).  MLOs signed a "Participant Acknowledgment" form included in the Comp-Plan, stating the MLO had received the Comp-Plan and "agreed to be bound by [its] terms."  2013 Comp-Plan at CITIZENS0000676 (docket no. 115, tab D); *see also* Gritz depo. at 213 (docket no. 115, tab J); Soda depo. at 200-01 (docket no. 115, tab L).  Citizens updated its Comp-Plans annually.

The undersigned has examined each of the annual Comp-Plans, word-for-word and in comparison to each other. This review shows that, year after year, the rules remained materially the same. Indeed, even though Citizens reorganized the Comp-Plan in 2016, it retained the language that matters in this case from 2012 through the present.

The Comp-Plans first provided that MLOs "will be paid, separate from this Plan, an agreed upon amount as base guaranteed compensation." 2013 Comp-Plan at CITIZENS0000660 (docket no. 115, tab D). Citizens set this "base guaranteed compensation," the $11.50 hourly pay mentioned above, in an offer letter received by the MLO at the outset of his or her employment. *See* Reinig Offer Letter at CITIZENS0000006 (docket no. 115, tab A). So far as the record reveals, the relevant language of all of the Plaintiffs' offer letters was the same (though other terms varied).

The Comp-Plan then explained how this base compensation figured in Citizen's calculation of commissions:

> The base compensation earned in a calendar month shall serve as a Participant's ***Draw Amount***. The ***Draw Amount*** in its entirety shall be offset against ***Gross Commissions*** prior to a participant earning any incentive under this Plan. At no time will a Participant receive less than the ***Draw Amount***.

2013 Comp-Plan at CITIZENS0000660 (docket no. 115, tab D) (emphasis added). Thus, under the Comp-Plan, Citizens compared (a) ***Gross Commissions***, to (b) the ***Draw Amount*** and other applicable ***Offsets***, to determine (c) ***Earned Commissions***.

If Gross Commissions exceeded the Draw Amount and other Offsets, Citizens paid the difference as Earned Commissions. But if the Draw Amount and Offsets exceeded Gross Commissions, then "the excess [was] aggregated with the subsequent month[']s ***Draw Amount*** and carried forward until ***Gross Commissions*** exceed all ***Draw Amounts*** and ***Offsets*** in the aggregate." *Id.* (emphasis added). In other words, if an MLO did not close enough loans for her Gross

10

Commissions to cover her Draw Amount and Offsets, then she incurred a "deficit" that she would

have to overcome (along with any additional, future Draw Amount or Offset) in subsequent months

before she could earn commissions. (An example illustration is provided in the next section of this

Report.)

Each of the three terms emphasized above—Draw Amount, Offset, and Gross

Commissions—was subject to further definition in the Comp-Plan, and these definitions are key to

understanding how Citizens calculated commissions. A "Draw Amount" was:

> [b]ase compensation amounts, whether provided as salary or hourly earnings, up to
> 45 hours per week at one times the Participant's hourly rate, which are guaranteed
> and earned but used as an Offset against Gross Commissions in determining an
> earned incentive. Draw Amounts may be carried over from [month] to [month] and
> may be aggregated with other Offsets or Advances where such amounts exceed any
> earned incentive.

*Id.* at CITIZENS0000671.[5]  The Comp-Plans defined an "Offset" as an "adjustment to Gross

Commission provided for under the Plan which results in the reduction of incentive calculation prior

to any incentive being earned." *Id.*  Thus, one of the amounts included as an "Offset" is the "Draw

Amount." *Id.* at CITIZENS0000665.  Finally, "Gross Commissions" were "[t]he raw maximum

amount of the incentive prior to calculation of applicable adjustments provided for in the Plan." *Id.*

---

[5] This definition, again, refers to "hourly earnings, up to ***45*** hours per week at ***one times*** the Participant's hourly rate." 2013 Comp-Plan at CITIZENS0000671 (docket no. 115, tab D) (emphasis added). This means Citizens included in the "Draw Amount," and thus the "Offset," ***only*** the ***straight portion*** of the ***first five hours*** of overtime pay. Citizens did not offset Gross Commissions by the overtime premium—the "half" in the "time-and-a-half" formula—and it did not offset Gross Commissions by overtime reported beyond five hours in a workweek.

Thus, as it relates to reported overtime, Plaintiffs' claim is that, "despite informing MLOs that they would receive an hourly wage and overtime premiums, [Citizens] treated the ***weekly pay*** up to ***forty-five (45)*** hours per week as a draw against future commissions, and required MLOs to repay the draw in its entirety prior to Citizens paying the MLOs any of the gross commissions earned for originating loans." Plaintiffs' summary judgment motion at 9 (docket no. 107) (emphasis added).

at CITIZENS0000671.  The Comp-Plans explained that "[a]ll incentives under this Plan are calculated pursuant to the specifics of and general provisions of this Plan," and an "incentive is ***not earned*** until the end of the appropriate" month and not "until all conditions have been met and adjustments . . . as specified in the Plan have been made."  *Id.* at CITIZENS0000665 (emphasis added).

### B.    The Comp-Plans In Operation—Calculating Commissions.

Citizens applied its compensation policies in a two-step process.  First, Citizens paid its MLOs their hourly pay and reported overtime on a weekly basis.  Then, Citizens calculated and paid commissions (if any) for loans that closed and funded in that month.  *See* Plaintiffs' response to Citizens' SOF at 5, ¶10 (docket no. 127-2).  Citizens calculated commissions using a one-month lag—meaning that, in late July of 2013, Citizens calculated and paid commissions owed for loans that an MLO had closed in June of 2013.  *Id.* at 7, ¶16; 8, ¶18.  The commissions calculation process is best illustrated with the following three simplified examples.[6]

---

[6] These examples employ the defined terms of the Comp-Plan.  The Monthly Loan Officer Commission Reports—the documents showing the commissions calculations for particular MLOs—in part use different terminology.  Even so, as a matter of arithmetic, the Comp-Plans and the Commission Reports function the same—in both, Citizens multiplied loan volume by a basis point figure, then reduced the resulting sum by, among other things, previously-paid hourly pay.  *See, e.g.*, Gramesty September 2014 Commission Report at CITIZENS0004801 (Plaintiffs' Exh. D).  Plaintiffs argue that the Commission Reports' use of the term "draw" bears on the question of when commissions are earned.  This contention is addressed below in section V of this Report.

First, suppose that, in June of 2013, MLO Brown (1) received hourly pay of $11.50, (2) worked no overtime, and (3) closed $2 million in loans.  In July of 2013, MLO Brown would receive commissions for June of $3,160, calculated as follows:

| MLO Brown – Overtime NO, Earned Commissions YES | | | | | |
|---|---|---|---|---|---|
| | **Draw Amount** | **Straight Time Portion of Overtime Pay** | **Offset** | **Gross Commissions**[7] | **Commissions Paid** |
| **Amount** | $1,840 | $0 | $1,840 | $5,000 | **$3,160** |
| **How Calculated** | $11.50/ hour x 40 hours/week x 4 weeks | N/A | Draw Amount (no other adjustments) | $2,000,000 x 25 basis points (.0025) | Gross Commissions ($5,000) - Offset ($1,840) |

---

[7] Gross commissions were calculated using a basis points system—the MLO was credited so many basis points for a particular loan.  One basis point equals 1/100th of a percent.  2013 Comp-Plan at CITIZENS0000671 (docket no. 115, tab D).  The exact basis point figure used to calculate gross commissions for a particular loan varied, based on factors such as the type of loan or an MLO's productivity.  *See, e.g.*, *id.* at CITIZENS0000660, tbl. A.  This Report uses a single, hypothetical 25 basis-point figure to illustrate Citizens' commissions policy.

Now suppose MLO Green had a slower month than MLO Brown; specifically, in June of 2013, Green (1) also received hourly pay of $11.50, (2) also worked no overtime, and (3) closed only $500,000 in loans.  In July of 2013, Green would receive commissions for June calculated as follows:

| MLO Green – Overtime NO, Earned Commissions NO | | | | | |
|---|---|---|---|---|---|
| | **Draw Amount** | **Straight Time Portion of Overtime Pay** | **Offset** | **Gross Commissions** | **Commissions Paid** |
| **Amount** | $1,840 | $0 | $1,840 | $1,250 | **-$590** |
| **How Calculated** | $11.50/ hour x 40 hours x 4 weeks | N/A | Draw Amount (no other adjustments) | $500,000 x 25 basis points (.0025) | Gross Commissions ($1,250) - Offset ($1,840) |

In this example, Green's Gross Commissions did not exceed his Offset amount.  Thus, Green not only did not receive any earned commissions for the month of June, he also incurred a "deficit" of $590.  Under the terms of the Comp-Plan, this $590 deficit "carried over" to July of 2013, and was "aggregated with" the Offset amount in that month.  2013 Comp-Plan at CITIZENS0000671 (docket no. 115, tab D).  In other words, because of this June deficit, Green would begin the month of July $590 "in the hole" on commissions, before he had received any part of his base hourly pay for that month.

Now consider one last example, featuring MLO White.  Like Brown and Green, White received hourly pay of $11.50.  And like Brown, White closed $2 million in loans in June of 2013.  But MLO White worked and reported 20 overtime hours in the same month—five hours in each week.  In July of 2013, White would receive commissions for June calculated as follows:

| MLO White – Overtime YES, Commissions YES | | | | | |
|---|---|---|---|---|---|
| | **Draw Amount** | **Straight Time Portion of Overtime Pay** | **Offset** | **Gross Commissions** | **Commissions Paid** |
| **Amount** | $1,840 | $230 | $2,070 | $5,000 | **$2,930** |
| **How Calculated** | $11.50/ hour x 40 hours/week x 4 weeks | $11.50 (hourly pay rate) x 20 overtime hours worked | Draw Amount ($1,840) + Overtime Pay ($230) | $2,000,000 x 25 basis points (or .0025) | Gross Commissions ($5,000) - Offset ($2,070) |

Notably, even though White worked overtime and Brown did not, at this point in the pay-calculation cycle the two received the same $3,160 in total compensation for closing the same $2 million in loans.  Citizens simply broke this $3,160 down in different ways.  Thus, while Brown received $3,160 in earned commissions and no overtime pay, White received $2,930 in earned commissions and $230 in straight-time overtime pay, for a total of $3,160.[8]

C.    **The Comp-Plans in Operation—Calculating Additional Overtime Pay Attributable To Commissions.**

Having calculated MLO White's commissions, Citizens had to take one final step to close out White's compensation for June of 2013—an additional step Citizens did not need to take with

---

[8]  As explained below, however, under the Comp-Plan Citizens would also pay White: (a) overtime premium pay, meaning the "half" of "time-and-a-half; and (b) additional overtime pay attributable to earned commissions.

15

either Brown or Green, because neither earned both Overtime Pay **and** earned commissions in June.

As with all other MLOs, White received a weekly paycheck during June of 2013.  And as with all other MLOs, the paycheck included $460 in regular pay—forty hours of work compensated at the hourly rate of $11.50.  Because White worked overtime each week, however, her weekly paychecks also included overtime pay of $86.25—five hours of overtime work each week, paid at $17.25 per hour, or 1.5 times the $11.50 hourly rate.  Thus, each week, White received a paycheck for $546.25—her $460 in regular pay, plus her $86.25 in overtime pay.

However, these four weekly paychecks, issued in June of 2013, did not fully compensate White for her overtime.  That is because White earned commissions in addition to an hourly wage—albeit earned commissions that could not be calculated until July of 2013—and Citizens had to factor in those commissions when calculating White's overtime rate.  That is, the $11.50 hourly rate, the basis for the overtime pay included in White's weekly paychecks, did not fully capture White's "regular rate" for purposes of overtime pay.  White was entitled to additional overtime pay, representing her effective hourly wage attributable to earned commissions.  *See* 29 C.F.R. §778.117 ("Commissions . . . are payment for hours worked and must be included in the regular rate" used to calculate overtime pay).

To address this issue, Citizens calculated and paid ***additional*** overtime pay at the same time it calculated earned commissions.  Mathieson depo. at 34 (docket no. 115, tab C).  Continuing the example of MLO White from above, this additional overtime pay was calculated as follows:

16

| MLO White – Additional Overtime Pay Calculation | | |
|---|---|---|
| **Step** | **How Calculated** | **Purpose** |
| Step 1: Allocate Earned Commissions to Work Weeks | $2,930 (earned commissions) ÷ 4 weeks = **$732.50** | Step 1 determines the amount of the MLO's additional hourly pay attributable to earned commissions, per week. |
| Step 2: Determine Additional Regular Rate | $732.50 ÷ 45 hours worked per week = **$16.28** | Step 2 determines the "regular hourly pay rate" attributable to the MLO's earned commissions. |
| Step 3: Determine Additional Overtime Pay | $16.28 x 0.5 (overtime premium) x 5 overtime hours per week x 4 weeks = **$162.80** | Step 3 determines the additional overtime pay owed, attributable to earned commissions. |

*Id.* at 34-35.  Citizens included this additional overtime pay in the MLO's commissions check.  So, in July of 2013, Citizens issued White a check for $3,092.80, the sum of $2,930 in earned commissions, plus $162.80 in additional overtime pay.

The table on the following page recapitulates all of the types of compensation, and the calculations underlying each type, for MLO White related to June of 2013.

| MLO White – Total Compensation for June 2013 | | | |
|---|---|---|---|
| **Compensation Type** | **Method of Calculation** | **Sum Paid** | **Time of Payment** |
| Weekly Paycheck | Hourly Pay: $11.50 x 40 hours/week = $460<br><br>Overtime Pay: $11.50 x 1.5 x 5 hours/week = $86.25<br><br>**$460 + $86.25 = $546.25** | **$546.25** each week<br><br>(equal to **$2,185** for the month) | Friday, June 7<br><br>Friday, June 14<br><br>Friday, June 21<br><br>Friday, June 28 |
| Earned Commissions | Gross Commissions: $2,000,000 x .0025 (25 basis points) = $5,000<br><br>Draw Amount: (Offset) $460/week x 4 weeks = $1,840<br><br>Straight-time Overtime Pay: (Offset) $11.50 x 20 hours = $230<br><br>**$5,000 - $1,840 - $230 = $2,930** | **$2,930** | Friday, July 26 |
| Overtime Attributable to Earned Commissions | Allocate Earned Commissions: $2,930 ÷ 4 weeks = $732.50<br><br>Determine Effective Regular Rate: $732.50 ÷ 45 total hours worked/week = $16.28<br><br>Determine Effective Overtime Pay: $16.28 x 0.5 x 5 overtime hours/week = $40.70<br><br>**$40.70 x 4 weeks = $162.80** | **$162.80** | Friday, July 26 |
| **Total Compensation** | **$5,277.80** | | |

18

### III.    Legal Standards.

Federal Civil Rule 23 permits "[o]ne or more members of a class [to] sue or be sued as representative parties on behalf of all members only if" the requirements of Rule 23(a) are met, alongside at least one of the three elements of Rule 23(b).  Fed. R. Civ. P. 23(a, b).  In addition, a class may be certified only if its members are "ascertainable."  *Hayes v. Wal-Mart Stores, Inc*., 725 F.3d 349, 354 (3rd Cir. 2013).  The party seeking certification—here, Plaintiffs—"must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original); *see also Carrera v. Bayer Corp*., 727 F.3d 300, 306 (3rd Cir. 2013) (explaining the moving party "must affirmatively demonstrate [its] compliance with Rule 23") (quotation marks omitted).

"Factual determinations necessary to make Rule 23 findings must be made by a preponderance of the evidence."  *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d 305, 320 (3rd Cir. 2008).  A court must "resolve all factual or legal disputes relevant to class certification," even if the disputes overlap with the merits of the claims.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3rd Cir. 2012) (quotation marks omitted); *but see Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 133 S.Ct. 1184, 1194-95 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent—*but only to the extent*—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied") (emphasis added).  "Class certification will thus be proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met."  *In re Modafinil Antitrust Litig*., 837 F.3d 238, 249 (3rd Cir. 2016) (quotation marks omitted). "Because the class action determination affects the rights of class members not before the court, as well as

named plaintiffs and defendants, it is not sufficient that plaintiffs make an uncontested motion for a class determination." *Davis v. Romney*, 490 F.2d 1360, 1366 (3rd Cir. 1974).

A trial court should not consider Rule 23's requirements in the abstract; rather, the court must "examine the elements of [a] plaintiff['s] claim through the prism of Rule 23." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311 (quotation marks omitted). The elements of the Recapture Claims are as follows.

Count I of the Amended Complaint alleges Citizens failed to pay Plaintiffs for all overtime worked in violation of the FLSA. Thus, this claim requires proof that a plaintiff worked more than forty hours in a given week, but was not compensated at one-and-a-half times their regular rate of pay for all or part of this overtime work; and, further, that Citizens knew or should have known the overtime work was being performed. *See Brown v. Scriptpro, LLC*, 700 F.3d 1222, 1230 (10th Cir. 2012) ("To succeed on an FLSA claim for unpaid overtime, the plaintiff has the burden of proving that he performed work for which he was not properly compensated."); *Reich v. Dep't of Conservation & Nat. Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (setting out the elements of a FLSA overtime claim); *see also* 29 U.S.C. §207(a)(1). Count II alleges Citizens failed to pay Plaintiffs the federal minimum wage of $7.25 for each hour worked. *See* 29 U.S.C. §206(a)(1)(C). Because Plaintiffs seek three years' worth of damages in both Counts, they must prove the alleged FLSA violations were "willful." *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-35 (1988) ("Ordinary violations of the FLSA are subject to the general 2-year statute of limitations. To obtain the benefit of the 3-year exception, the [plaintiff] must prove that the employer's conduct was willful," meaning, "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute").

Counts III-VI and VIII-XIII are Plaintiffs' State-law wage-and-hour claims.  The parties agree these claims are analogous to the FLSA claims.  *See* Citizens summary judgment motion at 35, n.3 (docket no. 116); Plaintiffs' summary judgment motion at 20 (docket no. 107).  Thus, each of these Counts requires proof of the following facts: each plaintiff worked more than forty hours in a given week, and was not compensated at one-and-a-half times their regular rate of pay for all or part of this work (for the overtime component of these claims); and each Plaintiff was not paid the relevant State minimum wage for each hour worked (for the minimum wage component of these claims).

Finally, Counts III-VII and IX-XIII are Plaintiffs' wage payment claims.  These claims simply require proof that Plaintiffs were not paid all earned compensation.  *See, e.g.*, *Braun v. Wal-Mart Stores, Inc*., 24 A.3d 875, 954 (Pa. Super. Ct. 2011).

In contrast to Plaintiffs' State-law Recapture Claims summarized immediately above, class treatment of which is governed by Fed. R. Civ. P. 23, federal-law claims brought under the FLSA are subject to a different "certification" standard.

> [T]o certify an FLSA collective action for trial, the District Court—after considering the claims and defenses of the parties and all the relevant evidence—must make a finding of fact that the members of the collective action are "similarly situated." The burden of demonstrating that members of the collective action are similarly situated is to be borne by the plaintiffs, who must show by a preponderance of the evidence that they are similarly situated.

*Zavala v. Wal-Mart Stores Inc*., 691 F.3d 527, 534 (3rd Cir. 2012).  "Being similarly situated means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA."  *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 85 (3rd Cir. 2017) (quotation marks omitted).  Moreover, in deciding whether employees are "similarly situated," a district court should ask whether the employees worked in the same department or location, advance

similar claims seeking substantially the same relief, have similar "circumstances of employment," or assert claims that are subject to individualized defenses. *Id.* (quotation marks omitted).

While not specifically addressed by the Third Circuit, courts elsewhere dispute whether the certification standards under Rule 23 and the FLSA are meaningfully different in application. *Compare O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 584-85 (6th Cir. 2009) (stating the standard applicable to certification under Rule 23 is more stringent than the standard applicable under the FLSA), *overruled on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 669 (2016); *with Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001) (rejecting use of an FLSA certification standard modeled on Rule 23, but stating "there is little difference in" an approach based on Rule 23 versus a more flexible "ad hoc" standard), *and Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 n.12 (11th Cir. 1996) (stating the FLSA certification standard is "independent of, and unrelated to, the requirements for a class action under Rule 23"), *and Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 772 (7th Cir. 2013) ("the case law has largely merged the [FLSA and Rule 23] standards, though with some terminological differences"). Below, this Report applies each of the certification standards separately, according to their own terms.

Finally, under Federal Civil Rule 56, summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The Court must draw "all reasonable inferences" in the non-moving party's "favor when considering the evidence." *In re Fosamax Alendronate Sodium Prods. Liab. Litig.*, 852 F.3d 268, 295 (3rd Cir. 2017). But:

> although the non-moving party receives the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the non-moving party must point to some evidence in the record that creates a genuine issue of material fact [once the movant carries its initial burden]. In this respect, summary judgment is

22

essentially "put up or shut up" time for the non-moving party: it must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.

*NAACP v. City of Phila.*, 834 F.3d 435, 440 (3ʳᵈ Cir. 2016).

## IV.    Analysis—Class Certification.

As noted above, Plaintiffs seek to certify for trial a collective of Plaintiffs asserting FLSA Recapture Claims, as well as State-specific classes asserting State-law Recapture Claims. Citizens does not oppose either request. *See* Citizens' certification response at 14 n.6 (docket no. 125); *see generally* Citizens' decertification motion (discussing only the Off-the-Clock Claims); Plaintiffs' decertification response at 32 (docket no. 128) (noting Citizens did not "move for decertification" with respect to the Recapture Claims). However, a court may not grant class certification solely because a motion requesting class treatment is unopposed, *see Davis*, 490 F.2d at 1366, and Plaintiffs bear the burden to show, as a matter of fact, that MLOs are similarly-situated with respect to the Recapture Claims, *see Zavala*, 691 F.3d at 534. Thus, this Report considers first the Rule 23 factors, followed by certification under the FLSA.

### A.    Rule 23 Certification—Overview.

Plaintiffs seek certification of ten State-specific classes. To warrant certification of these classes, Plaintiffs must affirmatively show, by a preponderance of the evidence, that the classes they seek to lead are ascertainable. Plaintiffs must then satisfy Rule 23(a) by showing that the proposed classes: (1) are sufficiently numerous, (2) raise common questions of fact or law, (3) are led by named Plaintiffs who assert claims that are typical of those possessed by absent class members, and

23

(4) are led by named Plaintiffs who can adequately represent the interests of absent class members. Finally, Plaintiffs must satisfy at least one provision of Rule 23(b). Here, Plaintiffs assert they satisfy both Rule 23(b)(2)—which requires that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole"—and also 23(b)(3)—which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

### B.    Ascertainability and the Rule 23(a) Factors.

As a threshold matter, Plaintiffs "must show by a preponderance of the evidence that there is a reliable and administratively feasible method for ascertaining the class." *Hayes*, 725 F.3d at 356. This ascertainability requirement ensures that proceedings post-certification will be administratively feasible, that the class notice required under Federal Civil Rule 23(e) can be sent to identifiable class members, and that the defendant receives the benefit of final classwide judgment resolving the claims of identifiable plaintiffs. *See Marcus*, 687 F.3d at 593. This requirement is satisfied here, because Class members have already been identified by Citizens as part of the collective action notice process. *See* Opt-in Notice List (Ex. 8 to Etter Decl.) (docket no. 112-1).

Numerosity also exists for each of the ten State-specific classes. Federal Civil Rule 23(a)(1) requires numerosity, meaning the Court must find "the class is so numerous that joinder of all members is impracticable." "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226-27

(3rd Cir. 2001). Here, the ten State-specific classes range in size from 42 members (the New Hampshire class) to 232 members (the New York class). *See* Daeun Kim decl. at 1, ¶3 (Plaintiffs' exhibit 1-KK). Accordingly, the Court should conclude Plaintiffs have met the numerosity requirement of Rule 23(a)(1).

Next, Rule 23(a)(2) permits a representative plaintiff to lead a certified class if "there are questions of law or fact common to the class." "[T]hat bar is not a high one;" it requires identification of only one common question. *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3rd Cir. 2013). This single, common question must be capable of "generat[ing] common ***answers*** apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (quotation marks omitted) (emphasis in original). "[A]s long as all putative class members were subjected to the same harmful conduct by the defendant, Rule 23(a) will endure many legal and factual differences among the putative class members." *In re Community Bank of N. Va. Mortg. Lending Practices Litig., PNC Bank NA*, 795 F.3d 380, 397 (3rd Cir. 2015).

As to the Recapture Claims, the overriding question is: Under the Comp-Plans, when did the MLOs "earn" their commissions? Did they earn commissions ***before*** Citizens subtracted from Gross Commissions, as "Offsets," the MLO's base compensation and the straight portion of the first five hours of reported overtime; or did they earn commissions ***only after*** Citizens subtracted these Offsets from Gross Commissions? If the former, then Citizens recaptured already-earned compensation illegally; if the latter, then Plaintiffs' Recapture claims fail. All of the named Plaintiffs and each class member pose this question in common, because Citizens calculated commissions for all MLOs according to the same Comp-Plans in the same way since at least 2012. The answer to this question determines for every MLO whether Citizens failed to pay the minimum

wage or the proper amount of overtime, and thus will "drive the resolution of the litigation" for all MLOs. *Dukes*, 564 U.S. at 350. For this reason, the Court should hold that Plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

For similar reasons, the claims of the named Plaintiffs are "typical of the claims . . . of the class[es]." Federal Civil Rule 23(a)(3). Under this "typicality" requirement, "[i]f a plaintiff's claim arises from the same event, practice or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class." *Marcus*, 687 F.3d at 598. Again, the focus of both the named Plaintiffs' and all other class members' Recapture Claims is the Comp-Plan—how it operated, and how it and other relevant documents defined every MLOs' entitlement to commissions. All MLOs advance the same theory for why Citizens' commissions policy deprived them of earned compensation. Accordingly, the Court should find Plaintiffs have met the typicality requirement of Rule 23(a)(3).

Finally, a proposed class action may only be certified if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). A court must find that "the putative named plaintiff has the ability and the incentive to represent the claims of the class vigorously, and that there is no conflict between the individual's claims and those asserted on behalf of the class." *In re Community Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 622 F.3d 275, 291 (3rd Cir. 2010) (quotation marks omitted). Whether considered under the rubric of "adequacy," or separately under Rule 23(g), certification also depends on the qualifications of proposed class counsel. *See id.* at 292-93. The adequacy requirement asks whether the interests and incentives of the named plaintiffs are aligned with those of the class. *Dewey v.*

26

*Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3rd Cir. 2012).   Here, those incentives are aligned, because the showing required to prove the named Plaintiffs' own Recapture Claims is the same showing required to prove the class claims.   Moreover, no conflicts between the named Plaintiffs and class members are apparent in the record.

Moreover, the named Plaintiffs and the class are represented by counsel who are certainly adequate to the task of representing the classes.   Proposed class counsel have extensive experience litigating hybrid wage-and-hour actions.   *See* Boyette & Swidler declarations (docket no. 121-1) (listing prior class and collective action representations).   As such, counsel are both experienced in, and have knowledge regarding, the claims asserted here.   *See* Federal Civil Rule 23(g)(1)(A)(ii)-(iii). Counsel have already expended significant resources, including attorney time, in the fairly extensive discovery conducted in this case and in identifying the legal issues at play in this matter.   *See id.* 23(g)(1)(A)(i)-(iv); *see also Bland v. PNC Bank, NA.*, Case No. 2:15-CV-01042-AJS, docket no. 307 at 30, n.21 (W.D. Pa.) (Report and Recommendation) (in a similar hybrid wage-and-hour action involving mortgage loan officers, recommending the Court deem plaintiffs' counsel in this matter qualified as class counsel).

In sum, the Court should conclude Plaintiffs have met all the requirements of Rule 23(a), and that proposed class counsel satisfy the requirements of Rule 23(g).

### C.      Rule 23(b)(3) Factors.

#### 1.      Predominance.

Plaintiffs seek certification of each of the ten State-specific classes under Rule 23(b)(3).   This requires the Court to find "that the questions of law or fact common to class members predominate

over any questions affecting only individual members." *Id.* "This predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Marcus*, 687 F.3d at 600 (quotation marks omitted). "[T]he predominance criterion is far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997). Third Circuit "precedent provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3rd Cir. 2011).

Predominance must be assessed in the context of the elements of the causes of action that a plaintiff asks to have certified. *See Marcus*, 687 F.3d at 600 ("A plaintiff must demonstrate that the element of the legal claim is capable of proof at trial through evidence that is common to the class rather than individual to its members.") (quotation marks omitted). "[T]he nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *Neale*, 794 F.3d at 371 (quotation marks omitted). Because the focus of the predominance inquiry is the evidence that will be used to prove claims at trial, the Court thus must make a "prediction as to how specific issues will play out." *Id.* (quotation marks omitted).

The Court's prediction, however, does ***not*** include foretelling whether Plaintiffs will prevail on the merits of their claims. Predominance requires only "a showing that ***questions*** common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc.*, 133 S.Ct. at 1191 (emphasis in original). And even in the presence of some individual questions, a district court retains discretion to certify a class; predominance is a "qualitative" measure, not simply a nose-counting exercise. *Neale*, 794 F.3d at 371; *but see In re Linerboard*

*Antitrust Litig.*, 305 F.3d 145, 156 (3rd Cir. 2002) (explaining class certification is inappropriate if an essential element of a claim requires individualized proof).

Here, common questions of fact and law clearly predominate over individual questions. The basic premise of all of Plaintiffs' Recapture Claims is that commissions were earned under the Comp-Plans ***prior to*** when Citizens reduced this earned amount by previously-paid hourly wages and the straight portion of the first five hours of overtime reported in a workweek. The various alleged statutory violations flow directly from this premise.

Thus, with regard to Plaintiffs' ***minimum wage claims*** asserted under the FLSA and analogous State wage-and-hour laws, Plaintiffs allege Citizens did not pay any wage whatsoever, because its practice of deducting hourly pay from earned commissions meant an MLO's hourly wage was not paid "free and clear;" rather, it was "subject to recall," when Citizens withheld a portion of earned commissions. Plaintiffs' certification motion at 7 (docket no. 118).[9]

Similarly, Plaintiffs' ***overtime claims***, asserted under the FLSA and analogous State wage-and-hour laws, posit that Citizens evaded the overtime requirement at each step of the two-step overtime calculation described above. At step one, Citizens paid overtime, based on the hourly rate of $11.50, but subsequently deducted portions of this payment from earned commissions. *See id.* at 6-7. And at step two, Citizens' calculation of the additional overtime attributable to commissions was not based on ***earned*** commissions, but rather the lower amount of ***paid*** commissions. *See* Plaintiffs' summary judgment response at 8-9 (docket no. 127) (arguing Citizens violated applicable

---

[9] Using MLO Brown's example on page 13, Plaintiffs assert Citizens paid $1,840 in hourly wages to Brown but then "clawed it back" in the form of an Offset, when it calculated Brown's commissions. Plaintiffs insist this tactic ultimately yielded Brown an hourly wage of zero, and not the $11.50 Brown was promised.

law at step two because the calculation was based on "dividing the employee's **paid** commissions, and not earned commissions, by the number of hours worked during the month to determine the additional regular rate to which overtime premiums were due.") (emphasis in original).[10]

Finally, Plaintiffs' State **wage payment** claims allege Citizens unlawfully reduced already-earned commissions by previously-paid wages and a portion of overtime—which are deductions not authorized by any of the relevant State statutes, and which resulted in Plaintiffs not receiving all earned compensation. *See* Plaintiffs' certification motion at 7 (docket no. 118).

Thus, to prevail on their Recapture Claims, Plaintiffs must establish that commissions were earned **prior to** when Citizens reduced Gross Commissions by previously-paid hourly wages and the straight portion of the first five hours of overtime reported in a workweek.  As proof of this entitlement, Plaintiffs point to the terms of the uniformly-applicable Comp-Plans, the content of uniformly-formatted Monthly Loan Officer Commission Reports, the offer letters, and the testimony of Citizens' corporate deponent, all of which is proof common to the Class. *See* Plaintiffs' summary judgment motion at 11-12 (docket no. 107).  This common evidence enables the Court or a fact finder to determine, on a class-wide basis, when MLO's commissions were earned.

Of course, individual questions are part of Plaintiffs' Recapture Claims as well—principally, each MLO's alleged damages.  Even so, the Court should find that individualized questions do not predominate.  If Plaintiffs prevail on their liability theory, individual damage amounts would be determined through fairly routine mathematical calculations. *Cf. Bell Atl. Corp. v. AT&T Corp.*, 339

---

[10]   Using MLO Brown's example on page 13, Plaintiffs assert Citizens should have calculated additional overtime based on gross commissions of $5,000 (25 basis points on $2,000,000 in loans that closed and funded in June of 2013), not commissions paid of $2,930 ($5,000 minus hourly pay and straight-portion overtime received in June of 2013).  Plaintiffs' method yields $277.80 in additional overtime, rather than the $162.80 figure produced by Citizens' calculation.

F.3d 294, 307 (5th Cir. 2003) (explaining "[c]lass treatment, . . . may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation"). In this case, individualized damages questions would not overwhelm common questions.

Thus, the Court should find the predominance requirement is satisfied for each State-specific class's Recapture Claims.

### 2.      Superiority.

In addition to requiring predominance, Rule 23(b)(3) permits a class action only if "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." In deciding this "superiority" requirement, a court should consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

*Id.* "[T]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *In re NFL Players Concussion Injury Litig.*, 821 F.3d 410, 434 (3rd Cir. 2016) (quotation marks omitted).

Weighing these factors here, a class action is superior to alternative available forms of adjudication. First, individual MLOs are unlikely to pursue a lawsuit on their own, outside of a class action. The per-Plaintiff recovery for the Recapture Claims appears modest, at most equal to the attorney time and costs required to litigate individual claims to judgment. *See Altnor v. Preferred Freezer Servs.*, 197 F. Supp.3d 746, 758 (E.D. Pa. 2016) (as to low-value claims, "it is unlikely that,

absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action," which weighs in favor of finding a class action superior to its alternatives) (quotation marks omitted). Second, the parties have not pointed to any litigation pending in another court that concerns the same subject matter as the Recapture Claims. Third, it makes sense to "concentrat[e] the litigation of the claims" in this Court because: (1) the Court has experience presiding over cases asserting substantially the same claims but involving different parties, *see Bland v. PNC Bank, NA.*, Case Nos. 2:15-CV-01042-AJS (W.D. Pa.); and (2) absent certification, dozens of MLOs could file repetitive, individual suits throughout the country. Moreover, it is more efficient to concentrate litigation of the two halves of the Recapture Claims in the same court—the federal claims that may only be certified under 29 U.S.C. §216(b), and the State claims that may only be certified under Rule 23. Fourth and finally, the undersigned agrees with the parties that the Recapture Claims pose pure questions of law. Thus, no manageability concerns counsel against certification.

In sum, because common questions of fact and law predominate over individual questions, and because a class action is superior to other procedural methods for adjudicating the Recapture Claims, the Court should conclude that Plaintiffs satisfy Rule 23(b)(3).

### D.    Rule 23(b)(2) Factors.

Plaintiffs additionally seek certification of the ten State-specific classes under Federal Civil Rule 23(b)(2), which permits a class action where "Rule 23(a) is satisfied and . . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole."  Plaintiffs' request is limited to the declaratory and injunctive relief components of their claims.  *See* Plaintiffs' certification motion at 52; *see also* Amended complaint at 49 (docket no. 85) (prayer for relief item B); *Dukes*, 564 U.S. at 363 (noting a Rule 23(b)(2) class cannot predominately seek money damages due to the lack of an opt-out right).  Citizens does not oppose certification of the Recapture Claims under Rule 23(b)(2).  *See* Citizens' certification response at 14 n.6 (docket no. 125); *see also id*. at 36-37 (opposing Rule 23(b)(2) certification of the "off-the-clock claims" only).

To merit Rule 23(b)(2) certification, the class must be sufficiently cohesive.  The injuries to be remedied by classwide relief must be group injuries, and the class must be bound together by some significant common trait.  *Barnes v. American Tobacco Co.*, 161 F.3d 127, 143, n.18 (3d Cir. Pa. 1998).  "Cohesiveness" generally exists where class members are subject to a uniform policy challenged as unlawful.  *See, e.g.*, *Clarke v. Lane*, 267 F.R.D. 180, 199 (E.D. Pa. 2010).  This case fits that rule—the allegedly unlawful policy, contained in the Comp-Plans, applied to all class members, and that policy "can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Gates v. Rhom and Haas Co.*, 655 F.3d 255, 264 (3rd Cir. 2011) (quotation marks omitted).

Accordingly, the Court should also certify Plaintiffs' Recapture Claims pursuant to Federal Civil Rule 23(b)(2), to the extent the claims seek injunctive or declaratory relief.

**E.    Certification Under the FLSA.**

Class certification of the Recapture Claims pursuant to Rule 23 pertains only to Plaintiffs' State-law claims.  Plaintiffs' federal claims are subject to certification under the FLSA itself, rather than Rule 23.  *See* 29 U.S.C. §216(b).  And to win certification under this standard, the named

Plaintiffs must show they are "similarly situated" to the opt-in Plaintiffs. *Id.* The named Plaintiffs have made this showing, and once again, Citizens does not oppose final certification as to the Recapture Claims.

"Being similarly situated . . . means that one is subjected to some common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Zavala*, 691 F.3d at 538. By contrast, if "[l]iability and damages still need to be individually proven," despite the existence of a common practice, certification under the FLSA may be inappropriate. *Id.*; *see also Halle v. W. Penn Allegheny Health Sys.*, 842 F.3d 215, 226 (3rd Cir. 2016) (listing other factors potentially relevant to a similarly-situated finding).

Here, the "common employer practice" that binds together named Plaintiffs and the opt-in plaintiffs is Citizens' Comp-Plans. Plaintiffs have one reading of the Comp-Plans and related documents—commissions were earned ***prior*** to the application of Offsets—while Citizens has a different reading—commissions were earned only ***after*** application of Offsets. Once it is determined which of these two readings is correct, liability as to Plaintiffs' FLSA claims will be resolved, one way or the other. Thus, the named Plaintiffs and the opt-in Plaintiffs "advance similar claims," "seek substantially the same form of relief," and have "similar . . . circumstances of employment." *Zavala*, 691 F.3d at 537.

The only differences amongst MLOs relevant to the Recapture Claims is damages—some MLOs were more productive than others in closing loans, and some MLOs reported more overtime than others. Still, as explained above, damages for the Recapture Claims are amenable to formulaic calculation and thus do not render unmanageable litigation of the FLSA Recapture Claims through a collective action. *See Karlo*, 849 F.3d at 86 (noting the need for individualized "damage

calculations does not vitiate automatically the collective action," and explaining district courts have broad discretion to decide whether the need for such calculations renders a collective action unmanageable) (quotation marks omitted).

Finally, there are no individualized defenses that render named Plaintiffs and the opt-in Plaintiffs "dissimilar." *Zavala*, 691 F.3d at 537. The predominant defense advanced by Citizens is a common defense—according to Citizens, there were no "earned" commissions for any MLO until all steps of the commission calculation process set forth in the Comp-Plan were applied.

Accordingly, the Court should deem the named Plaintiffs and the opt-in Plaintiffs "similarly situated" with respect to the FLSA Recapture Claims, and finally certify these claims pursuant to 29 U.S.C. §216(b).

## V.    Analysis – Summary Judgment.

The Special Master now turns to the key question that undergirds the Recapture Claims—when were commissions *earned*? The parties agree there is no genuine dispute of material fact on this question. *See* Plaintiffs' summary judgment response at 5 (docket no. 127) ("each [Recapture] claim for which Defendants seek summary judgment is a pure legal issue, and thus, no material factual disputes exist, and Plaintiffs agree [with Citizens] that this Court should issue a decision adjudicating the claims.").

For the reasons noted below, the undersigned also agrees—there are no facts that need resolution by a jury before the essential legal question of when commissions were earned may be answered. And the answer to that question is found in the plain language of the Comp-Plans.

This language supports Citizens' view that commissions were not "earned" until *after*

previously-paid hourly wages and the straight portion of the first five hours of overtime pay were subtracted as Offsets from Gross Commissions. This conclusion defeats each one of the Recapture Claims. Accordingly, as explained below, this Court should grant summary judgment in Citizens' favor as to all Recapture Claims.

### A.      Gross Commissions Are Not Earned Compensation.

The summary judgment analysis begins with the language of the Comp-Plan. The Comp-Plans makes clear two aspects of the MLOs' entitlement to compensation.

First, the Comp-Plans state that MLOs "will be paid, separate from this Plan, an agreed upon amount as base guaranteed compensation." As Plaintiffs do not dispute, and as the 2016 Comp-Plan made clear, this "base guaranteed compensation" was the $11.50 per hour specified in the MLOs' offer letters. *See* 2016 Comp-Plan at CITIZENS0016091 (docket no. 115, tab D) ("Participants will be paid base compensation as specified in their offer letters, previous agreements or as otherwise agreed upon in writing.").

The Comp-Plans call this base guaranteed compensation a "Draw Amount," and specify that "[a]t no time will a Participant receive less than the Draw Amount." 2013 Comp-Plan at CITIZENS0000660 (docket no. 115, tab D). There is no dispute that this in fact occurred—the record shows that Citizens always processed its weekly payroll for MLOs at the $11.50 per hour figure, and always paid MLOs by direct deposit or otherwise. *See* Plaintiffs response to Citizens' SOF at 5, ¶10 (docket no. 127-2) (collecting named Plaintiff pay records). Plaintiffs do not allege any MLO was ever required to subsequently return back to Citizens any paid amount already received—for example, by cutting Citizens a check for the same amount. Even MLOs who were

"in the hole" when they left their employment were not required to return any previously-paid compensation payment.

Second, the Comp-Plans make clear that an MLO did not earn commissions until ***after*** the "Draw Amount" and other applicable "Offsets" had been subtracted from "Gross Commissions." Again and again, the Comp-Plans reiterate this principle:

- "The Draw Amount in its entirety shall be offset against Gross Commissions ***prior*** to a Participant ***earning*** any incentive under this Plan." 2013 Comp-Plan at CITIZENS0000660 (docket no. 115, tab D) (emphasis added).

- "All incentives under this Plan are calculated pursuant to the specifics of and the general provisions of this Plan. In any calculation, the incentive ***is not earned*** until the end of the appropriate Performance Period and if applicable, the Reconciliation Period and until all conditions have been and ***adjustments made as specified in the Plan have been made***." *Id.* at CITIZENS0000665 (emphasis added).

- "Subject to the specific requirements of the Plan, an incentive is ***deemed earned if***, prior to either the applicable Payout Date [or the employee's termination or resignation, whichever came first,] . . . "all dollar adjustments and Offsets, when applicable, to Gross Commission and/or Basis Point adjustments to the incentive have been made." *Id.* (emphasis added).

- "In the calculation of any incentive under this Plan specified items will be used in calculating the award and ***operate as Offsets to the maximum available incentive in determining the ultimate award earned***. As applicable, such Offsets include but are not limited to uncollected fees, Draw Amounts" and other amounts. "In the calculation of any incentive compensation under this Plan the following conditions"—including (for example) rules against falsifying information in the course of selling a loan—"and ***applicable adjustments to Gross Commissions will be made prior to any incentive being earned***." *Id.* at CITIZENS0000665-666 (emphases added).

Ultimately, the Comp-Plans set forth a commissions computation framework consistent with the rule that commissions are earned only after the Offsets set forth in the Comp-Plans have been deducted, and example calculations included in the Comp-Plan showed how this framework

operated. *See, e.g.*, *id.* at CITIZENS0000667-668. This framework begins with "Gross Commissions," the "raw maximum amount of the incentive prior to calculation of applicable adjustments provided for in the Plan." *Id.* at CITIZENS0000671. Gross Commissions are calculated by multiplying loan volume by a particular basis point figure. *Id.* at CITIZENS0000667-668. Then, Citizens deducts two principal figures from Gross Commissions (though there are many other Offsets). First, Citizens subtracts from Gross Commissions the "Draw Amount," which is

> [b]ase compensation amounts, whether provided as salary or hourly earnings, up to 45 hours per week at one times the Participant's hourly rate, which are guaranteed and earned but used as an Offset against Gross Commissions in determining the earned incentive. Draw Amounts may be carried over from [month] to [month] and may be aggregated with other Offsets or Advances where such amounts exceed any earned incentive.

*Id.* at CITIZENS0000671. Second, the Comp-Plans deduct from Gross Commissions any other "Offsets," which are "adjustment[s] to Gross Commissions which results in the reduction of incentive calculation *prior to any incentive being earned*." *Id.* (emphasis added).

Applying these terms, all of the example calculations in the Comp-Plans: (1) show an amount of Gross Commissions, calculated based on loan volume and a basis point figure; (2) then deduct from that sum the Draw Amount and other applicable Offsets, resulting in "Total Earned Commissions." *Id.* at CITIZENS0000668. Accordingly, as a matter of law and undisputed fact, the Comp-Plans provide that commissions are earned only *after* previously-paid hourly wages and the straight-time portion of the first five hours of overtime pay are deducted from Gross Commissions.

Plaintiffs offer several arguments to the contrary, but none have merit. First, Plaintiffs assert baldly and repeatedly that (for example) MLOs were paid an hourly wage, but such hourly wage was deducted "from gross commissions *earned* by the MLOs in subsequent pay periods." Plaintiffs' summary judgment motion at 13 (docket no. 107) (emphasis added). Similarly, Plaintiffs insist

Citizens "deducted from **earned** commissions an amount equal to 2/3 of the previously paid overtime for the first 5 hours of overtime in addition to the hourly wages for 40 hours per workweek."  Plaintiffs' summary judgment response at 8 (docket no. 127) (emphasis added).  But the sums from which these deductions were made were "Gross Commissions," as Plaintiffs themselves recognize.  In the face of detailed Comp-Plan language stating "Gross Commissions" are **not** earned compensation, it does not suffice to simply state the contrary.  *See City of Phila.*, 834 F.3d at 440 (explaining that at summary judgment it is "'put up or shut up' time for the non-moving party," who "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.").  Indeed, Plaintiffs do not specifically grapple with any of the detailed Comp-Plan language noted above in either their Motion for Partial Summary Judgment or their Response to Citizens' Cross-motion.  Plaintiffs simply proclaim that all of Gross Commissions are "earned," even though the Comp-Plans clearly state otherwise.

Second, citing the deposition testimony of Citizens' 30(b)(6) deponent, Plaintiffs assert that, "[w]hile Citizens claims in offer letters that MLOs receive [] wages plus commission, Citizens claws back all amounts paid as hourly wages up to forty-five (45) in a workweek from gross commissions otherwise due to an MLO."  Plaintiffs' summary judgment motion at 11 (docket no. 107).  Further, Plaintiffs state the same witness testified MLOs were not paid a wage but rather only a draw.  *Id.* at 15.  The cited testimony, however, is entirely consistent with the Comp-Plans, and the Comp-Plans provide that: (1) hourly wages are guaranteed earned compensation when paid; but (2) Gross Commissions are **calculated** as a step in the process of determining the amount of commissions earned and paid—Gross Commissions are not earned or guaranteed.

Third, Plaintiffs say their "offer letters describe the compensation package to include an

hourly wage of $11.50.  However, the hourly wage is **deducted** from gross commissions **earned** by the MLOs in subsequent pay periods." *Id.* at 13 (second emphasis added) (internal citation omitted). But the offer letters do not state Gross Commissions are "earned" compensation. To the contrary, the offer letters simply reiterate the Comp-Plan framework, explaining that, after a "Commission Advance Period, your weekly pay will be an offset to your monthly gross commission up to 45 hours per week at one times your hourly rate.  Overtime earnings and all hours worked over and above 45 per week are not gross commission offsets."  Reining offer letter at CITIZENS0000006 (docket no. 115, tab A).  Plaintiffs persist in calling gross commissions "gross commissions **earned**," even though the Comp-Plans make clear they are not.  Plaintiffs' summary judgment motion at 13 (docket no. 107).

Fourth, in their Response to Citizens' Concise Statement of Facts, Plaintiffs "deny that the [Comp-Plan] authorizes deductions of previously paid wages and overtime from commissions when commissions do not exceed the threshold.  Instead, ***the document provides that commissions are earned once 'loan production' exceeds the salary and previously paid overtime***."  Plaintiffs' response to Citizens' SOF at 3, ¶5 (docket no. 127-2) (emphasis added).  In support, however, Plaintiffs do not cite to a particular page of a particular Comp-Plan, but rather to the entire 2013 Comp-Plan.  The undersigned has reviewed that document word-by-word, and the phrase "loan production" does not appear anywhere in the 2013 Comp-Plan, much less in the context asserted by Plaintiffs.

Fifth, Plaintiffs note that the Monthly Loan Officer Reports characterize each weekly paycheck as a "Draw Against Commission," and call the total of these amounts the "Draw Total." *See, e.g.*, November 2014 Soda Commission Report at CITIZENS0000506 (Plaintiffs' Exhibit 1-D).

40

Plaintiffs then state, "[t]hat amount is then deducted from the gross commissions *earned* by the MLO prior to paying the MLO any of their commission." Plaintiffs' summary judgment motion at 11-12 (docket no. 107) (emphasis added); *see also id.* at 16 ("Additionally, while Citizens may try to mince terminology to argue that it paid an hourly wage, it is notable that the mortgage earnings statements which show the mortgage commission calculations refer to 'wages' as a 'Draw Against Commission'"). This designation in the Monthly Loan Officer Reports is consistent with the Comp-Plan, which identified the Draw Amount as guaranteed minimum compensation, while also repeatedly stating that commissions are not earned until all steps in the commissions calculation process have been completed. Calling hourly wages a "draw" in the Monthly Loan Officer Reports is not evidence contradicting the terms of the Comp-Plans.

Citizens has carried its initial burden of showing there is no dispute of material fact regarding when commissions became "earned," and Plaintiffs offer nothing that rebuts that showing.

### B.    Because Gross Commissions Are Not Earned Compensation, Each of the Recapture Claims Fails.

With this recommended conclusion that MLOs earned commissions only after Citizens deducted the Draw Amount and other applicable Offsets from Gross Commissions, each of the three categories of Recapture Claims necessarily fails.

*First*, Plaintiffs base their minimum wage claims—both federal and State—on the theory that Citizens did not pay hourly wages "free and clear," because "the hourly wage [was] *deducted* from gross commissions *earned* by the MLOs in subsequent pay periods." Plaintiffs' summary judgment motion at 13 (docket no. 107) (second emphasis added); *see also* 29 C.F.R. § 531.35 (wages are not "paid" for purposes of the FLSA unless paid "free and clear"). "Thus," according to Plaintiffs, "the

41

entire salary was 'kicked back' to Citizens, in violation of the minimum wage requirements of the FLSA" and State law.  Plaintiffs' summary judgment motion at 13 (docket no. 107).[11]  But Gross Commissions were not earned compensation, so Citizens' subtraction of the Draw Amount (*i.e.*, hourly wages) from that sum as a step in its earned-commission-calculation-process does not mean that hourly wages were initially paid with "strings attached," or were required to be "repaid" in subsequent months through the reduction of a commission that an MLO had already "earned." Every MLO was paid an hourly wage and never had to repay that hourly wage.  That Citizens used that same hourly wage as an Offset when calculating earned commissions does not change this fact, nor create a genuine dispute.  Moreover, there is no dispute that Plaintiffs actually received in hourly pay every week more than any of the applicable minimum wage rates, federal or State.[12]

Plaintiffs' cited case law does not change this conclusion.  *Perez v. Westchester Foreign Autos, Inc.*, 2013 WL 749497 (S.D.N.Y. Feb. 28, 2013), concerns a car dealership's use of a "salary plus commissions" pay framework.  The employer nominally paid its sales consultants $300 per week, and nominally paid its sales managers $800 each week.  Only a portion of this compensation was guaranteed: sales consultants (for example) received $150 per week in guaranteed compensation, and the remaining $150 consisted of either earned commissions or a draw against future earned commissions.  Thus, in one week , "Perez was paid $150 in salary, plus $61.54 in commissions, plus $88.46 as a draw, totaling the weekly minimum of $300."  *Id.* at *2.  The court

---

[11]  Referring back to the example of MLO Brown on page 13, Plaintiffs' theory is that the $1,840 Offset means that Brown did not receive her wages "free and clear."

[12]  The federal minimum wage was $7.25 per hour during the relevant time period, and the applicable State minimum wages ranged from $7.25 per hour to $10.00 per hour.  *See* Citizens' response to motion for summary judgment at 11 (docket no. 126).

counted only the first $150 of this pay as having been paid free and clear; draws on commissions were kicked back to the employer from earned commissions in subsequent pay periods. *See id.* at *3-4. In this case, however, Plaintiffs were at all times paid more than any applicable minimum wage. No portion of this hourly wage pay was "kicked back" to Citizens, because the "Draw Amount" was not an Offset to ***earned*** commissions. Thus, contrary to Plaintiffs' assertions, hourly pay did not "operate as a draw" even if it was labeled as such in the Comp-Plans. Plaintiffs' summary judgment motion at 15 (docket no. 107). And *Tackas v. A.G. Edwards & Sons, Inc.* 444 F Supp. 2d 1100 (S.D. Cal. 2006), is likewise inapt. There, the court found the defendant's use of a "draw deduction" was an "impermissible offset that is taken from Plaintiffs' guaranteed salary" and not (as in this case) "a variable [used] in the calculation of commissions paid." *Id.* at 1110.[13]

***Second***, Plaintiffs' overtime Recapture Claims—again, both federal and State—allege that Citizens evaded paying time-and-a-half for overtime, in two ways. Plaintiffs first say Citizens skirted applicable law by nominally paying time-and-a-half for reported overtime, but then reducing

---

[13] Similarly, Plaintiffs state that the Department of Labor ("DOL") "has issue[d] an [Opinion Letter] making clear that offsetting commissions otherwise due to an employee with wages paid which were guaranteed by the FLSA (minimum wage or overtime) violates the FLSA." Plaintiffs' summary judgment response at 14 (docket no. 127). This Opinion Letter, however, dealt with a "draw versus commission" framework, in which the employee received a guaranteed sum of $40 each week, but "total compensation [was] actually computed . . . on the basis of a commission of 5% for all goods sold." The employer "compute[d] the ***commissions earned*** in a given week and subtract[ed] therefrom the $40 amount paid, provided there were sufficient commissions earned. In weeks where there [were] insufficient commissions earned, [the employer] pa[id] the $40 and [then] subtract[ed] the deficit in subsequent weeks." U.S. Department of Labor Opinion Letter, 1962 DOLWH LEXIS 187 at *1 (Aug. 14, 1962) (emphasis added). The $40 sum thus was not paid free and clear, because it was subject to recapture from ***earned*** commissions. This is a different situation from Citizens' commissions-calculation framework. *See* U.S. Department of Labor Opinion Letter WH–129, 1971 WL 33066 at *1 (March 4, 1971) (explaining that the DOL does not interpret the FLSA to "preclude adoption of a compensation plan under which an employee is guaranteed payment of a salary and/or draw plus extra compensation from commissions earned and paid in accordance with a formula.").

43

MLO's "commissions earned by two-thirds of the overtime earned by an employee, thereby reducing the pay for regular hours to make up for the 150% overtime rate that must be paid."  Plaintiffs' summary judgment motion at 16 (docket no. 107).  In other words, Plaintiffs maintain that ***Gross Commissions*** were part of the payment MLOs were entitled to receive for hours worked.  When Citizens subtracted the straight portion of the first five hours of reported overtime from this Gross Commissions, according to Plaintiffs, Citizens artificially and unlawfully depressed the MLO's regular rate, and thus did not pay full time-and-a-half.[14]

While it is true that "[t]he regular rate by its very nature must reflect all payments which the parties have ***agreed shall be received*** regularly during the workweek, exclusive of overtime payments," *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945) (emphasis added), here the parties simply did not agree that Gross Commissions were earned compensation.  Gross Commissions thus are not part of the regular rate for purposes of calculating overtime pay, and Citizens did not artificially depress the regular rate by subtracting the straight portion of the first five hours of reported overtime from Gross Commissions.

This same conclusion applies to the second way Plaintiffs say Citizens shortchanged them on reported overtime.  When an MLO worked overtime in a month, and also closed a large volume of loans in that month, the parties agree the MLO would be entitled to additional overtime pay.  This additional overtime was attributable to the fact that the calculation of an MLO's regular rate must factor in the amount of earned commissions (as shown in MLO White's example).  Moreover, the parties do not dispute that the ***framework*** Citizens used to calculate this additional overtime was

_____

[14]  Referring back to the example of MLO White on pages 17-18, Plaintiffs' theory is that the $230 Offset means White did not actually receive all of her "time-and-a-half" pay for the overtime hours she reported.

appropriate—it is consistent with the Department of Labor's regulations on the matter. *See* 29 C.F.R. §778.119-.120. However, the parties disagree over Citizens' choice of ***inputs*** into this framework, because Citizens used as its start point "***paid*** commissions, and not earned commissions." Plaintiffs' summary judgment response at 4-5 (docket no. 127).[15] Again, however, Gross Commissions simply were not earned commissions, and Plaintiffs' bald statements cannot overcome the plain language of the Comp-Plans. The additional earned compensation that mattered for this overtime calculation was the difference between Gross Commissions and the Draw Amount together with applicable Offsets, which Citizens correctly used as the start point for calculating the additional overtime attributable to earned commissions.

Neither step in this commission calculation process artificially depresses the regular rate. Plaintiffs contend, for example, that Citizens' commissions calculation process is similar to an impermissible "pseudo [percentage] bonus" pay system. *See* Plaintiffs' summary judgment motion at 17 (docket no. 107). Not so. In a pseudo percentage bonus pay system, an employer sets a "percentage bonus" that "***decrease[s]*** in amount in direct proportion to ***increases*** in the number of hours worked in a week in excess of 40," resulting in "[t]he hourly rate purportedly paid" under the bonus system being "artificially low." 29 C.F.R. §778.503 (emphases added); *see also Frank v. McQuigg*, 950 F.2d 590, 595, 596 (9th Cir. 1991) (examining a cost-of-living adjustment that "pa[id] less for the first 40 hours of an overtime week than it [did] for the same hours in a non-overtime week," thus "reduc[ing] 40-hour earnings in order to pay overtime earnings"). Citizens'

---

[15] Referring back to the example of MLO White on pages 17-18, Citizens calculated White's additional overtime pay using Earned Commissions of $2,930, not Gross Commissions of $5,000. Plaintiffs' theory is that, by doing so, White did not receive all of the additional overtime pay to which she was entitled.

45

compensation policies paid overtime pay at a single rate that did not vary with overtime hours worked, and this overtime pay was later supplemented with commissions attributable to earned commissions, using a framework consistent with federal regulations.

*Third*, Plaintiffs' State-law wage payment claims theorize that Citizens made an unlawful "deduction" from their "wages," as the relevant State-law defines that term, by "[r]ecapturing . . . previously paid wages."  Plaintiffs' summary judgment motion at 24 (docket no. 107).  But "the [Pennsylvania] Wage Payment and Collection Law does not create a right to compensation[,] it merely offers a statutory remedy for an employer's breach of its contractual obligation to pay wages."  *Lejeck v. MBH Sols., Inc.*, 2007 WL 2743677 at *7 (W.D. Pa. Sep. 18, 2007); *see also Braun*, 24 A.3d at 957 ("Whether specific wages are due is determined by the terms of the contract.") (quotation marks omitted).  And the same is true for the analogous statutes in the other class States.  *See* Citizens' summary judgment motion at 30 (docket no. 116) (collecting case law).  Plaintiffs' wage-payment  claims depend on the theory that Citizens deducted one component of their earned compensation—the hourly wage or Draw Amount—from a second component of their earned compensation—Gross Commissions—contrary to the contract between the parties.  There is no genuine dispute of material fact that Gross Commissions were not earned compensation.  Citizens did not breach the plain terms of its Comp-Plan contracts with the MLOs and did not recapture previously-paid wages.  Thus, Plaintiffs wage payment claims fail as well.

Accordingly, this Court should grant Citizens' motion for summary judgment as to all

Recapture Claims, and deny Plaintiffs' cross-motion for partial summary judgment on these claims.[16]

## VI.    Summary Chart.

The following chart summarizes the Special Master's conclusions regarding Plaintiffs' motion for class certification, Citizens' motion for decertification, and the parties' cross-motions for summary judgment.  Each recommended ruling on certification and summary judgment shown below extends *only* to the Recapture Claims.  The motions as they relate to Plaintiffs' Off-the-Clock Claims will be addressed in a forthcoming Report.

| Class Recommended for Certification | Counts Recommended for Certification | Recommended Summary Judgment Ruling |
|---|---|---|
| FLSA Collective | Count I – FLSA Overtime<br>Count II – FLSA Minimum Wage | Count I – Grant Summary Judgment to Citizens<br>Count II – Grant Summary Judgment to Citizens |
| Rule 23 Connecticut Class | Count III – Connecticut Wage Laws | Count III – Grant Summary Judgment to Citizens |
| Rule 23 New York Class | Count IV – Illinois Wage Laws | Count IV – Grant Summary Judgment to Citizens |
| Rule 23 Massachusetts Class | Count V – Massachusetts Wage Laws | Count V – Grant Summary Judgment to Citizens |
| Rule 23 Ohio Class | Count VI – Ohio Wage Laws | Count VI – Grant Summary Judgment to Citizens |
| Rule 23 Pennsylvania Class | Count VII – Pennsylvania Wage Payment and Collection Law<br>Count VIII – Pennsylvania Minimum Wage Act | Count VII – Grant Summary Judgment to Citizens<br>Count VIII – Grant Summary Judgment to Citizens |
| Rule 23 New York Class | Count IX – New York Wage Laws | Count IX – Grant Summary Judgment to Citizens |

---

[16]  Because the undersigned recommends summary judgment be entered in Citizens' favor on these grounds, this Report does not address two additional arguments advanced by Citizens in support of summary judgment—specifically, that the federal and State claims are barred by the statute of limitations, and are barred as to at least some Plaintiffs by a prior class action settlement. *See* Citizens' summary judgment motion at 43-48 (docket no. 116).

| Class Recommended for Certification | Counts Recommended for Certification | Recommended Summary Judgment Ruling |
|---|---|---|
| Rule 23 North Carolina Class | Count X – North Carolina Wage Laws | Count X – Grant Summary Judgment to Citizens |
| Rule 23 Rhode Island Class | Count XI – Rhode Island Wage Laws | Count XI – Grant Summary Judgment to Citizens |
| Rule 23 Michigan Class | Count XII – Michigan Wage Laws | Count XII – Grant Summary Judgment to Citizens |
| Rule 23 New Hampshire Class | Count XIII – New Hampshire Wage Laws | Count XIII – Grant Summary Judgment to Citizens |

**VII.   Time for Filing Objections.**

The parties have stipulated that, "Pursuant to FRCP 53(f)(2), any party may file objections to, or a motion to modify, any Report and Recommendation on or before 14 days from the time the Report and Recommendation is filed on ECF.  If no objections or Motions to Modify are filed within said time period, any such objections or proposed modifications are waived."  Stipulation at 2, ¶5 (docket no. 82).

**RESPECTFULLY SUBMITTED,**

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**DATED**: August 2, 2017

48

Yellow Shading: Certification standard is FLSA

Blue Shading: Certification standard is Rule 23

| APPENDIX A: COUNT CHART | | | | | | |
|---|---|---|---|---|---|---|
| Count | *Off-the-Clock* State Law (Wage & Hour Statutes) | *Off-the-Clock* Federal Law (FLSA) | *Recapture* State Law (Wage & Hour Statutes) | *Recapture* State Law (Wage Payment Statutes) | *Recapture* Federal Law (FLSA) | Class |
| Count I | | Requiring MLOs to work overtime, but not paying them overtime | | | (1) Evading payment of overtime, by deducting 2/3 of the first five hours of previously-paid overtime from commissions as an "offset"<br><br>(2) Using an incorrectly-low regular pay rate when calculating overtime | National Opt-ins |
| Count II | | | | | Evading payment of minimum wage, by deducting previously-paid hourly wages from commissions as an "offset" | National Opt-ins |

Exhibit A - page 1

| APPENDIX A: COUNT CHART | | | | | | |
|---|---|---|---|---|---|---|
| Count | *Off-the-Clock* State Law (Wage & Hour Statutes) | *Off-the-Clock* Federal Law (FLSA) | *Recapture* State Law (Wage & Hour Statutes) | *Recapture* State Law (Wage Payment Statutes) | *Recapture* Federal Law (FLSA) | Class |
| Counts III-VI, IX-XIII | Requiring MLOs to work overtime, but not paying them overtime | | (1) Evading payment of overtime, by deducting 2/3 of the first five hours of previously-paid overtime from commissions as an "offset"<br><br>(2) Evading payment of minimum wage, by deducting previously-paid hourly wages from commissions as an "offset"<br><br>(3) Using an incorrectly-low regular pay rate when calculating overtime | (1) Evading payment of overtime, by deducting 2/3 of previously-paid overtime from commissions as an "offset"<br><br>(2) Evading payment of earned hourly wages, by deducting previously-paid hourly wages from commissions as an "offset" | | CT (Count III)<br><br>IL (Count IV)<br><br>MA (Count V)<br><br>OH (Count VI)<br><br>NY (Count IX)<br><br>NC (Count X)<br><br>RI (Count XI)<br><br>MI (Count XII)<br><br>NH (Count XIII) |

Exhibit A - page 2

| APPENDIX A: COUNT CHART | | | | | | |
| Count | *Off-the-Clock* **State Law (Wage & Hour Statutes)** | *Off-the-Clock* **Federal Law (FLSA)** | *Recapture* **State Law (Wage & Hour Statutes)** | *Recapture* **State Law (Wage Payment Statutes)** | *Recapture* **Federal Law (FLSA)** | Class |
|---|---|---|---|---|---|---|
| Count VII | | | | (1) Evading payment of overtime, by deducting 2/3 of previously-paid overtime from commissions as an "offset"<br><br>(2) Evading payment of earned hourly wages, by deducting previously-paid hourly wages from commissions as an "offset" | | PA |

| APPENDIX A: COUNT CHART | | | | | | |
|---|---|---|---|---|---|---|
| Count | *Off-the-Clock* State Law (Wage & Hour Statutes) | *Off-the-Clock* Federal Law (FLSA) | *Recapture* State Law (Wage & Hour Statutes) | *Recapture* State Law (Wage Payment Statutes) | *Recapture* Federal Law (FLSA) | Class |
| Count VIII | Requiring MLOs to work overtime, but not paying them overtime | | (1) Evading payment of overtime, by deducting 2/3 of the first five hours of previously-paid overtime from commissions as an "offset"<br><br>(2) Using an incorrectly-low regular pay rate when calculating overtime<br><br>(3) Evading payment of minimum wage, by deducting previously-paid hourly wages from commissions as an "offset" | | | PA |

Exhibit A - page 4