**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALEX REINIG, *individually and on behalf of all others similarly situated*, | : : : | Case No. 2:15-CV-01042-AJS |
| v. | : : | SECOND REPORT REGARDING |
| RBS CITIZENS, N.A. | : : : : : | CERTIFICATION MOTIONS AND MOTION FOR SUMMARY JUDGMENT AS TO OFF-THE-CLOCK CLAIMS |

This is the second of two Reports offering recommended rulings on motions filed by the

parties to this wage-and-hour lawsuit. Plaintiffs are current or former Mortgage Loan Officers

("MLOs") of Defendant Citizens, N.A. (referred to in the Amended Complaint as "RBS Citizens,

N.A."). Plaintiffs sue Citizens to recover allegedly withheld compensation for their work as MLOs.

Relevant here, Plaintiffs allege Citizens maintained an unofficial policy or practice requiring MLOs

to work "off the clock," in excess of forty hours per week. Because this work went unreported,

MLOs were not paid for their off-the-clock hours, in violation of federal and State law. And because

the alleged off-the-clock requirement applied across the company, Plaintiffs seek not only to recover

for their own unpaid overtime, but also to lead certified classes of current and former MLOs who

allegedly suffered the same injury.

The parties have conducted substantial discovery on the claims. Plaintiffs now move for

certification, pursuant to Fed. R. Civ. P. 23, of their State-law Off-the-Clock claims. Conversely,

Citizens moves for decertification of the collective action that the Court previously conditionally

certified under Section 216(b) of the federal Fair Labor Standards Act ("FLSA"). Citizens also

moves for summary judgment on all Off-the-Clock claims.

The Court appointed the undersigned to issue recommended rulings on the motion for class certification, the motion for decertification, and the motion for summary judgment. *See Appointment Order* (docket no. 86). For the reasons stated below, the Special Master now **RECOMMENDS** the Court:

- **DENY** Citizens' motion for summary judgment on the Off-the-Clock Claims; *except* that the motion should be: (1) **granted** with respect to Citizens' argument that plaintiffs Gramesty, Smith, Dal Pino, and Kinsella released their State-law Off-the-Clock claims that accrued prior to February 4, 2014, pursuant to the class-action settlement in *Ginter v. RBS Citizens, N.A.*; and (2) **granted** with respect to Citizens' argument that Plaintiffs' State-law claims are barred to the extent they accrued before the beginning of the applicable statutory limitations period, as set out in the chart presented by Citizens at docket no. 117-3, exhibit C.

- **GRANT** final certification of Plaintiffs' federal-law Off-the-Clock Claims; and

- **GRANT** Plaintiffs' motion for class certification of Plaintiffs' State-law Off-the-Clock Claims.

## I.    Factual Background.[1]

### A.    MLO Duties.

Plaintiffs are current or former MLOs. Citizens applied one job description to all MLOs, essentially describing the position as being a salesperson for Citizens' mortgage loan products.

---

[1] The undersigned discussed the procedural background of this case in the *First Report* at 2-8 (docket no. 179). The undersigned incorporates that discussion here, including the recommendation that this Court consider Plaintiffs' motion for certification on the basis of the ten State-specific classes identified in the Amended Complaint, and ***not*** the class and sub-class definitions set forth in Plaintiffs' motion for class certification.

Mathieson depo. at 44 (Plaintiffs' Exhibit 1-A).[2] Most importantly, the MLO works to secure clients for Citizens' residential lending arm.  An MLO could obtain a client from internal referrals at the Bank, or external referrals from real estate agents, attorneys, or former clients.  Gramesty depo. at 27 (Plaintiffs' Exhibit 1-V); *see also* Cremeans depo. at 34 (Plaintiffs' Exhibit 1-EE) (mentioning home builders as a source of clients).  Thus, networking was an important part of an MLO's job. Importantly, this networking could occur after normal business hours, including at weekend real estate open houses.  Dal Pino depo. at 42 (Plaintiffs' Exhibit 1-W); Soda depo. at 85 (Plaintiffs' Exhibit 1-JJ).

During an initial client contact, the MLO would gather information for the client's loan application.  Soda depo. at 64-65 (Plaintiffs' Exhibit 1-JJ); *see also* Richardson depo. at 20 (Plaintiffs' Exhibit 1-BB).  The MLO would then review the customer's credit and obtain a "preapproval," which stated the loan products and terms potentially available to the client.  Soda depo. at 65 (Plaintiffs' Exhibit 1-JJ).  Thereafter, the MLO would request documents verifying the client information and would prepare a Good Faith Estimate ("GFE"), showing the breakdown of approximate payments due upon the closing of a mortgage loan.  The GFE often had to be revised as the customer's desired loan terms changed—for example, after an initial GFE, the client might decide to purchase a more expensive house than originally planned, and thus would need to borrow more money.  *Id.* at 66, 77.  If the client finally found the loan terms acceptable, the MLO facilitated the client's signing of loan disclosures.  *Id.* at 66.  The MLO then forwarded the client's loan file to a loan processor and ordered an appraisal of the property, which served as loan collateral.  *Id.* at

---

[2] When available, citations in this Report refer to a document's ECF pagination.  When ECF pagination is not available, the Report cites to a document's Bates numbering.

67.  During loan processing, the MLO stayed in contact with the client, acting as go-between for the client and loan processor.  *Id. at* 67-68.  Following underwriting, the MLO scheduled a closing, and typically would attend the closing in person.  *Id.* at 70; *see also* Pedersen depo. at 52 (Plaintiffs' Exhibit 1-X) (explaining he had to advise underwriters on certain lending guidelines).

MLOs had flexibility as to where they performed their work during regular business hours.  Some worked from home.  Richardson depo. at 174-75 (Plaintiffs' Exhibit 1-BB).  Others were based at a Citizens building that housed a variety of Citizens' functions. Cremeans depo. at 114-15 (Plaintiffs' Exhibit 1-EE); Karametros depo. at 90-91 (Plaintiffs' Exhibit 1-U); Gramesty depo. at 68-69 (Plaintiffs' Exhibit 1-V).  Most had office space at so-called "mortgage offices."  Dal Pino depo. at 60, 64 (Plaintiffs' Exhibit 1-W); Ziminsky depo. at 69 (Plaintiffs' Exhibit 1-Z).  The mortgage office was typically distinct from a Bank branch. Ziminsky depo. at 69 (Plaintiffs' Exhibit 1-Z).

While an MLO typically was based in a mortgage office, MLOs were usually also assigned to "cover" one or more bank branch offices.  Dal Pino interrogatory response no. 11 (Plaintiffs' Exhibit 1-F) (identifying three assigned branch offices in the Chicago region); Jindra interrogatory response no. 11 (Plaintiffs' Exhibit 1-F) (six branches in northeast Ohio).[3]  MLOs generally were required to visit each of their assigned branch offices once a week during business hours.  Schwartz depo. at 54 (Plaintiffs' Exhibit 1-J); Soda depo. at 88 (Plaintiffs' Exhibit 1-JJ); Pederson depo. at 16 (Plaintiffs' Exhibit 1-X); Smith depo. at 61 (Plaintiffs' Exhibit 1-CC).  While visiting a branch office, an MLO would meet with customers or train staff in subjects such as "how to refer a

---

[3]  Not all MLOs, however, were assigned to bank branches.  *See* Howard depo. at 29 (Plaintiffs' Exhibit 1-GG); Cremeans depo. at 114 (Plaintiffs' Exhibit 1-EE); Farrell interrogatory response no. 11 (Plaintiffs' Exhibit 1-F).

4

mortgage."  Pedersen depo. at 51 (Plaintiffs' Exhibit 1-X).

Citizens generally accorded MLOs flexibility in determining their own working hours and where to perform their work.  MLOs were not, for example, required to be at their desk in a mortgage office at 8:00 a.m.  Smith depo. at 66 (Plaintiffs' Exhibit 1-CC); Cremeans depo. at 44-45 (Plaintiffs' Exhibit 1-EE).  As a practical matter, however, MLOs had to be continuously available to clients and real estate professionals, both during normal business hours and also after hours and on weekends.  Attorneys, for example, were usually available to MLOs only during normal business hours.  But other persons with whom the MLO worked had varying schedules.  For example, "[a] lot of times clients weren't available during the normal business hours," MLO Soda explained, "so you'd have to take the application or talk to them at night when it was convenient for them, or on the weekends."  Soda depo. at 214 (Plaintiffs' Exhibit 1-JJ); *see also* Reinig depo. at 156 (Plaintiffs' Exhibit 1-HH) (providing the example of a physician client who, because of rotations, would call at 11:00 p.m. on a Saturday to finish a preapproval).  Open houses typically occurred on weekends, and even when an MLO did not herself attend an open house—though often they did—a client's weekend house hunt could cause an MLO to work during the weekend.  *See* Smith depo. at 113-14 (Plaintiffs' Exhibit 1-CC) (explaining that, even when he did not attend a weekend open house, after showing a client a particular house, a "referral partner," such as a realtor, might suggest to the client "hey, let's call Peter and get you prequalified," causing MLO Smith to work during the weekend).  In sum, it was not possible for an MLO to perform all the work that the position required during "normal business days" of Monday through Friday, or "normal business hours" of 9:00 a.m to 5:00 p.m.

### B.    Citizens' Time Sheet Policy.

Beginning in 2012, Citizens classified its MLOs as "non-exempt" under federal and State wage and hour laws.  Accordingly, MLOs received an hourly wage for all hours worked in a workweek, up to 40 hours, plus time-and-a-half overtime pay for any additional hours worked. Citizens required MLOs to track the hours they worked and, according to Citizens, its "Time Sheet Policy" set forth the company's requirements in this regard.

Citizens required its MLOs to record the hours they worked each week using the "Time & Labor" software.  Matheison depo. at 50 (Plaintiffs' Exhibit 1-A).  Non-exempt employees had to "input their actual hours worked on a daily basis [in] to Time & Labor, including the 'In' and 'Out' times of any unpaid breaks.  Time Sheet Policy at CITIZENS0002201 (effective October 2012) (docket no. 115, tab E); *see also id.* at CITIZENS0002197 (effective June 2013) (same); *id.* at CITIZENS0002193 (effective January 2015) (same); *id.* at 2189 (effective June 2015) (same).  Each "in" and "out" had to be recorded, resulting in an MLO typically having four entries in the Time & Labor software records each workday: the morning clock-in; a clock-out and clock-in for the lunch period; and the evening clock-out.  *See, e.g.*, Cremeans Time Sheet at 1 (Plaintiffs' Exhibit 1-FF(2)).

The Time Sheet Policy also required MLOs to record "all time that [the MLO] is required to perform[] duties" for Citizens, including work performed outside of regular work hours or outside of a Citizens branch or mortgage office.  Time Sheet Policy at CITIZENS0002193 (effective January 2015) (docket no. 115, tab E); *id.* at CITIZENS0002189 (effective June 2015).  A workweek began Monday morning and ended Sunday evening.  An MLO had to enter her hours worked in a given week by midnight on Sunday of that week.  *See* Time Sheet Policy at CITIZENS0002201 (effective October 2012) (docket no. 115, tab E); *id.* at CITIZENS0002197 (effective June 2013) (same); *id.*

6

at CITIZENS0002193 (effective January 2015) (same); *id.* at CITIZENS0002189 (effective June 2015) (same). In turn, the MLO's manager had to "verify[] that the information in Time & Labor [was] accurate and complete," including any after-hours or off-premises work. Specifically, "Managers are required to ensure their employees are entering their actual 'In' and 'Out' times, including 'In' and 'Out' times of any unpaid breaks." Time Sheet Policy at CITIZENS0002202 (effective October 2012) (docket no. 115, tab E); *see also id.* at CITIZENS0002198 (effective June 2013) (same); *id.* at CITIZENS0002194 (effective January 2015) (same); *id.* at CITIZENS0002190 (effective June 2015) (same). The manager had to approve the MLO's recorded time by Monday at noon—that is, the day after MLOs were required to submit their hours.

The Time Sheet Policy also advised MLOs of Citizens' formal complaint procedure, which could be used by the MLO to complain that she had not been paid for all hours worked. *See* Time Sheet Policy at CITIZENS0002202-03 (effective October 2012) (docket no. 115, tab E); *id.* at CITIZENS0002198 (effective June 2013) (same); *id.* at CITIZENS0002194 (effective January 2015) (same); *id.* at CITIZENS0002190 (effective June 2015) (same). Citizens did not directly provide MLOs with copies of the Time Sheet Policy—neither in paper form, by mail, or by e-mail. Rather, the Time Sheet Policy was made available to MLOs on the "HR Express" portion of Citizens' intranet page, and Citizens told its employees "on a regular basis that HR Express has information that is helpful to do their job, part of which would be on time sheet policy." Mathieson depo. at 101 (Plaintiffs' Exhibit 1-A).

While the Time Sheet Policy required MLOs to ***report*** all hours worked, including overtime, a separate but related policy governed the MLO's ***ability*** to work overtime. Specifically, each MLO's offer letter stated that an MLO was "required to obtain prior approval from [a] supervisor

7

for any hours worked in excess of 40 hours per week."  Reinig offer letter at CITIZENS000006 (docket no. 115, tab A); *see also* Mathieson depo. at 128-30 (Plaintiffs' Exhibit 1-A).  Tom Gamache, Citizens' head of the National Retail Loan Officer Sales Channel, explained this preapproval requirement existed so that when an MLO requested overtime, the MLO's manager had the chance to "discuss workload, time management[,] and any other issues that may be contributing to the need to work additional hours."  Gamache memo. at CITIZENS0002239 (docket no. 115, tab F).  If an MLO disregarded this policy by not seeking approval of overtime hours—either preapproval, or approval after overtime had been incurred—the MLO could be disciplined for failure to follow company policy.  Mathieson depo. at 132-33 (Plaintiffs' Exhibit 1-A).

## IV.    Legal Standards.

In the *First Report*, the undersigned set forth the legal standard applicable to motions for certification under Rule 23 and the FLSA, as well as the summary judgment standard.  The same standards govern here, so the undersigned incorporates that discussion by reference.  *See First Report* at 19-32 (docket no. 179).  Not discussed in the *First Report* were the legal standards applicable to Off-the-Clock claims, which are set out below.

### A.    Elements of the Claims.

The elements of Plaintiffs' Off-the-Clock claims are set forth in a federal statute.  The FLSA provides:

> no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for

8

his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. §207(a)(1).  The Act defines "employ" with "striking breadth."  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).  Employ "includes to suffer or permit to work."  29 U.S.C. §203(g).  Thus, even if an employer did not specifically request the employee to perform a particular task, the time spent performing the task counts toward overtime hours if the employer knew or had reason to know the work was being performed.  *See* 29 C.F.R. §785.11 ("Work not requested but suffered or permitted is work time.").[4]  If the employer has knowledge of the employee's off-the-clock work, "[t]he reason [such work was performed] is immaterial," *id.*, and "the fact that the employee performed the work voluntarily [does not] necessarily take her claim outside of the FLSA," *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011); *see also Tony & Susan Alamo Foundation v. Secretary of Labor*, 471 U.S. 290, 302 (1985) ("the purposes of the Act require that it be applied even to those who would decline its protection").  "An employer who has knowledge that an employee is working, and who does not desire the work be done, has a duty to make every effort to prevent its performance . . . . even where the employer has not requested the overtime be performed or does not desire the employee to work, or where the employee fails to report his overtime hours."  *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2nd Cir. 2008).

"In reviewing the extent of an employer's awareness [of work being performed], a court need

---

[4]  Courts decide questions of statutory interpretation involving the FLSA.  *See* 29 C.F.R. §785.2 ("The ultimate decision on interpretations of the act are made by the courts."); *see also Perez v. American Future Sys.*, 2015 WL 8973055 at *5 (E.D. Pa. Dec. 16, 2015) (explaining that the "rules" included in Part 785 of Chapter 29 of the Code of Federal Regulations have not been promulgated pursuant to notice-and-comment rulemaking).  However, courts give "respect" to the Department of Labor's interpretation of the statute.  *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 288 (2nd Cir. 2008).

only inquire whether the circumstances were such that the employer either had knowledge of overtime hours being worked or else had the opportunity through reasonable diligence to acquire knowledge." *Reich v. Dep't of Conservation & Nat. Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (quotation marks omitted). So, for example, the "existence of a culture that discourages reporting overtime may support an inference that an employer knew of its employees' failure to report overtime." *Butler v. Homeservices Lending LLC*, 2013 WL 1285567 at *6 (S.D. Cal. Mar. 26, 2013). Ultimately, however,

> it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. [Management] cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R. §785.13.

## B.      Burden of Proof.

In this case, the parties disagree regarding the particular burden Plaintiffs must carry to establish the elements of their overtime claims. Citizens argues the amount of evidence required to carry this burden varies depending on circumstances, and that, in this case, the more stringent of two possible standards applies. *See* Citizens' motion for decertification at 22 (docket no. 112). These two possibilities are known as: (1) the *Anderson* burden-shifting standard, which usually applies; and (2) the *Seevers* exceptional standard.

As a general matter, "[t]he remedial nature of [the FLSA] and the great public policy which it embodies . . . militate against making" the burden of proving an overtime violation "an impossible hurdle for the employee." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). The

Supreme Court explained:

> When the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records. But where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes, a more difficult problem arises. The solution, however, is not to penalize the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act. In such a situation we hold that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687-88.

Courts occasionally recognize an exception to this burden-shifting rule, and Citizens contends this exception applies here. In *Seevers v. Carol Corp.*, 528 F. Supp. 2d 159, 170 (W.D.N.Y. 2007), the court held plaintiffs had failed to carry their burden of "produc[ing] any specific facts or evidence of the work for which they were allegedly unpaid." Rather, plaintiffs offered only "nebulous recollections of tasks each individual might have performed off-the-clock, which vary dramatically between the plaintiffs and are uncorroborated by any other evidence." *Id.* at 169. The court declined to apply the *Anderson* burden-shifting framework, explaining:

> In attempting to apply the *Anderson* test here, plaintiffs overlook a crucial fact: this case does not present the type of factual scenario confronted in *Anderson* and its progeny, where an employer maintains control over the calculation and

compensation of time worked and either alters or fails to keep complete time records as mandated by the FLSA, thereby placing the employee at a marked disadvantage in pursuing an FLSA claim.   Here, it is undisputed that [the employer's] record-keeping complied with the requirements of the FLSA and New York Labor Law, and that the plaintiffs' time records were maintained and paid exactly as plaintiffs fashioned them, meaning that any inaccuracies in [the employer's] records are ***solely due to the plaintiffs' deliberate failure to accurately report the time they worked***.

*Id.* at 170 (emphasis in original).[5]

For several reasons, the Special Master concludes that the exceptional *Seevers* standard should not be applied here, and thus *Anderson* should apply.  First, the standard set forth in *Seevers* has been questioned by the Second Circuit.  *See Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 363 (2nd Cir. 2011) (disagreeing with the district court's reliance on *Seever* and explaining, "once an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation simply because the employee failed to properly record or claim his overtime hours.  Accordingly, the fact that an employee is required to submit his own timesheets does not necessarily preclude him from invoking *Anderson*'s standard where those records appear to be incomplete or inaccurate.").

Furthermore, on its own terms, the *Seevers* specific-facts standard does not apply here. *Anderson* controls where "there is a genuine dispute as to whether the inaccuracies in the time

---

[5] Citizens also characterizes Plaintiffs' burden as requiring "definite and certain evidence concerning their alleged off-the-clock work."  Citizens' summary judgment motion at 36 (docket no. 116) (quotation marks omitted).  Citizens does not suggest that the definite-and-certain-evidence articulation of Plaintiffs' burden is different from the *Seevers* specific-facts standard.  Thus, the undersigned construes Citizens' characterization of Plaintiffs' burden to mean the same thing—Citizens asserts that, because Plaintiffs' time sheets are allegedly inaccurate solely because MLOs decided to disregard Citizens' Time Sheet Policy, a more stringent standard of damages proof should apply.

records were not *solely* due to Plaintiffs' deliberate failure to accurately record time but also to" the employer's official policy or unofficial practice. *Brennan v. Qwest Communs. Int'l, Inc.*, 727 F. Supp. 2d 751, 762 (D. Minn. 2010) (emphasis added). "At least where the employee's falsifications were carried out *at the instruction of the employer or the employer's agents*, the employer cannot be exonerated by the fact that the employee physically entered the erroneous hours into the timesheets." *Kuebel*, 643 F.3d at 363 (emphasis added).

As explained in more detail below, there is substantial evidence in this case that Citizens' managers "command[ed], entice[d], or encourage[d] its employees not to record all of their overtime." *Brennan*, 727 F.Supp.2d at 762. "[I]f an employer has actual or constructive knowledge that its employees are not recording all of their overtime, whatever the reason for the under-reporting might be, the employer cannot sit back or stand idly by and allow the employee to under-report his time," only to then take advantage of the *Seever* exception. *Id.* Accordingly, the undersigned examines Citizens' motions below against the *Anderson* standard.

## V.    Analysis—Summary Judgment.

Citizens' summary judgment motion targets the claims of the 12 individual named Plaintiffs. Citizens first claims Plaintiffs cannot offer "definite and certain evidence" that they performed work for which they were not compensated, claiming Plaintiffs admit they cannot identify "with reasonable certainty" the overtime hours they worked without pay. Citizens' summary judgment motion at 35-36 (docket no. 116). Second, Citizens contends that, even if Plaintiffs produce the requisite amount and type of evidence of overtime worked, they have no evidence showing Citizens knew or should have known this overtime work was being performed. *Id.* at 37-43. If either of these

contentions is true with respect to a given Plaintiff, then summary judgment is appropriate as to that Plaintiff.

If neither contention is true, then the Court must examine an additional argument advanced by Citizens: assuming Plaintiffs identify genuine disputes of material fact as to their Off-the-Clock claims, Citizens argues the statutes of limitation applicable to the federal and State-law claims limit the time period for which damages are available. *See id.* at 46-48.

All of these issues are addressed below.[6]

_____

[6] Citizens also argues that the terms of a prior class action settlement, in a case known as *Ginter*, released any State-law claims that accrued prior to February 4, 2014 for Plaintiffs Gramesty, Smith, Dal Pino, and Kinsella. *See* Citizens summary judgment motion at 43-46 (docket no. 116) (referring to *Ginter v. RBS Citizens, N.A.*, Case No. 1:12-CV-00008-M-PAS, docket no. 133 (D. RI.)). Citizens has satisfied its initial summary judgment burden on this issue, pointing to the clear terms of the *Ginter* settlement agreement. Thus, to avoid summary judgment, Plaintiffs had to "point to some evidence in the record that creates a genuine issue of material fact." *NAACP v. City of Phila.*, 834 F.3d 435, 440 (3rd Cir. 2016). Aside from one mention of the *Ginter* litigation, offered as alleged proof that Citizens knew its MLOs had "routinely" worked off the clock, *see* Plaintiffs' summary judgment response at 31 (docket no. 127), Plaintiffs do not respond to or mention the effect of the *Ginter* settlement on pre-February 2014 State-law claims. Thus, the undersigned recommends this Court enter summary judgment in Citizens' favor with respect to its argument that the class action settlement in *Ginter*, released all State-law Off-the-Clock claims that accrued prior to February 4, 2014 for the four Plaintiffs mentioned above.

If this Court accepts this recommended ruling, Plaintiff Smith would lack any State-law claims, because his employment ended in September of 2013; the *Ginter* settlement release subsumes all of his claims. Smith depo. at 28 (Plaintiffs' Exhibit 1-CC). Likewise, Plaintiff Kinsella would lack any State-law claims because his employment ended, at the latest, in January of 2014. Kinsella depo. at 27-28 (Plaintiffs' Exhibit 1-Y). Plaintiffs have proposed Smith and Kinsella as the sole named Plaintiffs for the New York and Massachusetts classes, respectively. Without State-law claims, Smith and Kinsella could not serve as class representatives, and both classes would thus lack a class representative. The parties are currently briefing Plaintiffs' motion for leave to file a second amended complaint (docket no. 172), which would substitute two Opt-In Plaintiffs for Smith and Kinsella to address this issue.

A.    **Proof of Work Performed.**

Citizens first claims that Plaintiffs cannot offer competent proof that they in fact performed work for which they were not properly compensated.  Invoking the "definite-and-certain" evidence standard, Citizens contends that Plaintiffs "affirmatively represent[ed] that they cannot even identify with reasonable certainty the hours they worked off the clock," and that any such evidence would be "speculation regarding the frequency and amount of any such work."  Citizens summary judgment motion at 36 (docket no. 116).  "[W]hen presented with their time sheets, Plaintiffs could not even hazard a guess as to whether or for how long they performed off-the-clock work."  *Id.*

As examples, Citizens notes as follows.  Citizens asked MLO Ken Gritz whether he could, in effect, take a day off if he was approaching his forty-hour-per-week cap.  Gritz responded that he "never kept track of hours.  I mean, that wasn't my focus."  Gritz depo. at 33 (Plaintiffs' Exhibit 1-II).  In other words, Gritz could not adjust his workweek to avoid overtime work, because he did not keep a record of the actual hours he had worked in a given week.  Similarly, Citizens presented MLO Mary Lou Gramesty with time sheet records for particular days in October 2014 and asked whether she could describe the work she performed or pinpoint the hours she worked on those particular days.  Gramesty could not identify the "exact hours."  She stated her time records would merely show 40 hours in a regular workweek.  Gramesty explained she always reported an eight hour work day, even when she worked more than eight hours.  Gramesty depo. at 115-16 (Plaintiffs' Exhibit 1-V).

In the same vein, MLO William Kinsella testified he was not aware of any record, other than his time sheets, that would "show[] the hours that [he] worked" as an MLO.  Kinsella depo. at 156-57 (Plaintiffs' Exhibit 1-Y).  He further testified he could not identify the number of hours he

actually worked, as opposed to reported, during the week of November 30, 2012, explaining that his time sheets for this week did not provide such proof. The time sheets "aren't representative of the hours that you work. These [hours] are what you put into the time sheet." *Id.* at 163-65.

Citizens had the same conversation with MLO Daniel Kolenda during his deposition—when presented with time records for a given week, he could not identify the hours he actually worked in that week, because the "hours that we were required to put [into the time sheet] was 40." Kolenda depo. at 75 (Plaintiffs' Exhibit 1-N). *See also id.* at 90; Pedersen depo. at 178-179 (Plaintiffs' Exhibit 1-X) (same testimony, and explaining "I was told to fill this [time sheet] fictitiously").

In other words, deposition testimony establishes that certain Plaintiffs cannot identify the hours they actually worked in a particular week.

But this factual conclusion, by itself, does not establish that Plaintiffs lack competent evidence that they performed work for which they were not compensated. By interrogatory response or by deposition testimony, each witness also provided sworn statements regarding the average amount of overtime hours that they worked in any given week. These statements are summarized in the following chart.

| Named Plaintiff | Average Hours Worked | Citation |
|---|---|---|
| Dal Pino, Valerie | 45 to 50 hours per week | Plaintiffs' Exhibit 1-W at 67 |
| Fragale, Teresa | 60 to 65 hours per week | Plaintiffs' Exhibit 1-K at 22 |
| Gramesty, Mary Lou | 45 to 50 hours per week | Plaintiffs' Exhibit 1-F, Response 3 |
| Gritz, Ken | 50 hours per workweek, based on an average weekday of 10 hours | Plaintiffs' Exhibit 1-II at 182-184 |
| Howard, David | 55 hours per week | Plaintiffs' Exhibit 1-GG at 113-14 |

16

| Kinsella, William | 60 to 65 hours per week, and no week in which less than 40 hours were worked | Plaintiffs' Exhibit 1-Y at 103-04; Plaintiffs' Exhibit 1-F, Response 3. |
|---|---|---|
| Kolenda, Daniel | 50 to 60 hours per week | Plaintiffs' Exhibit 1-N at 85-87. |
| Naji, Ahmad | 50 hours per week | Plaintiffs' Exhibit 1-O at 48-49 |
| Pedersen, Robert | 85 hours per week | Plaintiffs' Exhibit 1-X at 97, 99 |
| Reinig, Alex | 50 to 60 hours per week | Plaintiffs' Exhibit 1-HH at 259 |
| Smith, Peter | "[C]lose to 60 hours a week" | Plaintiffs' Exhibit 1-CC at 109, 111 |
| Soda, Robert | 50 to 60 hours | Plaintiffs' Exhibit 1-JJ at 213 |

Case law reveals that this evidence is sufficient to resist summary judgment. As noted above and explained in more detail below, there is a genuine dispute regarding whether MLOs kept inaccurate time sheets *because they were instructed to do so by Citizens' managers*. Thus, the *Anderson* standard applies. And under this standard, "it is possible for a plaintiff to meet this burden through estimates based on his own recollection." *Kuebel*, 643 F.3d at 362-63 (reversing summary judgment for the employer); *see also Turner v. Human Genome Scis., Inc.*, 292 F. Supp. 2d 738, 748 (D. Md. 2003) (denying summary judgment even though, as here, plaintiffs had not "provided [documentary] evidence corroborating their testimony," stating: "A prima facie case can be made through an employee's testimony giving his recollection of hours worked and his case is not to be dismissed nor should recovery for back pay be denied, because proof of the number of hours worked is inexact or not perfectly accurate.") (quotation marks omitted).

Moreover, the estimates listed in the chart above are not just impermissible speculation.

Plaintiffs have provided a reasoned basis for their reckoning by (for example) explaining the tasks they normally performed in a workweek, or the start and end times of a typical work day. *See, e.g.*, Gritz depo. at 183-84 (Plaintiffs' Exhibit 1-II) (describing a typical work day); Howard depo. at 117-18 (Plaintiffs' Exhibit 1-GG) (explaining the basis for the statement that he worked an average of 55 hours per week).

Accordingly, the undersigned recommends this Court overrule Citizen's argument that it is entitled to summary judgment on the ground that Plaintiffs have failed to present adequate evidence that they performed work for which they were not compensated.

### B.      Proof That Citizens Knew Or Should Have Known Plaintiffs Worked Off-the-Clock.

The FLSA, however, is not a strict-liability statute.  "[T]he FLSA stops short of requiring the employer to pay for work it did not know about, and ***had no reason to know about***." *Kellar*, 664 F.3d at 177 (emphasis added).  But an employer ***can*** be held liable for unpaid overtime where the record discloses actual knowledge of overtime work, or if the employer "could have acquired actual knowledge" of the unpaid overtime through "the exercise of reasonable diligence." *Reich*, 28 F.3d at 1084.  Moreover, an employer's knowledge that its employees worked overtime can still lead to liability even if the employer only obtained that knowledge ***after*** the employees performed their overtime work.  *Chao*, 514 F.3d at 287.

Citizens argues there is no evidence that it had actual or constructive knowledge of off-the-clock work, and certain Plaintiffs even "testified that they never advised their manager that they were working off the clock."  Citizens summary judgment motion at 38 (docket no. 116).  Again, however, Citizens does not present the full scope of the Plaintiffs' testimony, nor does it view that

testimony in the light most favorable to Plaintiffs.

Mary Lou Gramesty testified she never informed one of her managers, Polly Curtin, that she worked unreported overtime. Gramesty depo. at 86-87 (Plaintiffs' Exhibit 1-V). Curtin did not instruct Gramesty to not report overtime, either. *Id.* But this testimony does not establish that Citizens lacked actual or constructive knowledge that Gramesty worked unreported overtime. Curtin was not Gramesty's only manager during the class period. Soon after MLOs were designated as non-exempt, in "the 2011/2012 time period," Gramesty reported to Jim Marong. *Id.* at 85. In connection with the non-exempt status change, Marong told Gramesty, in so many words, that "'[i]t's a 40-hour workweek and that's what's supposed to be on your timecard.'" *Id.* at 84. Gramesty told Marong she "wasn't comfortable putting down the hours on the time sheet because [she] felt that [forty hours] wasn't a true reflection of the hours that [she] worked." *Id.* at 82. Gramesty felt she should be able to record the hours that she actually worked, but "didn't feel like it was something that was – I was able to do" in light of Marong's instructions. *Id.* at 83.

Other examples abound, several of which were discussed by Plaintiff David Howard. Sometime before joining Citizens in June of 2014, manager John Porath told Howard that, "[a]s long as you keep [overtime] down to 5 hours or something, then you can do that." Howard depo. at 99-100 (Plaintiffs' Exhibit 1-GG). Howard understood this meant he could not report overtime beyond this five hour limit. Howard complained to manager Keith Hurley that following this instruction required him to work off the clock. *Id.* at 69. Hurley, however, was not Howard's supervisor. In March of 2015, Keith Johnson, a then-manager who "helped" Porath, *id.* at 47, e-mailed Howard after noting Howard had recorded more than 8 hours per day on his time sheet. Howard wrote: "Could you go in and fix your time sheet? It's showing 9 hours every day . . . should be eight . . .

19

may have left out the lunch hour in the middle?  If it is correct, please contact John Porath for approval for overtime . . . currently not allowed."  April 11, 2015 e-mail from Keith Johnson to David Howard at CITIZENS_ESI00043852 (Plaintiffs' Exhibit 1-H3).  After "fixing" his time sheet, Howard approached Johnson to discuss the e-mail, stating: "'What's up with the overtime' was probably my question.  And [Johnson] responded and said, 'We can't have overtime anymore.'" Howard depo. at 176-77.  Finally, in the third quarter of 2015, Sam Holmes, a producing sales manager who supervised Howard and reported to Porath, told Howard that "there would be no overtime paid . . . . That was talking about [the] period going forward." *Id.* at 48-49, 94-95.  Howard understood this last discussion to mean "you could not report – you could not have overtime in the future." *Id.* at 95.

Like other named Plaintiffs, William Kinsella did not advise his managers of the "exact" number of hours he worked each week.  Kinsella depo. at 69 (Plaintiffs' Exhibit 1-Y).  But like Gramesty, Kinsella was told he was supposed to list 40-hours-worked on this time card, and that if he wanted to report overtime, he had to seek preapproval, which was unlikely to be granted.  *Id.* at 64.  So far as preapproval was concerned, "[b]asically we were told not to bother."  *Id.* at 68.

For Daniel Kolenda, it "became practice" to fill out his time sheet with 40 hours, after his direct supervisor told Kolenda "you can't put more than 40 hours in" and back-adjusted Kolenda's time sheet accordingly.  Kolenda depo. at 71-72 (Plaintiffs' Exhibit 1-N).

Valerie Dal Pino understood Citizens' official preapproval requirement, but she also understood that preapproval would not be granted and so she never requested preapproval.  Soon after becoming non-exempt, she overheard her indirect supervisor, Todd Crisman, tell an unknown MLO that the MLO was not allowed to report overtime.  Dal Pino depo. at 122-23 (Plaintiffs'

20

Exhibit 1-W).  Crisman and direct supervisor Daniel Brady told Dal Pino and others "not to report more overtime."  Dal Pino interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).  And Dal Pino understood from a co-worker that "you couldn't get approved for" overtime by Brady.  Dal Pino depo. at 54-57.

Ahmad Naji was also specifically instructed not to record overtime, after he tried to record five or seven hours of overtime within a month or two of becoming an MLO.  After seeing his timecard, Manager Sam Ammar sent Naji an e-mail that "basically said do not clock in more than 40 hours a week," an instruction that Ammar told Naji came from "higher-ups," and which Naji understood as a "friendly threat."  Naji depo. at 36-37, 40-41 (Plaintiffs' Exhibit 1-O).  In connection with this same attempt to record overtime, Manager Chris Gough stated without qualification: "you know, we're not allowed to put overtime." *Id.* at 38-39.

Thus, while these Plaintiffs each testified they did not inform their managers when they worked off the clock, there is substantial evidence that these same managers instructed the MLOs not to record overtime, and/or that requesting preapproval would be futile.  *See Butler*, 2013 WL 1285567 at *6 (the "existence of a culture that discourages reporting overtime may support an inference that an employer knew of its employees' failure to report overtime").  This testimony is sufficient to create a genuine dispute of fact that Citizens knew or should have known that its MLOs were performing work off the clock.  If credited by a jury, this testimony establishes that Citizens discouraged Plaintiffs from reporting overtime.

Courts routinely deny summary judgment as to issues of actual or constructive knowledge in the presence of this type of evidence.  For example, in *Kuebel*, employer Black & Decker had a written policy requiring its non-exempt Retail Specialists to accurately record their hours worked.

643 F.3d at 356.  Nevertheless, plaintiff Kuebel routinely underreported the time he worked.  He explained "he falsified his time-sheets because his supervisors instructed him not to record more than forty hours per week."  *Id.*  Pointing to this evidence, the appellate court reversed summary judgment for Black & Decker.  *See id*. at 365.  Likewise, in *Brennan v. General Motors Acceptance Corp*., 482 F.2d 825 (5ᵗʰ Cir. 1973), even though upper-level management encouraged certain field representatives who "work[ed] on their own and without direct supervision" to accurately report their hours worked, the representatives' "immediate superiors . . . insisted that reported overtime hours be kept to a stated minimum level, thus forcing the employees to work unreported and thus uncompensated hours of overtime."  *Id.* at 827.  On appeal from a bench trial that resulted in a plaintiffs' verdict, the appellate court rejected the employer's claim that it "had no actual or constructive knowledge that these employees were working unreported, uncompensated hours of overtime."  *Id.*  The court reasoned:

> Because the immediate supervisors were primarily responsible for the employees' failing to report all overtime, we believe they may have had actual knowledge of the unreported overtime.  At the very least they had constructive knowledge, for they had the opportunity to get truthful overtime reports but opted to encourage artificially low reporting instead.  The company cannot disclaim knowledge when certain segments of its management squelched truthful responses.

*Id.* at 828.

Citizens' cited cases do not involve instructions by managers that employees may not record overtime, or may only record a certain amount of overtime (and no more), regardless of the hours actually worked.  Thus, Citizens' cases do not mandate entry of summary judgment.  For example, in *White v. Baptist Mem'l Health Care Corp.*, 699 F.3d 869 (6ᵗʰ Cir. 2012), there was "no evidence that [the employer] discouraged employees from reporting time worked during meal breaks or that

they were otherwise notified that their employees were failing to report time worked during meal breaks." *Id.* at 877; *see id.* ("Without evidence that [the employer] prevented [the employee] from utilizing the system to report either entirely or partially missed meal breaks, [the employee] cannot recover damages from [the employer] under the FLSA.").  Similarly, in *Kellar v. Summit Seating Inc.*, 664 F.3d 169, 173, 178 (7th Cir. 2011), the employee did not allege her employer discouraged her from accurately noting the work she performed before clocking in, and thus the employer "had little reason to know, or even suspect, [the employee] was acting in direct contradiction of a company policy and practice that she herself was partially responsible for enforcing."

The same dearth of evidence of an "unofficial policy" against overtime was present in *Brown v. Scriptpro LLC*, 700 F.3d 1222, 1230 (10th Cir. 2012) ("There was no failure by ScriptPro to keep accurate records, but there was a failure by Mr. Brown to comply with ScriptPro's timekeeping system.").  And in *Harvill v. Westward Communs., L.L.C.*, 433 F.3d 428 (5th Cir. 2005), the employee evidently attempted to avoid summary judgment on her FLSA claim by offering only "argument" and "assertions"—meaning statements in a brief that were not evidence—to support a claim that her employer "required her to turn in false time sheets."  *See id.* at 441 (noting the employee "offered no factual allegations ***at all*** to substantiate her claim, and she presented ***no*** evidence of the amount or the extent of hours she worked without compensation.  Moreover, she presented ***no*** evidence that [the employer] was aware that she worked overtime hours without compensation.") (emphases in original); *see also NAACP*, 834 F.3d at 441 (explaining a party cannot evade summary judgment by "rest[ing] solely on assertions made in the pleadings, legal memoranda,

or oral argument").[7]

In sum, there is far more than a mere scintilla of evidence that Citizens knew or should have known that Plaintiffs performed work for which they were not compensated.  Accordingly, the undersigned recommends this Court overrule Citizen's argument that it is entitled to summary judgment on the ground that Plaintiffs have failed to present sufficient evidence of Citizens' knowledge.

C.      Statutes of Limitation.

Finally, Citizens moves for summary judgment on the ground that certain claims are barred by a statute of limitations.  Citizens asserts that the FLSA's default two-year limitations period applies, rather than a three-year limitations period, because no reasonable jury could conclude Citizens knew (or showed reckless disregard to) the fact that its overtime policies and practices violated the FLSA.  Citizens' summary judgment motion at 47 (docket no. 116).

---

[7]   The list of distinguishable or inapt case law offered by Citizens goes on.  *See, e.g.*, *Wood v. Mid-Am. Mgmt. Corp.*, 192 F. App'x 378, 381 (6th Cir. 2006) (employee admitted that employer did not advise him to not "turn in those hours"); *Newton v. City of Henderson*, 47 F.3d 746, 750 (5th Cir. 1995) (reversing judgment entered after a bench trial, because "the facts upon which the district court relied in imputing constructive knowledge to [the employer] do not support a finding that the employer in this case encouraged Newton to falsely report his hours"); *Hinterberger v. Catholic Health Sys.*, 299 F.R.D. 22, 43, 45 (W.D.N.Y. 2014) (denying ***plaintiffs'*** request for summary judgment as to knowledge of off-the-clock work, and distinguishing a line of cases "involv[ing] circumstances where the employer either had actual knowledge of a labor law violation, had promulgated a 'no overtime' policy, or had prevented employees from reporting overtime hours."); *Schremp v. Langlade Cty.*, 2012 WL 3113177 at *3 (E.D. Wis. July 31, 2012) ("Plaintiff does not allege he was ever told by any County Board Supervisor or management representatives of the County that he was not allowed to work overtime or that he should not report all of his work hours on his timesheets."); *Stanislaw v. Erie Indem. Co.*, 2012 WL 517332 at *9 (W.D. Pa. Feb. 15, 2012) (McLaughlin, J.) (noting that, in numerous cases, federal appellate courts have expressly recognized that summary judgment may be improper "if there was evidence that an employer had actively discouraged accurate time reporting").

"Ordinary violations of the FLSA are subject to the general 2-year statute of limitations.  To obtain the benefit of the 3-year exception, the [plaintiff] must prove that the employer's conduct was willful," meaning, "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-35 (1988).  "Courts have consistently concluded that a violation is willful where an employer intentionally discourages or inhibits employees from accurately reporting overtime." *Stanislaw*, 2012 WL 517332 at *10 (collecting cases).

For the reasons noted above, the record reveals genuine questions of fact as to whether Citizens purposefully "discourage[d] or inhibit[ed]" Plaintiffs from reporting all of the overtime they worked.  *Id.*  Thus, the undersigned recommends this Court  overrule Citizen's argument that it is entitled to summary judgment on the ground that Plaintiffs can point to no evidence establishing a "willful" violation of the FLSA.[8]

## VI.    Analysis—Final Certification Under the FLSA.

Plaintiffs' federal claims are subject to certification under the FLSA itself, rather than Fed. R. Civ. P. 23.  *See* 29 U.S.C. §216(b).  And to win certification under this standard, the named Plaintiffs must show they are "similarly situated" to the opt-in plaintiffs.  *Id.*  "Being similarly situated . . . . means that one is subjected to some common employer practice that, if proved, would

---

[8] Citizens also argues that Plaintiffs' State-law claims "are barred to the extent they accrued before the beginning of the applicable statutory period," which ranges from two to six years in the ten different class States.  Citizens' summary judgment motion at 48 (docket no. 116).  The limitations period for Plaintiffs' State-law claims do not depend on a finding of willfulness. Plaintiffs do not respond to this argument.  Thus, the undersigned recommends the Court enter summary judgment with respect to Citizens' State-law statute of limitations arguments, in accord with the chart presented by Citizens' at docket no. 117-3, exhibit C.

help demonstrate a violation of the FLSA." *Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 538 (3rd Cir. 2012). Circuit courts have declined to impose a rigid requirement that this common practice be tantamount to a "unified policy, plan, or scheme." *See O'Brien v. Ed Donnelly Enters.*, 575 F.3d 567, 584 (6th Cir. 2009), *overruled on other grounds by Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 669 (2016); *Grayson v. KMart Corp.*, 79 F.3d 1086, 1095 (11th Cir. 1996). If "[l]iability and damages still need to be individually proven" despite such a common practice, however, certification under the FLSA may be inappropriate. *Zavala*, 691 F.3d at 538. In deciding whether employees are "similarly-situated," a district court should ask whether the plaintiffs: (1) are employed in the same corporate department, division, and location; (2) advance similar claims; (3) seek substantially the same form of relief; and (4) have similar salaries and circumstances of employment. *Id.* at 536-37. Plaintiffs must make the similarly-situated showing by a preponderance of the evidence. *Id.*

"One way in which plaintiffs in a FLSA collective action may demonstrate that they are similarly situated is by showing that they 'suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.'" *Harris v. Chipotle Mexican Grill, Inc.*, 2017 WL 2537228 at *6 (D. Minn. June 12, 2017) (quoting *Bouaphakeo v. Tyson Foods Inc.*, 765 F.3d 791, 796 (8th Cir. 2014), *affirmed*, 136 S.Ct. 1036 (2016)); *see also Reed v. Cty. of Orange*, 266 F.R.D. 446, 450 (C.D. Cal. 2010) (explaining that an unofficial policy helps establish employees are similarly situated by showing similarity in the employees' employment circumstances). This showing can be made even though the employer also maintains official, written policies that are consistent with the FLSA's requirements. *See Allen v. City of Chicago*, 2013 WL 146389 at *4 (N.D. Ill. Jan. 14, 2013). And

the showing can be made on the basis of the testimony of a representative group of plaintiffs.  *See Reich v. Gateway Press*, 13 F.3d 685, 701 (3rd Cir. 1994) ("Courts commonly allow representative employees to prove violations with respect to all employees.").

Here, there is substantial testimony from numerous MLOs—beyond the experiences of just those named Plaintiffs already referenced above—that Citizens enforced an ***unofficial*** policy that discouraged MLOs from reporting all of the hours they worked, at the same time that Citizens promulgated its ***official*** Time Sheet Policy.  Specifically, although MLOs were told of the Time Sheet Policy, class members were also informed as follows:

- Lisa Traxler was told she "could not report overtime at all," even if she sought approval.  Traxler interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).  And early during her tenure with Citizens, Traxler reported overtime, but was advised by market managers that she "was not permitted to record more than 40 hours per workweek, at all."  *Id.*

- While he was being taught to log hours at the start of his employment with Citizens, Ryan Strickler was advised "that the MLOs were unable to log anything over 40 hours," and that if overtime was requested, "the Managers reiterated that as commissioned employees, there was no reason to place it down as it would simply be paid back by" Strickler in the course of Citizens' calculating commissions.  Strickler interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).  And although two managers in particular informed Strickler of the preapproval requirement, they "would not approve any overtime, making it impossible to record actual hours worked."  *Id.* interrogatory response no. 8.

- Adam Soroka received the same message as Strickler: a preapproval requirement applied, but Soroka's managers "would not approve any overtime, making it impossible to record actual hours worked."  Soroka interrogatory response no. 8 (Plaintiffs' Exhibit 1-F).

- Mark Ross also got the same message.  Ross interrogatory response no. 8

27

(Plaintiffs' Exhibit 1-F).  So did Cynthia Nostro, who, additionally, was disciplined when she reported overtime and told "she was not to report more than 40 hours per week."  Nostro interrogatory response no. 8 (Plaintiffs' Exhibit 1-F).

• Carol Waterhouse, who reported 10 hours of overtime near the time she began with Citizens, was told by manager Ray Pool to "Get [the overtime hours] out of there."  Waterhouse depo. at 59 (Plaintiffs' Exhibit 1-Q). Waterhouse complied, removing the overtime hours from her time-sheet so that Citizens "could only see the 40 hours."  *Id.* at 54.

• Marie Seufert reported overtime shortly after being hired and was reprimanded for doing so by her managers, who told "her she was not permitted to record more than 40 hours per workweek."  Seufert interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).

• Melita Randolph similarly reported overtime as a new Citizens employee, only to be told by her manager that she "was not permitted to record more than 40 hours per workweek" and that "overtime was not paid."  Randolph interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).

• Troy Farrell likewise attempted to report overtime as a new Citizens employee, and he too was told by managers that he "was not permitted to record more than 40 hours per workweek, at all."  Farrell interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).

• Manager John Leeser ignored or denied Larry Heydon's requests to report overtime, Heydon interrogatory response no. 2 (Plaintiffs' Exhibit 1-F), and otherwise instructed Heydon: "With the time management, you're going to record your 40 hours a week."  Heydon depo. at 78 (Plaintiffs' Exhibit 1-R).

• Cheryl Roach questioned manager John Kraus about Citizens' stated Time Sheet Policy, and he responded "he believed she didn't work more than 40 hours per week and as such she did not have any reportable overtime." Roach interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).

• Konstantinos Karametros likewise questioned manager Lance Adie about the

28

preapproval requirement and "how he could possibly produce [the amount of loan closings that] was required at only working 40 hours." Adie responded that "if Plaintiff asked for overtime, that management would simply deny same." Karametros interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).

• Three different mangers told Andrew Pennington "to only record 40 hours per week on his timecard, as overtime hours would not be approved." Pennington interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).

• Karen Jindra's manager, Michael Gordon, informed her that "the way to report time is to simply go in to the software once a week and report 8 hours per workday for five days," and that it "did not matter" to report overtime, because overtime simply came out of commissions. Moreover, Jindra heard either Gordon or Tad Kuhn say that "holiday overtime . . . would be overtime, and MLOs should not report overtime." Jindra interrogatory response no. 2 (Plaintiffs' Exhibit 1-F); *see also id.* interrogatory response no. 7 ("Plaintiff was informed by her managers, Michael Gordon and Tad Kuhn[,] that Plaintiff was not permitted to record more than 40 hours per workweek.").

• Likewise, Tad Kuhn instructed George Cremeans in 2015 that he should not record overtime hours. Cremeans depo. at 50-51 (Plaintiffs' Exhibit 1-EE); *see also id.* at 53 ("that's what was conveyed to me, don't record all your hours.").[9]

• Manager Michael Norman told Lynn Duban that she and her fellow MLOs "had to keep their recorded hours to 40," and "even if they went over the reported 40, they were not allowed to record it." Duban interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).

• During staff meetings held at a Bob Evans restaurant, manager William Yates informed Tanya Comber and others "that no overtime was allowed." Comber interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).

---

[9] Cremeans' deposition transcript refers to the manager in question as Tad "Coon." This appears to be a faulty transcription. Tad Kuhn and George Cremeans worked at the same Columbus, Ohio office.

- Similarly, during a conference call led by managers Jeffrey Page and Ellen Steinfeld, Louis Belezos learned of Citizens' preapproval requirement, but was also told by Steinfeld that Citizens "did not want Plaintiff to report or ask for more than 40 hours per workweek and that overtime hours would not, in fact, be approved, even if asked for." Belezos interrogatory response no. 2 (Plaintiffs' Exhibit 1-F).

- Teresa Fragale sought information from manager Jim Schwartz regarding Citizens' overtime policy in March 2015, during a particularly busy time at work. Fragale depo. at 27-28 (Plaintiffs' Exhibit 1-K). Schwartz told Fragale she could request overtime "but it will not be approved." *Id.* at 28.[10]

This evidence of an unofficial policy discouraging the reporting of overtime hours is evidence of "a common employer practice that, if proved, would help demonstrate a violation of the FLSA." *Zavala*, 691 F.3d at 538.

Moreover, the time-sheets of the above-mentioned Plaintiffs' are generally consistent with their testimony (although of course exceptions exist). Despite widespread affirmation from MLOs that their jobs regularly required them to work more than 40 hours per week, the MLOs who assert their managers told them not to ***report*** those overtime hours adduce evidence that they adhered to this unofficial policy:

- In 96 weeks as a Citizens employee, Gramesty never reported overtime.

- Howard reported overtime in 20 out of 93 weeks. However, as noted above, Porath gave Howard standing preapproval for 45 hours per week during a portion of his employment, before Howard was prohibited from reporting further overtime.

---

[10] By contrast, the single Citizens-selected Opt-In Plaintiff who participated in discovery stated he ***did not work off the clock***, nor was he discouraged by a Citizens manager from reporting all of the hours that he worked).. *See* Richards' survey response at 1-2 (docket no. 112-1, Exhibit 7).

- In 56 weeks as a Citizens employee, Kinsella never reported overtime.

- Kolenda passed 63 weeks as an MLO without once reporting overtime.

- Dal Pino worked 137 weeks without reporting overtime.

- Naji reported overtime in 10 of 12 weeks. He was not told to cease reporting overtime until two months after beginning employment with Citizens. *See* Naji depo. at 37 (Plaintiffs' Exhibit 1-O).

- Traxler reported overtime in 9 of 128 weeks as a Citizens employee.

- Strickler reported overtime in one week out of 21 as a Citizens employee.

- Soroka reported overtime in 16 out of 40 weeks as an MLO.

- Ross never reported overtime in 40 weeks as an MLO.

- Nostro, employed as an MLO for 136 weeks, never reported overtime.

- Waterhouse reported overtime once in 69 weeks as an MLO.

- Seufert recorded overtime in 3 weeks out of the 40 she was employed by Citizens.

- Randolph did not report overtime in 15 weeks.

- Farrell claimed overtime in three of 27 weeks.

- Heydon recorded overtime in 36 out of 245 weeks.

- Roach reported overtime in one out of 134 weeks.

- Karametros claimed overtime in 32 out of 61 weeks.

- Pennington did not report overtime in 65 weeks.

- Jindra recorded overtime in 20 out of 79 weeks.

- Cremeans reported overtime in 54 out of 71 weeks. However, he testified he was generally allowed to report up to 5 hours of overtime per week.

- Duban never reported overtime in 37 weeks.

- Comber did not report overtime in 46 weeks.

- Belezos did not report overtime in 52 weeks.

- Fragale reported overtime in 3 out of 36 weeks.

Broderick decl. exh. 2 (docket no. 112-1, Exhibit 1).[11]

Citizens, of course, offers contradictory testimony from Citizens' managers, who insist they did not discourage the reporting of overtime hours. *See* Citizens decertification motion at 18-19 (docket no. 112). But the ultimate resolution of this genuine factual dispute necessarily rests with the fact-finder. It suffices for now that Plaintiffs have carried their burden under *Zavala*.

Aside from this evidence of Citizens' policy-to-violate-the policy, the named and Opt-in Plaintiffs have similar employment circumstances—all are MLOs, who are governed by a single job description, and who perform the same tasks in order to generate sales of Citizens' residential mortgage products. In addition to performing the same tasks, the MLOs were all subject to the same Comp-Plans and the same Time Sheet Policy. Moreover, all MLOs assert the same legal claims, seeking the same relief. The fact that the named and Opt-in Plaintiffs perform these tasks in different States for different managers certainly does not render them so dissimilar, for purposes of the claims asserted in this case, that certification becomes inappropriate.

Citizens responds by pointing to other differences in the factual and employment settings of particular named and Opt-in Plaintiffs, each of which Citizens asserts "presents fact-specific questions that must be answered separately for each Plaintiff and each Opt-in." Citizens decertification motion at 20 (docket no. 112). These differences include whether the MLOs worked

---

[11] These same MLOs estimate an average workweek of actual hours worked well in excess of 40 hours per week. *See* Plaintiffs' decertification opposition at 13-15 (docket no. 128).

overtime and how much; whether MLOs who worked overtime requested preapproval (and whether their requests were granted); whether MLOs recorded their overtime hours (and if not, why not); and whether the MLO's manager knew or should have known that the MLO was performing off-the-clock work.  But Plaintiffs can establish virtually all of these points through representative evidence; sworn testimony as to the number of hours the MLOs actually worked, based on the MLOs' recollections, suffices under *Anderson*.  *See Bouaphakeo*, 136 S.Ct. at 1046-47.  And the members of a collective may be similarly-situated even though their damages vary.  *Butler v. DirectSAT USA, LLC*, 47 F. Supp. 3d 300, 312 (D. Md. 2014) ("Here, many of the differences to which Defendants point go to individual damages, not liability across the entire class.  It is well established that the fact that individualized findings regarding damages may be necessary does not require class decertification.") (quotation marks omitted); *see also Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 86 (3rd Cir. 2017) (noting the need for individualized "damage calculations does not vitiate automatically the collective action," and explaining that district courts have broad discretion to decide whether the need for such calculations renders a collective action unmanageable) (quotation marks omitted); *Verma v. 3001 Castor, Inc.*, 2016 WL 6962522 at *5 (E.D. Pa. Nov. 29, 2016) ("Courts applying *Zavala* have indicated that plaintiffs may satisfy this factor even where individual plaintiffs ultimately seek different dollar amounts of relief for their claims.").

Citizens next asserts that individualized defenses weigh against final certification here.  These defenses include "whether and why" an MLO worked overtime, failed to record overtime, or otherwise violated Citizens' Time Sheet Policy.  Citizens' decertification motion at 35 (docket no. 112).  Citizens also asserts that a particular manager's actual or constructive knowledge of off-the-

clock overtime is an individualized question, as is whether the MLO complained about the requirement of working without pay. *Id.* Finally, Citizens maintains that a court cannot determine in the context of a collective action whether the off-the-clock work was compensable or so limited as to be *de minimis.* *Id.*

Courts regularly reject similar arguments seeking denial of final certification in similar circumstances. In *Monroe v. FTS USA, LLC*, 800 F.3d 389 (6th Cir. 2017), employers argued they were entitled to "raise separate defenses by examining each individual plaintiff on the number of unrecorded hours they worked," but were improperly denied this opportunity because the district court permitted plaintiffs to prove off-the-clock FLSA violations using representative evidence. *Id.* at 404. The Sixth Circuit rejected this argument: "[s]everal circuits, including our own, hold that individualized defenses alone do not warrant decertification where sufficient common issues or job traits otherwise permit collective litigation." *Id.* Holding that the *Anderson* framework applied, the *Monroe* court explained:

> Under this framework, and with the use of representative testimony and an estimated-average approach, defenses successfully asserted against representative testifying technicians were properly distributed across the claims of nontestifying technicians. For example, [the employers] argue that testifying [employees] did not work all of the overtime they claimed and underreported some of their overtime for reasons other than a company-wide policy requiring it. [The employers] had every opportunity to submit witnesses and evidence supporting this claim. The jury's partial acceptance of these defenses, as evidenced by its finding that testifying technicians worked fewer hours than they claimed, resulted in a lower average for nontestifying technicians. Thus, [the employees'] representative evidence allowed appropriate consideration of the individual defenses raised here.

*Id.* at 404-05.

The same is true here. Citizens may examine each of the testifying MLOs concerning (for

example) the extent of off-the-clock time the MLO claims to have worked, and the nature of such work; and Citizens may present testimony from managers undercutting the opposing evidence that managers routinely discouraged MLOs from reporting all hours worked.  The jury's determinations of credibility will translate directly into their determinations of liability and/or damages.  *See Rivet v. Office Depot, Inc.*, 207 F. Supp.3d 417, 428 (D.N.J. 2016) ("The Court is confident that Office Depot can make its credibility arguments on a collective basis.  Accordingly, it rejects Office Depot's argument that individual defenses preclude final certification.").

Finally, Citizens contends that Plaintiffs' claims and Citizens' affirmative defenses require that each MLO's claim for uncompensated work be adjudicated individually.  Citizens insists "there is no way, consistent with Due Process, to adjudicate the claims of all Plaintiffs and Opt-Ins based on a sample of Plaintiffs and Opt-Ins."  Citizens decertification motion at 40 (docket no. 112).  It is true that a collective action generally cannot be maintained, in fairness to a defendant, when the individual circumstances of plaintiff-employees vary widely.  *Cf. Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1264 (11th Cir. 2008) ("the more similar the employees, the less likely that collectively litigating the executive-exemption issue can be fundamentally unfair").  For the reasons noted above, however, the fundamental variation between each MLO's circumstances is not wide. Citizens can challenge Plaintiffs' claims of overtime work, and the existence of an unofficial policy discouraging the reporting of overtime work, by rebutting the representative evidence offered by Plaintiffs or by undercutting the credibility of the witnesses called to testify.  *See Reich*, 13 F.3d at 701 ("Courts commonly allow representative employees to prove violations with respect to all employees."); *DeAngelis v. Bally's Park Place, Inc.*, 298 F.R.D. 188, 195 (D.N.J. 2014) (rejecting a due process challenge by defendant in a wage-and-hour case).

Furthermore, the similarities between the named and Opt-in Plaintiffs and the efficiencies to be had by litigating these claims on a collective basis, contrasted against the result of decertification, weigh strongly in favor of final certification. If this Court denies final certification, "the court will decertify the class, dismiss the opt-in plaintiffs without prejudice, and permit the named plaintiffs to proceed to trial." *Halle v. West Penn Allegheny Health Sys.*, 842 F.3d 215, 226 (3rd Cir. 2016). Opt-ins would then be "forced to file individual lawsuits on their own behalf" to continue pursuit of their claims, generating accompanying expenses and judicial inefficiencies that are not warranted in light of the similarities among MLOs. *Rivet*, 207 F. Supp. 3d at 428.

Accordingly, the Special Master recommends the Court should deem the named Plaintiffs and the opt-in Plaintiffs "similarly situated" with respect to the FLSA Off-the-Clock Claims, and finally certify these claims pursuant to 29 U.S.C. §216(b).

## VII.    Analysis – Class Certification.

Finally, Plaintiffs move for certification, pursuant to Federal Civil Rule 23, of ten State-specific classes asserting State-law Off-the-Clock claims. Citizens opposes on grounds that Plaintiffs cannot establish the commonality or typicality requirements of Rule 23(a), the predominance or superiority requirements of Rule 23(b)(3), or the requirements of Rule 23(b)(2). Citizens does ***not*** dispute that the members of the proposed classes are ascertainable. *See Hayes v. Wal-Mart Stores, Inc*., 725 F.3d 349, 354 (3rd Cir. 2013). Nor does Citizens contest that the members of the proposed classes are sufficiently numerous that joinder of all class members is impracticable. *See* Federal Civil Rule 23(a)(1). And Citizens does not argue the class representatives or proposed class counsel are not adequate, within the meaning of Rule 23. *See id.*

36

(a)(4), (g)(1)-(4).  The undersigned previously recommended the Court should find Plaintiffs satisfy the ascertainability, numerosity, and adequacy prerequisites to class certification with respect to the Recapture Claims, and that discussion, equally applicable here, is incorporated by reference.  *See First Report* at 23-33 (docket no. 179).

The key point of dispute between the parties on Plaintiffs' motion for class certification is whether the circumstances of each MLO's employment—and thus, the facts underlying each MLO's Off-the-Clock claims—are so dissimilar that class treatment is inappropriate under Federal Civil Rule 23(a) and (b)(3).  This dispute spills across three of the elements of Plaintiffs' class certification burden: whether the questions posed by the class claims are common; whether the claims of the named Plaintiffs are typical of the claims of class members; and whether individualized questions of fact and law predominate over common questions.

**Commonality.**  Rule 23(a)(2) permits a representative plaintiff to lead a certified class if "there are questions of law or fact common to the class."  "[T]hat bar is not a high one;" it requires identification of only one common question.  *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3rd Cir. 2013).  This single, common question must be capable of "generat[ing] common ***answers*** apt to drive the resolution of the litigation."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quotation marks omitted) (emphasis in original).  "[A]s long as all putative class members were subjected to the same harmful conduct by the defendant, Rule 23(a) will endure many legal and factual differences among the putative class members."  *In re Community Bank of N. Va. Mortg. Lending Practices Litig., PNC Bank NA*, 795 F.3d 380, 397 (3rd Cir. 2015).

Plaintiffs argue they have identified a common question of fact or law—whether "Citizens maintained a policy and practice of not allowing MLOs to report overtime commensurate with the

amount of overtime MLOs were actually working, and that this policy was applied to all MLOs throughout Citizens' mortgage division."  Plaintiffs' certification motion at 32 (docket no. 118).  Citizens argues this question does not satisfy the commonality requirement because it is incapable of generating the common answers that Rule 23(a)(2) requires.  Citizens insists that "whether an MLO can prove the elements of his or her claim depends entirely on individual circumstances unique to that MLO."  Citizens' certification opposition at 17 (docket no. 125).

Contrary to Citizens' assertion, however, courts have held that, when an off-the-clock claim rests on an alleged unofficial policy requiring off-the-clock work, the resolution of whether such a policy exists will drive the resolution of the entire class's claims.  *See Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 378 (7th Cir. 2015) ("If, on the merits, the district court were to determine that there was no such unofficial policy (and indeed it is possible, as we make no contentions about the prospects of victory on the merits), then all of the class members' claims would fail in unison.") (citation omitted); *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1166 (9th Cir. 2014) (holding that "[p]roving at trial whether such informal or unofficial policies existed will drive the resolution of" the elements of the plaintiffs' off-the-clock claims, which depended on an alleged "unofficial policy of discouraging reporting of . . . overtime") (quotation marks omitted).

The same is true here.  By pursuing this case as a class action, Plaintiffs have chosen to stand or fall as a class on common evidence of an unofficial policy discouraging MLOs from reporting all of the hours they worked.  If the jury accepts the contention that such a policy existed, then central elements of liability will be established on a classwide basis.  But if the jury finds no such policy, then the class claims will "fail in unison," and there will be no opportunity, in the context of a class action, for plaintiffs to prove overtime violations on other grounds.  *See Bell*, 800 F.3d at

38

378-79 (finding class claims alleging an unofficial policy requiring off-the-clock work posed a common question, because while class members "may have an individual claim that [would] remain[]" if the jury concluded no such unofficial policy existed, the remaining individual claim "would be based on an entirely different legal theory" and "the class would be decertified"). Plaintiffs meet the commonality requirement.

**Typicality.**  Plaintiffs must next show that their "claims or defenses . . . are typical of the claims or defenses of the class."  Federal Civil Rule 23(a)(3).  This typicality requirement "screen[s] out [proposed] class actions [from gaining certification when] . . . the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present."  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 598 (3rd Cir. 2012) (quotation marks omitted).  In other words, the requirement "is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals."  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 311 (3rd Cir. 1998).

"[T]ypicality, as with commonality, does not require that all putative class members share identical claims."  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531-32 (3rd Cir. 2004) (quotation marks and footnote omitted).  "If a plaintiff's claim arises from the same event, practice or course of conduct that gives rises to the claims of the class members, factual differences will not render that claim atypical if it is based on the same legal theory as the claims of the class."  *Id.* "[C]ases challenging the same unlawful conduct which affects both the named plaintiffs and the putative class usually satisfy the typicality requirement irrespective of the varying fact patterns underlying the individual claims."  *In Re Prudential*, 148 F.3d at 311 (quotation marks omitted).

39

Plaintiffs contend the named Plaintiffs' claims are typical of the class members' claims because each of the named representatives were "discouraged from seeking overtime compensation by [Citizens] for hours actually worked in excess of forty (40) in a workweek in a manner typical to all class members." Plaintiffs' class certification motion at 37 (docket no. 118). In response, noting that the analyses for commonality and typicality "tend to merge," Citizens' certification opposition at 16 (docket no. 125), Citizens' argument for the absence of typicality is the same as its commonality argument. Thus, Citizens argues that typicality is lacking because, "among Plaintiffs and Discovery Opt-Ins, testimony revealed material differences with respect to liability and damages," including the number of overtime hours that different MLOs reported. *See id.* at 20-21.

But the differences Citizens points to do not render the named Plaintiffs' claims *atypical* of the class claims. The class claims depend on the same factual and legal theories as the named Plaintiffs' claims. Thus, to prove their own off-the-clock claims, the named Plaintiffs must establish the same elements as class members, principally including the existence of an unofficial policy discouraging the reporting of all hours worked. *See In re Warfarin.*, 391 F.3d at 532 (affirming a finding of typicality because "the claims of the representative plaintiffs ar[ose] from the same alleged wrongful conduct on the part of [the defendant]" and also "ar[o]se from the same general legal theories" as the class claims). The fact that damages (if any) may vary between class members—because, for example, some MLOs reported less overtime than others—does not change the fact that the named Plaintiffs' claims are "typical, in common-sense terms, of the class." *In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 598 (3rd Cir. 2009) (quotation marks omitted); *see also In re Chocolate Confectionary Antitrust Litig.*, 289 F.R.D. 200, 217 (M.D. Pa. 2012) (noting that differences between class members, "even those which impact damages calculations, do not

preclude a finding of typicality," where all claims arose out of the same alleged unlawful conduct). Indeed, none of the factual differences Citizens identifies cause the interests of the named Plaintiffs to diverge from those of the class.  Plaintiffs meet the typicality requirement.

*Predominance*.  Finally, Plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members."  Federal Civil Rule 23(b)(3). "This predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Marcus*, 687 F.3d at 600 (quotation marks omitted).  "[T]he predominance criterion is far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods. v. Windsor*, 521 U.S. 591, 623-24 (1997).  Third Circuit "precedent provides that the focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298 (3rd Cir. 2011).  Predominance requires only "a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013) (emphasis in original).  And even in the presence of some individual questions, a district court retains discretion to certify a class; predominance is a "qualitative" measure, not simply a nose-counting exercise. *Neale V. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 371 (3rd Cir. 2015).

Plaintiffs argue they have presented "significant and more than sufficient evidence of a clear 'policy-to-violate-the-policy' with respect to working and reporting overtime by MLOs that extended to **all** MLOs working for [Citizens] during the relevant time period."  Plaintiffs' certification motion at 46 (docket no. 118) (emphasis added).  Citizens responds that trying the class

claims will require "highly individualized mini-trials for each MLO," examining the same issues that Citizens says deprive the class of commonality and the named Plaintiffs of typical claims—that is, (1) whether the MLO worked overtime and how much; (2) whether Citizens requested the overtime and the MLO was paid for this work; (3) whether Citizens knew or should have known of any uncompensated work; and (4) whether the work was compensable. Citizens' certification opposition at 28 (docket no. 125). All of these showings, Citizens argues, must be made under the more demanding *Seevers* standard (a contention already rejected above). *See id.* at 30. And Citizens maintains that its defenses, including application of any applicable statute of limitation, are individualized, as is the need to assess the credibility of each MLO and his or her manager. *Id.* at 28.

After careful review of the record, the undersigned concludes that Plaintiffs have demonstrated that the unofficial policy upon which their Off-the-Clock claims are predicated is amenable to common proof and that this common question will predominate over any individualized questions. "[A] court weighing class certification must walk a balance between evaluating evidence to determine whether a common question exists and predominates, without weighing that evidence to determine whether the plaintiff class will ultimately prevail on the merits." *Bell*, 800 F.3d at 377. Plaintiffs here have "offered [substantial] evidence that the denial of overtime pay came from a broader company policy and not from the discretionary decisions of individual managers." *Id.* at 375. This evidence comes from roughly two dozen MLOs, employed by Citizens in different states, during different times, and under different managers. These MLOs generally testify that, while Citizens maintained an ***official*** policy that required all hours worked to be reported and paid, and while Citizens ***officially*** required overtime to be requested and approved in advance, Citizens'

managers nonetheless regularly and almost uniformly instructed MLOs not to report all the hours that they worked. "[T]he number of people" offering such testimony "across branches, managers, positions, and time frames has reached a point from which it may be inferred that the common issue of whether a company-wide policy existed to deny overtime will predominate over the variations in methods used to accomplish the alleged policy." *Id.* (quoting *Ross v. RBS Citizens, N.A.*, 2010 WL 3980113 at *6 (N.D. Ill. 2010), *aff'd* 667 F.3d 900 (7th Cir. 2012)).[12]

Aside from emphasizing the individual circumstances of each MLO, Citizens offers a few other rejoinders, but none change this conclusion. First, Citizens essentially argues the Court should disregard the named and Opt-in Plaintiffs' answers to interrogatories, because "when confronted with their discovery responses at deposition, many of the deponents crumbled and it became clear that counsel had a heavy hand in drafting of those responses and often the responses reflected an effort to jam a square peg into a round []hole." Citizens' certification opposition at 34-35 (docket no. 125). Even assuming it would be proper to discount verified interrogatories on these grounds in connection with deciding class certification, the record simply does not support Citizens' characterizations. For example, MLO Heydon testified he had not seen the Interrogatory Responses bearing his name that Plaintiffs served on Citizens. But he further testified he ***had*** answered the questions posed in Citizens' interrogatories, and had a hazy recollection of having signed his name in the course of filling out a form provided to him by counsel that posed Citizens' questions. *See*

---

[12] Citizens does not address the holding in *Bell*, evidently because Plaintiffs captioned the case incorrectly in their certification motion—PNC Bank, not Citizens, was the defendant in *Bell*. *See* Citizens' certification opposition at 33 (docket no. 125) ("First, the case *Bell v. **Citizens***, 800 F.3d 360 (7th Cir. 2015)[,] does not exist.") (emphasis added). Plaintiffs provided the correct Federal reporter citation for *Bell*, however, and quoted at length from the decision. Citizens thus had sufficient notice to rebut application of the Seventh Circuit's analysis to this case, but did not.

Heydon depo. at 114 (Plaintiffs' Exhibit 1-R) ("I remember answering these questions."). That Heydon did not recall seeing the formal interrogatory responses filed by counsel does not undermine the veracity of what the document contained.

Second, Citizens argues that Plaintiffs "offer no tenable proposal for measuring damages on a class-wide basis." Citizens' certification opposition at 30 (docket no. 125). However, Plaintiffs have proposed a method for the jury's determination of damages, *see* Plaintiffs' pretrial statement at 8-11 (docket no. 155), and case law supports certification in various types of cases where there are individualized damages issues. For example, "[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3)." *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) (reversing decertification of a class of cellular telephone customers asserting breach of contract claims, even though they had different calling plans and individual damage amounts). Similarly, in a securities class action, "[t]he amount of damages is invariably an individual question and does not defeat class action treatment." *Blackie v. Barrack*, 524 F.2d 891, 905 (9th Cir. 1975) (affirming class certification). And in an antitrust case, "[c]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 139 (2nd Cir. 2001) (affirming class certification, and adding that "failure to certify an action under Rule

23(b)(3) on the sole ground that it would be unmanageable is disfavored") (Sotomayor, J.).[13]

In sum, Plaintiffs have carried their burden of showing commonality, typicality, and predominance.  Accordingly, the Special Master recommends the Court should grant Plaintiffs' motion for class certification of the State-law Off-the-Clock Claims.[14]

---

[13]  Then-Judge Sotomayor further noted that "[t]here are a number of management tools available to a district court to address any individualized damages issues that might arise in a class action, including: (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class." *In re Visa*, 280 F.3d at 141 (footnote omitted).

*See also* 2 *Newberg on Class Actions* §4:54 at 210 (5th ed. 2012) ("[O]utside of the personal injury/mass tort context, cases in which individual damage concerns predominate and defeat certification 'rarely, if ever, come along.'") (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004)); 1 *McLaughlin on Class Actions* ¶4:19 (12th ed. 2015) ("The overwhelming majority of cases addressing the effect of variations in the amount of damages recoverable by class members on the certification analysis have concluded that if there is a sufficient nucleus of common questions concerning liability, the fact that damages will need to be calculated on an individual basis does not defeat typicality or otherwise bar class certification.") (citing cases); 5 *Moore's Federal Practice* §23.23[2] (1997) ("[T]he necessity of making an individualized determination of damages for each class member generally does not defeat commonality."); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1437 (2013) ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal.") (Ginsburg and Breyer, JJ., dissenting).

[14] In addition to its arguments regarding commonality, typicality, and predominance, Citizens also asserts "class certification is not the superior method of adjudication because Plaintiffs can put forward no reasonable trial plan for adjudication of these individualized claims."  Citizens certification opposition at 35-36 (docket no. 125).  In support of this contention, however, Citizens again cites case law standing for the basic proposition that the circumstances of individual MLOs are too dissimilar to be tried on a classwide basis.  As noted above, the Special Master disagrees, and incorporates the *First Report's* recommended findings with respect to superiority.  *See First Report* at 31-32 (docket no. 179).

Likewise, Citizens contests certification pursuant to Federal Civil Rule 23(b)(2).  *See* Citizens' certification opposition at 36-37 (docket no. 125).  For the same reasons as stated in the *First Report*, however, certification of the injunctive and declaratory relief portions of the Amended Complaint is appropriate.  The alleged off-the-clock policy "can be enjoined and declared unlawful only as to all of the class members or as to none of them," *Gates v. Rhom and Haas Co.*, 655 F.3d at 255, 264 (3rd Cir. 2011) (quotation marks omitted), and Plaintiffs independently satisfy Rule 23(b)(3) with respect to the damages portion of their claims.

**VIII.   Time for Filing Objections.**

The parties have stipulated that, "Pursuant to FRCP 53(f)(2), any party may file objections to, or a motion to modify, any Report and Recommendation on or before 14 days from the time the Report and Recommendation is filed on ECF.  If no objections or Motions to Modify are filed within said time period, any such objections or proposed modifications are waived."  Stipulation at 2, ¶5 (docket no. 82).

RESPECTFULLY SUBMITTED,

/s/ David R. Cohen
**David R. Cohen**
**Special Master**

**DATED**: August 2, 2017

46