# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEX REINIG, KEN GRITZ, and BOB SODA, individually and on behalf of those similarly situated, | ) ) ) | No. 2:15-cv-01541 |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| CITIZENS BANK, N.A., | ) | |
| | | |
| Defendant. | | |

## **PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

*On behalf of the Plaintiffs:*


*/s Joshua S. Boyette*
Joshua S. Boyette, Esq.
Justin L. Swidler, Esq.
**SWARTZ SWIDLER, LLC**
jboyette@swartz-legal.com


Robert D. Soloff, Esq.
**ROBERT D. SOLOFF, P.A.**

# TABLE OF CONTENTS

A.   CITIZENS BANKS' MLO OVERTIME PRACTICES ........................................ 1

    i.   Job Duties of MLOs ...................................................................................... 1

    ii.   MLO Compensation Plan  and Official Overtime and Time Tracking Policies ............. 3

    iii.   Citizens' official policies required MLOs' managers to review MLOs' timesheets for completeness and accuracy before approving ......................................................... 5

    iv.   MLOs were directed to report a 40-hour workweek ...................................... 6

    v.   Citizens' Managers accepted MLOs' "block-reported" attendance records despite knowing that these records were inaccurate. ......................................................... 7

    vi.   MLOs could not typically perform their work within a 40-hour workweek................. 10

    vii.   Citizens never performed any time studies to determine a reasonable and feasible standard workweek length for MLOs. ................................................................... 10

    viii.   MLOs' managers did not have line-on-sight on MLOs such that they could physically observe the MLOs' work. ......................................................................... 10

    ix.   MLOs' managers had no individualized compensation-based incentives to deny MLOs' authorization to report or to work overtime. ............................................... 11

    x.   Citizens HR's Employee Relations division only received two complaints of MLOs not being paid for overtime worked between November 2012 and March 2016. ..................... 11

    xi.   Defendant's Pre-Litigation Efforts to Manage Overtime................................ 11

    xii.   Defendant's Post-Litigation Mitigation Effort in December 2015............................ 14

    xiii.   Defendants' Resumption of Centralized Efforts to Control Overtime in Early 2017  15

    xiv.   MLOs reported very few overtime hours during the period for which Defendant has provided data of November 2012 through April 2017........................................... 16

B.   CENTRAL DIVISION MLO OVERTIME PRACTICES .................................... 17

    i.   Division Manager Robb Sutton (Aug. 2013-Aug. 2018) ................................ 17

  b.   OHIO MLO OVERTIME PRACTICES ........................................................ 18

    i.   RSM Tad Kuhn (June 2012-Dec. 2016)........................................................ 18

    ii.   PSM James Schwartz (Dec. 2010-Oct. 2015) .............................................. 23

    iii.   Marina Fiorello (Sept. 2011-July 2013) ..................................................... 24

    iv.   Lynn Duban (Oct. 2011-Jan. 2013) ............................................................. 25

    v.   Larry Heydon (Nov. 2011-Present)............................................................... 25

    vi.   Teresa Fragale (Oct. 2014-Oct. 2015, Jan. 2018-Present) ............................ 27

    vii.   Tanya Comber (Nov. 2014-October 2015).................................................. 28

    viii.   Karen Jindra (Nov. 2014-June 2016) ........................................................ 28

    ix.   George Cremeans (May 2015-Sept. 2016)................................................... 30

  c.   MICHIGAN MLO OVERTIME PRACTICES ................................................ 31

      i.    RSM Christopher Gough ............................................................. 31

      ii.   Clare Richardson (June 2014-Aug. 2015) .................................. 32

      iii.  Ahmad Naji (Dec. 2014-March 2015) ....................................... 34

  d.    ILLINOIS MLO OVERTIME PRACTICES ....................................... 34

      i.    Illinois Management during the Relevant Period ........................ 35

      ii.   Valerie Dal Pino (July 2008-April 2016) .................................. 35

      iii.  Melita Randolph (March 2012-February 2013) .......................... 37

      iv.  Timothy Gerrity (March 2014-June 2015) ................................. 37

  e.    CENTRAL AND WESTERN PENNSYLVANIA MLO OVERTIME PRACTICES ...... 38

      i.    Area Manager Lowell "Tom" Kullman (May 2012-Present) ....................................... 38

      ii.   PSM George Dillinger ............................................................... 42

      iii.  PSM Lance Fultz (Aug. 2012-Present) ...................................... 42

      iv.  Stephanie Joy Moyer (Feb. 2006-October 2014) ....................... 44

      v.    Alex Reinig (Dec. 2013-Sept. 2015) ......................................... 45

      vi.   Robert Soda (Feb. 2014-Dec. 2015) .......................................... 48

      vii.    Ryan Strickler (March 2014-Aug. 2014) ................................. 51

      viii.   Kenneth Gritz (Nov. 2014-Oct. 2015) .................................... 51

      ix.   David Bouder (Jan. 1991-Present) ............................................. 53

  f.    UPSTATE NEW YORK MLO OVERTIME PRACTICES ........................... 54

      i.    PSM Edwin Negron ................................................................... 54

      ii.   PSM Jill Allen ........................................................................... 55

      iii.  Peter Smith (April 2011-Sept. 2013) ......................................... 55

      iv.  Cynthia Nostro (April 2011-Nov. 2014) .................................... 56

      v.    Mark Anthony Ross (Aug. 2004-Dec. 2005, April 2015-Jan. 2016) ............................ 57

  g.    NORTH CAROLINA MLO OVERTIME PRACTICES ............................ 58

      i.    David Howard (Aug. 2014-June 2016) ....................................... 58

C.   NEW ENGLAND MORTGAGE LOAN OFFICER OVERTIME PRACTICES ................ 59

  a.    NEW ENGLAND MANAGEMENT ................................................... 59

      i.    Division Manager Bruce Ocko (2006-Sept. 2014) ...................... 59

      ii.   RSM Nancy Monbouquette (June 2010-March 2021) ................. 60

  b.    NEW HAMPSHIRE MORTGAGE LOAN OFFICER OVERTIME PRACTICES ......... 66

      i.    Robert Pedersen (Sept. 2008-Feb. 2014) .................................. 66

      ii.   Konstantinos Karametros (Feb. 2015-April 2016) ..................... 70

  c.    RHODE ISLAND MLO OVERTIME PRACTICES ................................ 72

     i.   Regional Manager John Kraus ..................................................................... 72

     ii.  Daniel Kolenda (May 2014-Aug. 2015) ..................................................... 72

     iii. Cheryl Roach (Jan. 2010-July 2015)........................................................... 73

  d.   MASSACHUSETTS MLO OVERTIME PRACTICES ......................................... 74

     i.   PSM Steven Roussel ................................................................................... 74

     ii.  PSM Lisa Oakley .......................................................................................... 76

     iii. PSM Lance Adie ........................................................................................... 76

     iv. PSM Joseph Boynton (Jan. 2011-Feb. 2013, April 2015-Present) ............... 76

     v.   Marie Seufert (Nov. 2012-Aug. 2013) ........................................................ 78

     vi. William Kinsella (Oct. 2009-Dec. 2013) ..................................................... 78

     vii.  William Ziminsky (June 2012-Dec. 2013) ................................................. 79

     viii.  Louis Belezos (March 2008-Nov. 2013) .................................................... 79

     ix. Dale Lawrence (May 2011-March 2014)..................................................... 80

  e.   CONNECTICUT MLO OVERTIME PRACTICES ........................................... 81

     i.   Mary Lou Gramesty (July 2000-Oct. 2014)................................................ 81

D.   NORTH EAST  DIVISION MLO OVERTIME PRACTICES ............................................. 82

     i.   National Sales Director and Former Division Manager Chace Gundlach (Dec. 2008-
Present) .............................................................................................................. 82

  b.   EASTERN PENNSYLVANIA MLO OVERTIME PRACTICES................................... 84

     i.   Carol Waterhouse (Aug. 2014-Dec. 2015)................................................... 84

     ii.  PSM Raymond Pool (2009-2012, 2013-2018)............................................. 85

  c.   METROPOLITAN NEW YORK MLO OVERTIME PRACTICES .............................. 87

     i.   Michael Troy Farrell (April 2015-Oct. 2015) ............................................. 87

Plaintiffs submit the following proposed findings of fact based on the testimony and evidence presented at the Rule 23 Class Certification Evidentiary Hearing, held on December 7 through December 10.

## A. CITIZENS BANKS' MLO OVERTIME PRACTICES

### i. Job Duties of MLOs

1.    The job duties of an MLO at Citizens Bank included providing loan officer support at retail bank branches; responding to emails and phone calls from customers and referral sources; seeking out and developing referral sources and business partners such as realtors and attorneys; attending open houses; responding to leads provided from Citizens Bank within 24 hours; doing pre-qualifications for customers and potential customers; entering loan applications for customers; gathering documents from customers necessary for the loan application; and being involved in the processing of the loans once the applications were entered. Fiorello Testimony, 12/7 Transcript, 4:15-5:06; Heydon Testimony, 12/7 Transcript, 51:12-25; Gritz Testimony, 12/7 Transcript, 71:14-72:20; Reinig Testimony, 12/7 Transcript, 113:19-114:03; Soda Testimony, 12/7 Transcript, 160:10-161:03; Dal Pino Deposition Designations, ECF Doc. No. 387-2, 27:11-17; Roach Deposition Designations, ECF Doc. No. 387-5, 85:20-87:05; Ziminsky Deposition Designations, ECF Doc. No. 387-16, 36:22-37:14; Gundlach Testimony, 12/8 Transcript, 56:05-58:23; Waterhouse Deposition Designations, 16:10-17; Monbouquette Testimony, 12/8 Transcript, 193:03-19; Kullman Testimony, 12/9 Transcript, 7:04-12; Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 39:17-24; Mortgage Loan Officer Description at Citizens Bank, Exhibit P-3.

2.    Citizens requires MLOs to perform pre-qualifications for every customer and potential customer who requests one.   Citizens' management is aware that not every

1

prequalification results in an application for a loan. Gundlach Testimony, 12/8 Transcript, 58:21-59:11.

3.      As a result, MLOs are required to communicate and take information from customers who ultimately do not apply for a loan, and are required to assist in taking applications from customers who are not qualified and/or do not close on a loan. Gundlach Testimony, 12/8 Transcript, 56:11-24. None of this required work increases an MLO's production numbers. *Id.* at 58:21-59:11

4.      MLOs' work includes following up on leads and developing referral sources, even when those leads fail or the referral source does not lead to closed loans. Gundlach Testimony, 12/8 Transcript, 56:25-58:05.

5.      "Part of a loan officer's job is at times to be available to potential customers on weekends." Gundlach Testimony, 12/8 Transcript, 60:12-14.

6.      "Part of a loan officer's job is to sometimes be available to clients on evenings." Gundlach Testimony, 12/8 Transcript, 60:15-17.

7.      MLOs were directed to attend open houses and brokers opens by both their direct supervisors (Producing Sales Managers or PSMs), as well as the supervisors' supervisors (Area or Regional Managers) as well as their supervisors' supervisors' supervisors (Divisional Managers or National Sales Management). Fiorello Testimony, 12/7 Transcript, 5:12-6:05; Reinig Testimony, 12/7 Transcript, 114:07-18.

8.      The majority of the markets in which MLOs in the putative classes worked had assigned retail bank branches, and MLOs who worked in those markets were directed that they should provide support for and develop business from those bank branches, usually by working out of the bank branches themselves. Fiorello Testimony, 12/7 Transcript, 13:03-08, 19-23;

Heydon Testimony, 12/7 Transcript, 52:04-14; Gritz Testimony, 12/7 Transcript, 79:20-80:07; Reinig Testimony, 12/7 Transcript, 114:19-115:05; Soda Testimony, 12/7 Transcript, 161:04-16, 162:20-163:03; Pool Testimony, 12/9 Transcript, 75:02-12; Boynton Testimony, 12/9 Transcript, 108:02-13; Gramesty Deposition Designations, ECF Doc. No. 388-3, 67:10-67:21.

9.      Specifically, as it relates to the ten state law subclasses for which Plaintiff seek certification, Citizens had retail bank branches in eight of those states: Connecticut, Massachusetts, New Hampshire, New York, Ohio, Pennsylvania, Michigan, and Rhode Island.  Citizens did not have retail branches in Illinois or North Carolina. Gundlach Testimony, 12/8 Transcript, 107:14-108:02; Richardson Deposition Designations, ECF Doc. No. 388-22, 74:09-74:13; Naji Deposition Designations, ECF Doc. No. 388-17, 44:17-44:23.

10.     MLOs were directed that they had to respond to respond to customer calls and emails within the same day, i.e., to follow the "Sunset Rule" for calls. Fiorello Testimony, 12/7 Transcript, 13:08-10, 13:23; Belezos Interrogatory Response No. 2.

### ii. MLO Compensation Plan  and Official Overtime and Time Tracking Policies

11.     Prior to the Spring of 2012, Citizens Bank paid MLOs on a draw-and-commission basis and designated MLOs exempt from overtime. During that period, Citizens did not require MLOs to track or report the number of hours worked each day or each week. Fiorello Testimony, 12/7 Transcript, 15:08-10. Pedersen Testimony, 12/7 Transcript, 31:13-21.

12.     The method of compensation for MLOs has not changed since 2012. Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 29:14-23.

13.     MLOs and PSMs alike characterized the pay plan after 2012 as remaining a draw-and-commission pay plan, where Citizens provided a draw on commission equal to $11.50 per hour, which it later recovered from the commissions earned by the MLOs. Fiorello Testimony,

12/7 Transcript, 16:15-18, 17:17-22; Gritz Testimony, 12/7 Transcript, 78:11-17; Reinig Testimony, 12/7 Transcript, 117:01-16; Soda Testimony, 12/7 Transcript, 168:14-22; Cremeans Testimony, 12/7 Transcript, 224:08-18; Gramesty Deposition Designations, ECF Doc. No. 388-3, 151:13-152:06.

14.     Specifically, all hourly pay provided to MLOs—up to the first 45 hours worked each workweek (40 regular hours and 5 overtime hours) at the regular hourly rate is defined in the MLO compensation plans as the "base compensation draw" and is entirely offset against gross commissions under the plans. Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 37:07-24.

15.     Citizens deducted 2/3 of the first five hours of overtime compensation (overtime is 1 and a half time the hourly rate; Citizens deducted only the base hourly rate); it was regularly communicated by Citizens' management that at least some of the overtime was taken out of the commissions. Gundlach Testimony, 12/8 Transcript, 81:22-82:12; *see also* P44 (Email to manager stating the manager told MLO that overtime "would just be taken out of commissions); P86 (Email from MLO to manager stating overtime comes out of commissions anyway so "I'll just log 40 every week to make it easy");

16.     Once Citizens Bank changed MLOs' overtime exemption status in 2012, Citizens' written policy provided that MLOs should report all hours worked and they would be paid for all reported hours, including overtime. Pedersen Testimony, 12/7 Transcript, 32:18-24.

17.     However, Citizens does not affirmatively distribute the written timesheet policy to its MLOs. Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 105:02-15.

18.     Citizens' corporate designee could not confirm whether MLOs are provided an employee handbook at the time of hire. Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 128:23-129:05.

19.     Citizens required all overtime be preapproved. Failure to follow the preapproval process for seeking overtime could result in corrective action up to and including termination. Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 132:14-133:16.

20.     The highest individual from Citizens who testified, the National Sales Director Chace Gundlach, testified that he could not attest that Citizens followed and enforced its timekeeping and reporting policies as written throughout the class period. Gundlach Testimony, 12/8 Transcript, 62:24-63:17.

### iii. Citizens' official policies required MLOs' managers to review MLOs' timesheets for completeness and accuracy before approving.

21.     Citizens' official policy is that supervisors are responsible for verifying that the information in Time & Labor is accurate and complete.; Gundlach Testimony, 12/8 Transcript, 66:05-12.  Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 80:01-81:14; Citizens Time Sheet Policies, Exhibit J-1 at CITIZENS0002190, CITIZENS0002194, CITIZENS0002197, CITIZENS0002202.

22.     Citizens' designee confirmed that it is a requirement of the written time sheet policy for the approving manager to look at the actual hours entered for each day and the actual start and stop time, and it would be a violation of the written policy to just look at the total hours reported for the week. Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 104:17-105:01.

23.   Citizens directed MLOs to keep their manager informed of their work schedule (including any changes) and seek approval where required. Tom Gamache December 2015 Memorandum, Exhibit J-3, at CITIZENS0002243.

### iv.   MLOs were directed to report a 40-hour workweek

24.   Prior to the change in exemption status, MLOs' offer letters explained that the MLO position was considered exempt from the overtime provisions of the Fair Labor Standards Act, that MLOs would not be eligible for overtime compensation, and that MLOs should devote their "full time and professional efforts to providing services to" Citizens. *See* Fiorello Offer Letter, Exhibit D-4, at CITIZENS0009187.

25.   MLOs hired after the change in the overtime exemption status received offer letters which explained that the MLO was scheduled to work 40 hours per week, that these scheduled weekly hours were subject to review and adjustment in Citizens' sole discretion, and that the MLO had to receive prior approval from their supervisor for any hours worked in excess of 40 hours per week. *See* Reinig Offer Letter, Exhibit D-2, Gritz Offer Letter, Exhibit D-3; Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 128:06-22, 129:10-23, 130:10-20, 131:01-17.

26.   During a company-wide phone call with all MLOs in the spring of 2012, National Sales Director Ellen Steinfeld told the MLOs that the job can and should be done in a 40-hour workweek, and if any MLO could not get their work done in 40 hours, they had time management issues. Fiorello Testimony, 12/7 Transcript, 13:21-14:07; Dal Pino Deposition Designations, ECF Doc. No. 387-2, 51:13-20, 52:13-12; Pedersen Testimony, 12/7 Transcript, 33:05-15; Gundlach Testimony, 12/8 Transcript, 104:07-15; Monbouquette Deposition Designations, ECF Doc. No. 387-21, 140:07-23; Belezos Interrogatory Responses, No. 2.

27.     During a meeting with Rhode Island MLOs about overtime in the spring of 2012, Ellen Steinfeld told the MLOs that they were expected to work a 40-hour workweek and if they could not their work done in 40 hours, they had time management issues. Roach Deposition Designations, ECF Doc. No. 387-5, 30:13-32:02.

28.     Ellen Steinfeld told her direct reports and Chace Gundlach, who was at that time a Regional Manager, that MLOs should "work their best 40 hours." Gundlach Testimony, 12/8 Transcript, 134:02-07. Gundlach testfied that his supervisor, Division Manager Bob Meyer, as well as Division Manager Bruce Ocko and Regional Manager Nancy Monbouquette were present when Steinfeld stated this. Gundlach Testimony, 12/8 Transcript, 120:06-09, 142:11-143:03.

29.     Gundlach also confirmed that Steinfeld told MLOs that the job was a 40-hour per week job. Gundlach Testimony, 12/8 Transcript, 134:08-13.

30.     Citizens did not inform its customers that their MLOs worked only 40 hours per week. Instead, Citizens provided MLO's cell phone numbers and emails on its website, advertising in that its loan officers were available from 8:00 AM to 8:00 PM Monday through Thursday, 8:00 AM to 6:00 PM Friday, and 9:00 AM to 3:00 PM on Saturday, totaling 64 hours per week. Excerpt of 2016 MLO Directory, Exhibit P-8.

### v. Citizens' Managers accepted MLOs' "block-reported" attendance records despite knowing that these records were inaccurate.

31.     In December 2015, Tom Gamache was the head of the national retail loan officer sales channel. Kullman Testimony, 12/9 Transcript, 11:10-13.

32.     MLOs regularly reported, and Citizens management regularly accepted, time sheets containing "block reporting," *i.e.* time sheets showing the **exact** same start time, the **exact** same end time, on the **exact** same five days (Monday to Friday) each week, week in and week out. Pedersen Attendance Records, Exhibit P-20; Reinig Testimony, 12/7 Transcript, 133:03-134:01;

Reinig Attendance Records, Exhibit J-8; Soda Testimony, 12/7 Transcript, 167:04-168:13; Soda Attendance Records, Exhibit J-10; Cremeans Attendance Records, Exhibit P-23; Vaughn Attendance Records, Exhibit P-15; Gramesty Attendance Records, Exhibit P-32; Dal Pino Attendance Records, Exhibit P-34, Plaintiff Attendance Records and Summaries (Fragale, Seufert, Waterhouse, Ziminsky, Kinsella, Kolenda, Roach, Belezos, Heydon & Howard), Exhibit P-37; James Sutcliffe Attendance Records, Exhibit P-150; Califano Attendance Records, Exhibit P-103; Lawrence Attendance Records, Exhibit P-110.

33.     Pursuant to the agreement of the parties to limit discovery to the Named Plaintiffs and a random sample of opt-in plaintiffs, Defendant only produced the time sheets for the Named Plaintiffs and Discovery Opt-In Plaintiffs. Defendant's Responses to Plaintiffs' Second Request for Documents, Resp. No. 13, Exhibit P-38.

34.     PSMs and other Citizens managers knew that MLOs ended their days at different times, and therefore knew or should have known that "block reported" attendance records which showed the exact same end-time each day, for the exact same days, for nearly every week of every month of every year, were inaccurate. Pedersen Testimony, 12/7 Transcript, 39:10-21; Gritz Testimony, 12/7 Transcript, 75:11-19; Gritz Testimony, 12/7 Transcript, 84:07-09; Kullman Testimony, 12/9 Transcript, 7:21-23; Kolenda Deposition Designations, ECF Doc. No. 66:16-24; Fultz email forwarding Tom Gamache December 2015 Memorandum, Exhibit D-5, at CITIZENS_ESI00068603; Tom Gamache December 2015 Memorandum, Exhibit J-3, at CITIZENS00022238;     Hoenigman/Kuhn     Email     Chain,     Exhibit     P-27, CITIZENS_ESI00196184.txt, at p. 3.

35.     Citizens did not expect MLOs to work the same 8-hour shift each and every day. Gundlach   Testimony,   12/8   Transcript,   61:16-62:17;   Tom   Gamache   December   2015

8

Memorandum, Exhibit J-3, at CITIZENS00022238, CITIZENS0002243; Tom Gamache February 8, 2017 Email, Exhibit P-5, at CITIZENS_ESI00058489-490; Gritz Testimony, 12/7 Transcript, 84:07-09; Cremeans Testimony, 12/7 Transcript, 228:01-03

36.     Every time sheet for every MLO was reviewed by the MLOs' managers and "verified" by those managers before being submitted to payroll. Gundlach Testimony, 12/8 Transcript, 66:17-21.

37.     Citizens' official policy was to prohibit MLOs from block-reporting their time, i.e., reporting the exact same start time day in and day out. Gundlach Testimony, 12/8 Transcript, 66:22-67:02.

38.     PSMs who were reviewing MLOs' time sheets were able to see whether the MLO was block-reporting his or her time, i.e., they were able to see whether the MLO was reporting the same start time and same end time, see that there was no evening time reported, see that there was no weekend work reported, and see that the same lunch break was being taken every day, week after week. Gundlach Testimony, 12/8 Transcript, 67:02-68:12.

39.     Because Citizens' time and attendance records rounded time to the nearest quarter of an hour, Gundlach admitted that it would be not be normal for an accurate timesheet to show nearly every start and stop time exactly on the hour.. Gundlach Testimony, 12/8 Transcript, 70:03-19, 75:04-11.

40.     Gundlach was not aware of any discussions between PSMs and MLOs about block-reported timesheets. Gundlach Testimony, 12/8 Transcript, 80:14-21.

41.     Citizens consistently accepted time sheets that showed block-reporting. Gundlach Testimony, 12/8 Transcript, 91:14-16.

42.     PSMs did not question MLOs about "block-reporting" time or reporting exactly the same number of hours worked each week. Soda Testimony, 12/7 Transcript, 174:03-09; Cremeans Testimony, 12/7 Transcript, 224:23-225:04, 228:04-07.

### vi. MLOs could not typically perform their work within a 40-hour workweek.

43.     MLOs working at Citizens Bank could not perform their jobs in 40 hours a week or less. Fiorello Testimony, 12/7 Transcript, 14:08-10; Heydon Testimony, 12/7 Transcript, 59:07-10; Gritz Testimony, 12/7 Transcript, 78:18-25; Soda Testimony, 12/7 Transcript, 175:12-17; Naji Deposition Designations, ECF Doc. No. 387-10, 46:18-21; Kolenda Deposition Designations, ECF Doc. No. 357-9, 84:14-85:02; Karametros Deposition Designations, ECF Doc. No. 387-13, 117:15-18; Roach Deposition Designations, ECF Doc. No. 387-5, 104:03-06; Ziminsky Deposition Designations, ECF Doc. No. 79:08-11; Richardson Deposition Designations, ECF Doc. No. 387-14, 80:12-15; Waterhouse Deposition Designations, ECF Doc. No. 387-15, 82:02-07; Smith Deposition Designations, ECF Doc No. 387-18, 105:20-23.

### vii. Citizens never performed any time studies to determine a reasonable and feasible standard workweek length for MLOs.

44.     In the ten years prior to Citizens' corporate designee's deposition, Citizens never performed any audits or time studies of the time MLOs worked. Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 94:07-15.

### viii. MLOs' managers did not have line-on-sight on MLOs such that they could physically observe the MLOs' work.

45.     PSMs did not physically observe all the work that MLOs performed in a workweek, so managed them by communicating with MLOs and keeping tabs on their general activities. Heydon Testimony, 12/7 Transcript, 65:20-25; Gritz Testimony, 12/7 Transcript, 87:25-88:05; Reinig Testimony, 152:11-19; Roach Deposition Designations, ECF Doc. No. 388-23, 156:24-

10

159:15; Richardson Deposition Designations, ECF Doc. No. 388-22, 178:20-179:20; Dal Pino

Deposition Designations, ECF Doc. No. 388-2, 75:09-77:08; Pool Testimony, 12/9 Transcript,

77:24-78:04; Fultz Testimony, 12/9 Transcript, 128:16-18.

### ix. MLOs' managers had no individualized compensation-based incentives to deny MLOs' authorization to report or to work overtime.

46.     PSMs had no individual compensation-based incentives for denying MLOs

authorization to report or work overtime. Reinig Testimony, 12/7 Transcript, 136:17-137:22;

Kullman Testimony, 12/9 Transcript, 19:03-09; Boynton Testimony, 12/9 Transcript, 110:09-14;

Fultz Testimony, 12/9 Transcript, 140:06-09.

47.     PSMs had an incentive to follow the directions of their managers with respect to

MLOs' reporting overtime, and their managers had an incentive to follow the directions of their

managers with respect to MLOs' reporting overtime. Reinig Testimony, 12/7 Transcript, 155:12-

18.

### x. Citizens HR's Employee Relations division only received two complaints of MLOs not being paid for overtime worked between November 2012 and March 2016.

48.     Defendant claims that since November 2012, Citizens Employee Relations only

received two complaints about MLOs not being paid overtime for the hours they actually worked,

filed by Patrick Kernick and by Maureen O'Toole, MLOs who reported to Alex Reinig.

Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 133:17-134:07.

Numerous produced emails from the same time period show frequent complaints, however. *See,*

*e.g.,* Exhibits P-44; P-48; P-65; P-71; P-73; P-86.

### xi. Defendant's Pre-Litigation Efforts to Manage Overtime

49.     As specified above, when MLOs were first designated as non-exempt in the Spring

of 2012, then National Sales Director Ellen Steinfeld held a conference call telling the MLOs that

the job can and should be done in a 40-hour workweek, claiming only MLOs with "time management" issues would have a problem. Fiorello Testimony, 12/7 Transcript, 13:21-14:07; Dal Pino Deposition Designations, ECF Doc. No. 387-2, 51:13-20, 52:13-12; Pedersen Testimony, 12/7 Transcript, 33:05-15; Gundlach Testimony, 12/8 Transcript, 104:07-15; Monbouquette Deposition Designations, ECF Doc. No. 387-21, 140:07-23.

50.     In February 26, 2013, Glenn Carter, who was the Executive Vice President of Home Lending Solutions, scheduled a call with Retail Product Leaders Bruce Ocko, the Divisional Manager for New England, Bob Meyer, the Division Manager for the Mid-Atlantic region, Todd Crisman, Regional Manager for Illinois, and Tad Kuhn, Regional Manager for Ohio, and Incentive Strategy Manager Charlotte Pemberton to share a report showing overtime usage by MLO and the deficits MLOs were running up due to receiving their hourly (including overtime) pay. Carter/Pemberton Email Chain, Exhibit P-51, CITIZENS_ESI00188587.txt, at pp. 1-2.

51.     On March 11, 2013, Charlotte Pemberton shared an overtime report with Glenn Carter, David Conners, (Vice President, Channel Administration Manager) and managers which highlighted in red any MLO in the company who was reporting more than 5 hours of overtime. Pemberton/Carter/Conners/Crisman Email Chain, Exhibit P-72, CITIZENS_ESI00205019.txt, at pp. 1-2.

52.     In April 2013, shortly after this call between Pemberton, the national sales leadership, and the MLOs' managers, Pemberton's subordinate Andrew McNally reported Ohio MLO Marina Fiorello to Glenn Carter and David Conners for reporting significant overtime with a deficit.. McNally/Carter/Conner/Kuhn Email Chain, Exhibit P-70, CITIZENS_ESI00196643.txt, at p. 4-9.

12

53.     In May 2013, McNally reported Fiorello for a second time to David Conners for still reporting significant overtime, and asked Conners "if you want me to continue to monitor or if these hours are acceptable." McNally/Carter/Conner/Kuhn Email Chain, Exhibit P-70, CITIZENS_ESI00196643.txt, at p. 4.

54.     In response, David Conners emailed Ohio Regional Manager Tad Kuhn, to whom Fiorello indirectly reported, and asked if Kuhn was comfortable with Fiorello reporting this amount of overtime. Kuhn told Conners that he had not been aware she was reporting this overtime, and he would follow-up with her direct supervisor.  McNally/Carter/Conner/Kuhn Email Chain, Exhibit P-70, CITIZENS_ESI00196643.txt, at pp. 1-2.

55.     Also in May 2013, McNally reported Massachusetts MLO Alexander Cohen to Conners, Massachusetts Regional Manager Nancy Monbouquette, and Division Manager Bruce Ocko for submitting 24 hours of overtime. Monbouquette replies to Conners that she has already addressed the issue, and asks whether Citizens has to pay for the time. McNally/Conners/Ocko/Monbouquette Email Chain, Exhibit P-75, CITIZENS_ESI00206884.txt, at pp. 1-3.

56.     In March 2015, McNally reported Massachusetts MLO Tom Preston to Monbouquette, Division Manager Tom Gamache, and Tim McKeever for reporting overtime while in a deficit, and Monbouquette replied to all "I will take care of this now." McNally/Gamache/Monbouquette Email Chain, Exhibit P-83, CITIZENS_ESI00209628.txt.

57.     In May 2015, McNally reported Michigan MLO Robert Aikens to Michigan Regional Manager Christopher Gough, Division Manager Robb Sutton, and SVP/ Strategic Production Manager Tim McKeever for reporting significant overtime. In response, Division Manager Sutton emailed Regional Manager Gough "I'm assuming you are addressing?" and

13

Gough forwards Aiken's PSM Bobby Shannon the email, adding: "See below. We've got to get this fixed today…" McNally/Sutton/Gough Email Chain, Exhibit P-88, CITIZENS_ESI00285323.txt.

58.     In September 2015, then Northeast Division Head Tom Gamache, who was that time the Northeast Division Sales Manager, asks to HR to research why "we cannot or should not charge all OT against commission versus just 5 hours." Gamache/Semple Email, Exhibit P-64, CITIZENS_ESI00191431.txt.

59.     Plaintiffs filed the instant complaint on November 23, 2015. ECF Doc. No. 1.

### xii.   Defendant's Post-Litigation Mitigation Effort in December 2015

60.     In December 2015, Defendant created a document called "Loan Officer Time Management Guidelines" with the intent to provide some guidance to MLOs on when they should be considering things work and when things are not considered work, and making clear that block-reporting time was a red flag and prohibited. Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 76:15-77:16; Memo from T. Gamache to MLOs re: Time Entry and Overtime Practices, Exhibit J-3.

61.     Prior to the creation of that document, Defendant did not have any documents specific for MLOs that gave guidelines on what was and what was not considered work. Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 77:17-77:24.

62.     Likewise, Retail LO Overtime FAQ was first created in December 2015, and no prior version of that document or any other document with similar content was distributed to MLOs. Mathieson-30(b)(6) Designee Deposition Designations, ECF Doc. No. 387-20, 78:01-78:15.

63.     The Loan Officer Time Management Guidelines was disseminated by National Sales Director Tom Gamache to the managers and MLOs on December 21, 2015. Dissemination

of Memo from T. Gamache to MLOs re: Time Entry and Overtime Practices, Exhibit D-5, at CITIZENS_ESI00189312.

64.     It took less than an hour for management to begin ensuring the written policies would not result in MLOs reporting all overtime.  Just twenty minutes after this memo was disseminated, the Regional Manager for New England Nancy Monbouquette sent a reply email to the PSMs and other managers reporting directly to her stating "We need to have all overtime approved prior to it being worked we rarely approve overtime please don't let this get out of control. "Monbouquette 12/21/15 Email, Exhibit P-69, CITIZENS_ESI00193857.txt.

### xiii.  Defendants' Resumption of Centralized Efforts to Control Overtime in Early 2017

65.     On January 24, 2017, then-National Sales Director Tom Gamache emailed the two Division Managers, Gundlach and Sutton, as well as the national Home Mortgage Sales leadership, saying "Guys, if there's a bucket of expenses we can hit hard it's in the OT line," and directed Citizens' leadership team to take a number of initiatives to decrease MLO overtime, including by holding a monthly executive review of the MLOs who report the highest amounts of overtime. Gamache Overtime Email, Exhibit P-55, CITIZENS_ESI00190201.txt.

66.     Attached to this email was a PowerPoint presentation showing a monthly overtime budget for 2016 and projections of overtime expenses in 2017, with a strategic plan to decrease overtime spending while increasing MLO headcount. The Presentation also contained a chart of the highest-overtime-reporting MLOs for August 2016.

67.     On January 31, 2017, Mortgage CFO Dator emailed President Nard and National Sales Manager Gamache showing the MLOs' overtime by month in 2016 and projected expense in 2017, and sought ideas from Dean Mathieson in HR how to source and report overtime data that

could help "Tom [Gamache] and team control this expense." Dator/Nard/Gamache Email, Exhibit P-56, CITIZENS_ESI00190209.txt.

68.     That same day, Gamache forwarded Dator's email to Gundlach and Sutton, stating: "We need to discuss controls on this[.] Volume down 40% this has to go down my guess is our top guys will be pushing their Psm around here." Gamache/Gundlach/Sutton Email, Exhibit P-57, CITIZENS_ESI00190211.txt.

69.     Gamache also asked for a monthly report of overtime by Loan Officer and Loan Officer Assistant. Gamache/Dator Email, Exhibit P-58, CITIZENS_ESI00190213.txt.

70.     President Chris Nard responded with two suggestions on how to reduce overtime expenditures: first, to eliminate the "5 hours without approval" and second, "going after the key overusers." Nard Email, Exhibit P-59, CITIZENS_ESI00190214.txt.

71.     On February 8, 2017, Gundlach emailed Gamache concerned that his managers' controlling MLO overtime reporting was going to land them "back into hot water." Wolfgang/Mathieson/Gundlach/Gamache        Email        Chain,        Exhibit        P-67, CITIZENS_ESI00192776.txt.

### xiv.  MLOs reported very few overtime hours during the period for which Defendant has provided data of November 2012 through April 2017.

72.     From the period of November 2012 through April 2017, MLOs collectively worked 66,486 workweeks, and reported 2,249,074.53 non-overtime hours reported, and 55,342.97 overtime hours.  On average, overtime reported totaled only 0.86 hours per workweek. Summary of Class Hours Worked Data 16Feb2017.XLSX – All MLOs, Exhibit P-6, at p. 15.

73.     Of the 1,060 MLOs whose information was produced in the litigation, 630 never recorded a single minute of overtime, despite working 31,816 workweeks. Summary of Class Hours Worked Data 16Feb2017.XLSX – All MLOs, Exhibit P-6. In other words, this cohort

represents 59.43% of the individuals in the data, and 47.85% of the workweeks in the data, but 0% of the OT reported.

74.     The top 10 overtime reporters reported an average of 15.23 hours of OT per week, while working a collective 523 workweeks, and were therefore responsible for 7893.25 of the OT hours. This small cohort represented 0.94% of the individuals in the data and 0.79% of the workweeks in the data, but were alone responsible for 14.26% of the OT reported.  Summary of Class Hours Worked Data 16Feb2017.XLSX – All MLOs, Exhibit P-6.

75.     When testifying about the summary before this Court, Gundlach testified that it "sound[ed] about right" that MLOs at Citizens would work about 55,342 hours of overtime over a period of "**five or six months**." (emphasis added). However, the summary was providing all the overtime Citizens paid its MLOs over **four and a half year**s (**54 months)**, *i.e.* it took Citizens a time period **10 times longer** than the time Gundlach was referring to pay MLOs that amount of overtime. Gundlach Testimony, 12/8 Transcript, 130:01-131:05, 132:25-133:16. Summary of Class Hours Worked Data 16Feb2017.XLSX – All MLOs, Exhibit P-6.

**B.   CENTRAL DIVISION MLO OVERTIME PRACTICES**

**i.   Division Manager Robb Sutton (Aug. 2013-Aug. 2018)**

76.     Robb Sutton joined Citizens in August 2013 as Division Manger of the Central Division. ECF Doc. No. 41 at p. 7, ¶ 14. According to his LinkedIn page, he left Citizens in August 2018. *See* https://www.linkedin.com/in/robb-sutton-595627b/, *(last visited January 10, 2022)*

77.     The Central Division consisted of *inter alia* the following states for which Plaintiffs seek to certify sub-classes: Ohio, Illinois, part of Pennsylvania, part of New York, Michigan, and North Carolina. ECF Doc. No. 41 at p. 7, ¶ 15.

78.     In April 2016, three Regional Sales Managers reported to Sutton: John Porath (Virginia and the Carolina); Tom Kullman (Western Pennsylvania); and Tad Kuhn (Ohio and

Indiana). Sutton's other regions were managed by Area Managers Gary Johansen (Upstate New York), Will Puckett (Kentucky) and Dan McGuire (Illinois). ECF Doc. No. 41 at p. 7, ¶ 16.

79.     Sutton confirmed that working overtime without getting preapproval was contrary to Citizens' policies, subject to performance review by the individual's managers, and, in certain circumstances, could lead to termination. Sutton Deposition Designations, ECF Doc. No. 387-30, 89:05-91:14.

80.     Sutton confirmed that Citizens Bank expected MLOs to work 40 hours per week, subject to a PSMs discretion to approve an MLO to work more time. Sutton Deposition Designations, ECF Doc. No. 387-30, 90:08-14.

81.     Sutton confirmed that he talked to his direct reports about managing overtime reporting. Sutton Deposition Designations, ECF Doc. No. 387-30, 95:24-96:04.

82.     While Sutton testified that he only talked about the general overtime policies with his direct reports, this testimony is contradicted by the May 2015 email chain in which he, after McNally alerted him as to an MLO's overtime reporting, emailed the regional manager stating: "I'm assuming you are addressing?" The regional manager responded by forwarding the email to necessary management: "See below. We've got to get this fixed today…" McNally/Sutton/Gough Email Chain, Exhibit P-88, CITIZENS_ESI00285323.txt.

### b.  OHIO MLO OVERTIME PRACTICES

#### i.  RSM Tad Kuhn (June 2012-Dec. 2016)

83.     Tad Kuhn worked at Citizens Bank from June 2012 through December 2016, as Regional Sales Manager of Ohio. Kuhn Deposition Designations, ECF Doc. No. 388-12, 8:13-17, 15:4-15:7, 15:20-21, 18:18-18:21.

84.     During his deposition, Kuhn testified under oath that no one ever told him MLOs were working overtime hours they were not reporting, and that if they had, he would have told

them to report the actual hours worked. ECF Doc. No. 387-26, 113:13-113:20. His testimony is contradicted by email evidence. In May 2013, one of his MLO reports emailed him that "my consistent 9-5 in the system is not anywhere close to the 8am-10pm I am actually working." Instead of telling her that she should be reporting her actual hours worked, Kuhn instead responds "I am sure you are working a ton. I am more interested in the underperforming LOs. … Some even TRY to claim overtime. LOL." Kuhn/Filler Email, Exhibit P-30, CITIZENS_ESI00196636.txt at p.1.

85.     A summary of Filler's Hours and Overtime Reported confirms that except for a single occasion, Filler always reported exactly 40 hours in Citizens' Time & Attendance system. Filler Hours Worked and Overtime Summary, Exhibit P-31.

86.     Kuhn knew that MLOs had to work overtime because of their responsibilities to service branches, and he knew that MLOs worked late on weekends, because he attended a committee meeting in May 2013 in which feedback received from MLOs provided same. Kuhn shared the minutes of this meeting, including this information about MLOs' hours worked, with PSMs Ed Negron, George Dillinger, and Lisa Oakley.. Kuhn Bank Partnership Email, Exhibit P-36, CITIZENS_ESI00226402.txt, at p. 1.

87.     On May 16, 2013, David Conners, the Vice President, Channel Administration Manager, reached out to Kuhn and asked him if he was comfortable with Marina Fiorello entering overtime hours. Kuhn responded that he reached out to her manager, Jim Schwartz.  Kuhn stated he was not aware she was submitting this overtime and she did not get that overtime approved by him. Conners/Kuhn Email Chain, Exhibit P-70, CITIZENS_ESI00196643.txt, at pp. 1-2.

88.     In June 2013, MLO David Restifo emailed Schwartz and stated that he "was recently made aware that overtime was being approved for other LO's" and wanted to request an additional 10 hours of OT every other week," but also stated that he was "definitely working 60

hrs per week plus." Schwartz forwarded this email to Kuhn and asked him "do you have a problem with this?" Restifo/Schwartz/Kuhn Email Chain, Exhibit P-71, CITIZENS_ESI00192882.txt. In other words, Restifo reported to Kuhn and Schwartz that he was working more hours than he was reporting, and requesting preapproval to report 15 less hours per week than he was actually working.

89.     In the Summer of 2015, Fragale complained to Kuhn and Schwartz that she was working a crazy amount of hours and not getting any support. Fragale Deposition Errata, 106:01-108:07. Despite telling Kuhn she was working long hours, Fragale;s attendance records do not show any overtime or night or weekend work for this time period. Fragale (J049315) Attendance Records, Exhibit P-37, at CITIZENS0009432-9445, Fragale Hours and Overtime Summary, Exhibit P-37, at p. 93.

90.      MLO Larry Heydon testified that Kuhn encouraged him not to report more than 40 hours. Heydon Testimony, 12/7 Transcript, 53:04-14.

91.     MLO George Cremeans testified that he overheard Kuhn speaking with PSM John Kreuzer that MLOs who reported more than 5 hours of OT would wind up on a list. Cremeans Testimony, 12/7 Transcript, 223:22-224:07, 237:07-09.

92.     On January 25, 2016, Tad Kuhn sent an email to MLOs providing Citizens' official overtime policies and noting not to block-fill or pre-fill hours. Hoenigman/Kuhn Email Chain, Exhibit P-27, CITIZENS_ESI00196184.txt,  at p. 3. In response, Hoenigman asked Kuhn "Has OV been approved? My actual hours every day are over 8. Yesterday I worked 6 hours, met with borrower and submitted loan." Hoenigman/Kuhn Email Chain, Exhibit P-27, CITIZENS_ESI00196184.txt,  at p. 3. Kuhn asked how much overtime she was working on average, while stating she should try to keep it at 5 hours. Hoenigman/Kuhn Email Chain, Exhibit

20

P-27, CITIZENS_ESI00196184.txt,  at p. 2. Hoenigman responded "**LOL, typically 20+ per week**" and explained the work she was doing. Hoenigman/Kuhn Email Chain, Exhibit P-27, CITIZENS_ESI00196184.txt,  at p. 3. Kuhn's response was "No way, that is a lot of OT. We need to discuss, I can't keep paying 20 hours of OT for $10MM in production. Cut it to 10 hours and see how that works for you." Hoenigman/Kuhn Email Chain, Exhibit P-27, CITIZENS_ESI00196184.txt,  at p. 2. Hoenigman then asked whether she could in fact then report 10 hours of overtime per week, to which Kuhn responded, "For now, you can but we need to get the hours down," and stated that the job "shouldn't take 50 hours a week for 5 closings a month" and "LOS all over the company are doing more closings and only working 40 hours a week." Hoenigman/Kuhn Email Chain, Exhibit P-27, CITIZENS_ESI00196184.txt,  at p. 1.

93.    Hoenigman's reported hours show that for an entire year--from June 23, 2013 through June 15, 2014--she reported no overtime hours. Over the next four tmonths, from June 15, 2014 through October 26, 2014, she reported between overtime hours each week. Next, from October 26., 2014 until the end of January 2016 (nearly a year and a half), she stopped reporting any overtime hours and always reported exactly 40 hours each week. She then reported a few overtime hours for four months, through May 15, 2016. From May 15, 2016 through January 1, 2017, Hoenigan again reported exactly 40 hours each week, and then did not report any additional overtime. Hoenigman Hours and Overtime Summary, Exhibit P-28.

94.    On September 28, 2016, Tad Kuhn sent an email to MLO Darren Patton and copied Patton's manager, PSM Robert Kreuzer, stating that Kuhn saw that Patton had entered 100 hours of work. Patton explained that it was for two weeks in which he had worked 50 hours each. In response, Kuhn states "50 hours is still a lot, how did you work that many hours?" and "Do you understand the policy of overtime? You MUST notify your manager (in this case me) when you

perceive working over 40 hours. I don't sweat 45 hours but 50 is significant overtime." Patton/Kuhn September 28, 2016 Email Chain, Exhibit P-25, at pp. 2-3. In response, Patton told Kuhn "put me down whatever you see fit then," "I think I am missing the point being that we are on the current comp plan we are on, we pay back every penny on the draw," and "I always work 45-50 hours per week." Patton/Kuhn September 28, 2016 Email Chain, Exhibit P-25, at pp. 2-3.

95.     On November 14, 2016, Kuhn emailed a number of MLOs asking them to complete their time cards. In response, Laurie Gaye wrote back "Why, so you can yell at me for working overtime?" Gaye/Kuhn Email, Exhibit P-29, CITIZENS_ESI001963853.txt, at p. 1.

96.     During his deposition, Kuhn testified that there was no reason the average number of hours his MLOs should work should have been 40 while he worked at Citizens. Kuhn Deposition Designations, ECF Doc. No. 388-12, 56:07-56:20.

97.     Kuhn testified that he knew his MLOs had to do more work because Citizens had trouble closing loans on time. Kuhn Deposition Designations, ECF Doc. No. 387-26, 82:08-11.

98.     Kuhn testified that he did not require PSMs who reported to him to come to him to get approval of an MLO's request to work overtime. Kuhn Deposition Designations, ECF Doc. No. 388-12, 107:08-13. However, PSM James Schwartz testified he was not permitted to approve requests to pre-approve overtime, but that he had to forward those requests to the Regional Manager (Tad Kuhn). Schwartz Deposition Designations, ECF Doc. No. 42:24-44:01.

99.     Schwartz' forwarding of Restifo's email requesting permission to report overtime corroborates Schwartz' testimony and undermines Kuhn's testimony, Restifo/Schwartz/Kuhn Email Chain, Exhibit P-71, CITIZENS_ESI00192882.txt., and Kuhn's directive to Darren Patton that Patton would have to come to him for approval to report/work overtime further contradict Kuhn's testimony. Patton/Kuhn September 28, 2016 Email Chain, Exhibit P-25, at pp. 2-3.

100.    Kuhn testified that the only reason he enforced the overtime pre-approval policy was because that policy came from Citizens Bank. Kuhn Deposition Designations, ECF Doc. No. 388-12, 111:23-112:11.

### ii.   PSM James Schwartz (Dec. 2010-Oct. 2015)

101.    PSM James Schwartz worked at Citizens from December 29, 2010 through the beginning of October 2015, except for a three month stint at Wells Fargo from January 2014 through April 2014, and was a PSM since April 2011. Schwartz Deposition Designations Errata, 13:04-07, 24:15-25:14.

102.    On May 1, 2013, Schwartz was 'cc'd on an email between MLO Michelle Filler and his manager Tad Kuhn in which she stated that she was working off-the-clock and simply block-reporting inaccurate 9-5 time blocks each day. Kuhn/Filler Email, Exhibit P-30, CITIZENS_ESI00196636.txt at p.1.

103.    PSM James Schwartz testified that MLOs were required to do one huddle per branch per month.  MLOs were required to visit each branch each week for at least two hours, though some branches required the MLO stay there for the full day. The MLO was required to record their visits in the Velocify computer system, which Schwartz checked every Sunday evening. Schwartz Deposition Designations Errata, 48:10-49:10.

104.    Schwartz would also call bank branches to confirm whether MLOs had actually visited and worked at the branches. Schwartz Deposition Designations Errata, 50:04-51:09.

105.    Schwartz testified that he had a general sense of the hours a MLO worked in a given week by looking at production, looking at their responses to him about his inquiries about leads and what they were working on, and he would know when he went to visit realtors or builders with the MLO. Schwartz Deposition Designations Errata, 60:01-17.

106.     Schwartz testified that Regional Manager Kuhn would not approve every request for overtime, that if the MLO reported the overtime it would be paid, but afterwards, if Kuhn felt the overtime was not warranted and the MLO was not entitled to overtime, Kuhn directed Schwartz to talk to the MLO and require the MLO to substantiate the reason for the overtime. Schwartz Deposition Designations Errata, 65:01-66:13.

107.     Schwartz testified that Kuhn wanted him to discipline an MLO for not seeking preauthorization of overtime. Schwartz Deposition Designations Errata, 67:01-20.

108.     Schwartz testified that his MLO Teresa Fragale called him over the summer of 2015 and told him that she was working evenings and working on the weekends, and that she cannot deal with the hours she was working. Schwartz responded that he would escalate the matter to Kuhn, which he did, and she reported back to him that she was not permitted to get an assistant. Schwartz Deposition Designations Errata, 71:19-73:19. Despite being apprised that Fragale was working long hours, Schwartz approved her attendance records reporting only 40 hours per week.

### iii.  Marina Fiorello (Sept. 2011-July 2013)

109.     Marina Fiorello was a Mortgage Loan Officer ("MLO") for Citizens Bank in Cleveland, Ohio from September 30, 2011 through July 28, 2013. Fiorello Testimony, 12/7 Transcript, 4:07-15; Joint Stipulations, ECF Doc. No. 357, ¶ 17.

110.     As an MLO working for Citizens Bank, Fiorello could not perform her job in 40 hours a week or less. Fiorello Testimony, 12/7 Transcript, 14:08-10.

111.     As an MLO working for Citizens Bank. Fiorello typically worked 60-70 hours per workweek, and this work is at least partially documented by the emails that were sent, credit that was pulled, and applications that were entered. Fiorello Testimony, 12/7 Transcript, 14:11-18.

112.     PSM Jim Schwartz told Fiorello and other MLOs working for him that overtime was discouraged by Citizens Bank' management, and therefore, to stay under the radar, MLOs

should not enter more than 3 to 4 hours of overtime. Fiorello Testimony, 12/7 Transcript, 15:19-25.

113.    At the end of her employment, Fiorello entered in her actual overtime hours. In response, she received a call from her PSM Jim Schwartz, who stated that his supervisor, Regional Manager Tad Kuhn was "mad as hell" and "getting his ass ripped from corporate" because Fiorello had entered these overtime hours. Fiorello Testimony, 12/7 Transcript, 16:17-17:16.

114.    A summary of Fiorello's OT hours reported shows that she reported 4.5 hours of OT in the second quarter of 2012, 0 hours of OT in the third quarter of 2012, 22.5 hours of OT in the fourth quarter of 2012, 114.25 hours of OT in the first quarter of 2013, 230.25 hours of OT in the second quarter of 2013, and 48.25 in the third quarter of 2013. *See* Plaintiffs' Exhibit 167.

115.    Fiorello complained to PSM Schwartz that she was required to work off-the-clock. Fiorello Testimony, 12/7 Transcript, 19:21-20:01.

### iv.  Lynn Duban (Oct. 2011-Jan. 2013)

116.    Lynn Duban worked as an MLO in Cleveland, Ohio from October 2011 through January 2013, and reported to PSM Michael Norman. Defendant's Interrogatory Responses, Nos. 1 and 2, P-39.

117.    Duban and other MLOs were told by Norman that they had to keep their recorded hours to 40. Duban Interrogatory Responses, No. 2.

118.    Duban estimated she typically worked 45-55 hours per work week, consisting of approximately 30 hours at Citizens' branch offices, 10 hours at home, and 10 hours at locations other than Citizens' offices or her home. Duban Interrogatory Responses, No. 3 and 13.

### v.  Larry Heydon (Nov. 2011-Present)

119.    Larry Heydon was and is employed by Citizens as an MLO in Akron, Ohio from November 21, 2011 to the present. Joint Stipulations, ECF Doc. No. 357, ¶ 18; Heydon Testimony, 12/7 Transcript, 51:07-11.

120.    Heydon was encouraged by his managers PSM Josh Leeser and PSM Michael Gordon and his Regional Manager Tad Kuhn not to report more than 40 hours per week. Heydon Testimony, 12/7 Transcript, 53:04-14.

121.    Heydon was encouraged to work more hours attending open houses and in the branches, but at the same time, was discouraged from reporting more than 40 hours recorded on his timesheets. Heydon Testimony, 12/7 Transcript, 54:01-55:01.

122.    Despite being a lot busier when Gordon became Heydon's direct supervisor, Gordon continued to communicate that Heydon should not have more than 40 hours if possible. Heydon Testimony, 12/7 Transcript, 55:06-15.

123.    Heydon concluded from Gordon's calls and emails about overtime that recording more than 40 hours was not something that the company wanted to see. Heydon Testimony, 12/7 Transcript, 55:20-56:01.

124.    Heydon understood from the calls and emails about overtime that if an MLO were to record overtime, the MLO would probably hear from somebody about it, and, unless they were producing extravagant or big numbers, they would be criticized for "being paid overtime for not producing," and the takeaway was that the MLOs were not supposed to work or record more than 40 hours. Heydon Testimony, 12/7 Transcript, 56:02-57:01.

125.    Heydon recalled emails in which it was communicated that overtime was only available if the MLO had a good reason for needing it, otherwise, the MLOs had to work within the 40 hours. Heydon Testimony, 12/7 Transcript, 57:02-08.

26

126.    Heydon did not request approval to work overtime because he understood it would not be allowed. Heydon Testimony, 12/7 Transcript, 57:18-58:01.

127.    Heydon advised his supervisor PSM Leeser that he was working more than the 40 hours he was recording on a dozen occasions by explaining to Leeser that he was working open houses on the weekend. Leeser knew or should have known that this work was time which was not being recorded because Heydon recorded all 40 of his hours for the week in the five weekdays. In fact, it was Leeser who instructed Heydon to record all 40 of his hours only in the five weekdays. Heydon Testimony, 12/7 Transcript, 58:02-20.

128.    Heydon could not perform his job as an MLO for Citizens in 40 hours a week or less. Heydon Testimony, 12/7 Transcript, 59:07-10.

129.    Heydon typically worked an average of 44-52 hours per week as an MLO for Citizens. Heydon Testimony, 12/7 Transcript, 59:24-60:02.

### vi.  Teresa Fragale (Oct. 2014-Oct. 2015, Jan. 2018-Present)

130.    Plaintiff Teresa A. Fragale has been employed by Citizens as an MLO in Cleveland, Ohio from October 2014 to October 2015, and from January 2018 to the present. Joint Stipulations, ECF Doc. No. 357, ¶ 11.

131.    During her first tenure at Citizens, Fragale reported to PSM Jim Schwartz. Fragale Deposition Designations, ECF Doc. No. 387-12, 25:03-25:07.

132.    Fragale estimates that she typically worked 20-25 hours of overtime per week as an MLO. Fragale Deposition Designations, ECF Doc. No. 387-12, 22:05-13.

133.    In March 2015, Fragale was in a period of heavy production, and she told her manager Jim Schwartz that it was impossible only work 40 hours per week and wanted to know how to request overtime. In response, he said that she could request it, but it would not be approved. Fragale Deposition Designations, ECF Doc. No. 387-12, 27:02-28:12.

134.     Fragale testified that when the hours got very bad, she complained to both Schwartz and Kuhn by phone, crying, and complaining that she was going to have a nervous breakdown because of her level of production, her lack of an assistant, and that she was working an "insane amount of hours and not being paid for it." Fragale Deposition Designation Errata, 106:01-108:07.

135.     Fragale testified approving overtime was not decided by Schwartz, but rather higher level management. Fragale Deposition Designations, ECF Doc. No. 387-12, 28:13-19.

136.     Fragale testified that she was also told by more senior MLOs that requests for overtime would not be approved. Fragale Deposition Designations, ECF Doc. No. 388-5, 31:17-31:24.

### vii.   Tanya Comber (Nov. 2014-October 2015)

137.     Tanya Comber worked as an MLO in Canton, Ohio from November 24, 2014 through October 12, 2015. Comber Interrogatory Responses, No. 9; Defendant's Interrogatory Responses, No. 1, Exhibit P-39.

138.     Comber's supervisor was William John Yates. Defendant's Interrogatory Responses, No. 1, Exhibit P-39.

139.     Yates instructed Comber and other MLOs reporting to him at staff meetings held at Bob Evans that no overtime was allowed. Comber Interrogatory Responses, No. 2.

140.     Comber estimated she typically worked 45-55 hours per workweek, which consisted of approximately 35-40 hours worked at Citizens' branch offices, 8 hours at home, and 3 hours at locations other than Citizens' offices or home. Comber Interrogatory Responses, Nos. 3 and 14.

### viii.  Karen Jindra (Nov. 2014-June 2016)

141.    Karen Jindra worked as an MLO in Akron, Ohio from November 2014 through June 2016 and reported to PSM Michael Gordon. Defendant's Interrogatory Responses, Nos. 1 and 2, P-39; Jindra Interrogatory Responses, No. 10.

142.    At the beginning of her training, a fellow MLO Brian Nordstrom told Jindra that although she would be required to work an immense amount of hours, Plaintiff should not record anything over 40 hours. Jindra Interrogatory Responses, No. 2.

143.    Another MLO, Beth Johnson, told Jindra that MLOs did not report overtime because it came out of their commissions. Early in her tenure, PSM Gordon reiterated this point and told Jindra that it did not matter if she reported overtime because it would simply be owed to the company as a draw against her commissions. Jindra Interrogatory Responses, No. 2.

144.    Gordon also explained to Jindra that the way to report time is to simply go in the software once a week and report 8 hours per workday for five days. Jindra Interrogatory Responses, No. 2.

145.    Jindra also attended a meeting where an MLO, Angela Waller, asked how to report holiday overtime, and either Gordon or Regional Manager Tad Kuhn told Waller not to report that time because it would be overtime, and MLOs should not report overtime. Jindra Interrogatory Responses, No. 2.

146.    Gordon once spoke to Jindra about another MLO and explained that the other MLO had put in overtime without having loan volume, and Gordon was concerned that upper management would not approve it. Jindra Interrogatory Responses, No. 2.

147.    Jindra estimated that she worked between 75-85 hours per workweek while an MLO, and that this time consisted of 5-10 hours at Citizens' mortgage offices, 30 hours at Citizens'

branch offices, 25 hours at home, and 15 hours at locations other than home or Citizens' offices. Jindra Interrogatory Responses, Nos. 3 and 14.

148.    Jindra identified MLO Deborah Kress as another MLO who worked 60-70 hours per week and did not report overtime, and recalled speaking with MLOs named Larry, Beth Johnson, and Brian Nordstrom about the hours they were working and that they were not allowed to record same. Jindra Interrogatory Responses, No. 6.

### ix.   George Cremeans (May 2015-Sept. 2016)

149.    George Cremeans was formerly employed by Citizens as an MLO in Columbus, Ohio from May 18, 2015 to September 2016. Joint Stipulations, ECF Doc. No. 357, ¶ 16; Cremeans Testimony, 12/7 Transcript, 218:21-23.

150.    Cremeans' direct supervisor at Citizens was PSM Robert Kreuzer, who reported to Regional Manager Tad Kuhn. Cremeans Testimony, 12/7 Transcript, 218:09-20.

151.    As an MLO for Citizens, Cremeans typically worked 48-53 hours per week. Cremeans Testimony, 12/7 Transcript, 218:24-02.

152.    As an MLO for Citizens, Cremeans always worked Monday to Friday, and worked approximately 30 weekend days a year. Cremeans Testimony, 12/7 Transcript, 219:03-17.

153.    Cremeans performed most of his work at the Easton office but would also work seminars, builder events, realtor offices, open houses, and from home. Cremeans Testimony, 12/7 Transcript, 219:18-25.

154.    Cremeans would typically arrive at the Easton office at 9:00 AM and would typically leave that office at 8:00 PM, unless he had an appointment elsewhere that caused him to leave earlier. Cremeans Testimony, 12/7 Transcript, Cremeans Testimony, 12/7 Transcript, 220:21-221:14.

30

155.    Except for a single occasion where Cremeans reported 32 hours worked per week, despite typically working 48-53 hours per week, Cremeans only reported either exactly 40 hours or exactly 45 hours of work on his timesheet. Cremeans Testimony, 12/7 Transcript, 221:18-223:21; Cremeans Hours and Overtime Summary, Exhibit P-24.

156.    Cremeans overheard his manager PSM Kreuzer speaking with Regional Manager Tad Kuhn discussing overtime, specifically in reference to an individual named Darren Patton, and heard them say that MLOs should have only report up to five hours of overtime in order to not appear on a report, and that MLOs who report 45 hours are placed on this report. Cremeans Testimony, 12/7 Transcript, 223:22-224:07, 225:13-19, 237:07-09.

157.    Cremeans believed that once his guarantee was over, he was eligible for overtime, but that Citizens treated the overtime as a draw against commissions. Cremeans Testimony, 12/7 Transcript, 224:08-18.

158.    Cremeans was never questioned by his manager Kreuzer about his time or his attendance records. Cremeans Testimony, 12/7 Transcript, 224:23-225:04, 228:04-07.

159.    Kreuzer worked out of the same office as Cremeans and knew that Cremeans worked on the weekends and on weekdays after 5:00 PM. Cremeans Testimony, 12/7 Transcript, 224:23-225:04.

### c.  MICHIGAN MLO OVERTIME PRACTICES

#### i.  RSM Christopher Gough

160.    On August 10, 2015, PSM Thomas Gilson, who worked in Birmingham, MI, emailed MLO Steven Murphy about reporting 20 hours of overtime, stated "OT has to have prior approval, and is still a draw against your commissions," and stating "Contact me directly prior to entering hours so we know about this ahead of time," and copying Regional Manager Christopher Gough. Gilson/Gough/Murphy August Email Chain, Exhibit P-65, CITIZENS_ESI00191753.txt,

at p. 1-2. In response, Murphy responded that he has always worked the OT but he just never claimed it recently, and stating "if it comes off the draw, why wouldn't I claim it?" Gilson responded that he has never seen anyone put in 20 hours of OT since he has worked there, but "it's policy to have regional approval beforehand." *Id.*

161.    On October 10, 2015, Gilson emailed Murphy again and asked him why he was always reporting exactly 10 hours of OT a week, and stated that moving forward, Murphy either was to not work the overtime, or "get prior approval form the regional manager ahead of time" and stating that "OT hours for us requires prior regional manager approval per the terms of the LO compensation plan." Gilson/Gough/Murphy October Email Chain, Exhibit P-66, CITIZENS_ESI00191882.txt, at p. 2. Murphy responded that he spoke/texted with Regional Gough when this had previously come up, and Gough had to told him to keep the OT to 10 hours or less. Murphy continued that he worked more than that but he simply "capped" his reported hours to 10 hours, stating that the hours were not "scheduled, but capped." *Id.* at p. 1. Gilson asked for guidance from Gough, and Gough responded "He needs to understand that if he's claiming an additional 10 hours weekly, then he needs to write and close more loans." *Id.*

162.    Christopher Gough resigned from Citizens Bank in November 2015. *See* Sutton Deposition Designation Errata, 31:23-32:15; Christopher Gough, LinkedIn Profile, available at https://www.linkedin.com/in/chris-gough-a3327314/.

### ii.  Clare Richardson (June 2014-Aug. 2015)

163.    Opt-In Plaintiff Clare Richardson was formerly employed by Citizens as a MLO in Michigan from June 30, 2014 to August 12, 2015. Joint Stipulations, ECF Doc. No. 357, ¶ 21.

164.    Regional Manager Christopher Gough told Richardson that she could not report over 40 hours a week in or around August 2014, and that if she reported more than 40 hours, (a) it

would just come out of her commissions, and (b) she would be reprimanded. Richardson Deposition Designations, ECF Doc. No. 387-14, 41:14-42:25.

165.    As an MLO for Citizens, it was not possible for Richardson to perform her job in 40 hours a week or less. Richardson Deposition Designations, ECF Doc. No. 387-14, 80:12-15.

166.    As an MLO for Citizens, Richardson was assigned three retail bank branches to cover. Richardson Deposition Designations, ECF Doc. No. 388-22, 74:09-74:13.

167.    As an MLO for Citizens, Richardson typically worked 55-60 hours per week. Richardson Deposition Designations, ECF Doc. No. 387-14, 83:04-08.

168.    On June 5, 2015, Richardson emailed her PSM Bobby Shannon an email with the subject "Commission Desk explained to me how overtime works." In it, she told Shannon that Regional Manager Gough told her not to report overtime because it would all be taken out of her commission. She reported that she had inquired with the commission staff and learned that only 45 hours at $11.50 an hour was deducted, and accordingly that she lost a lot of money because she worked a lot of overtime that went unpaid. Richardson/Shannon/Gough Email Chain, Exhibit P-44, CITIZENS_ESI00092765.txt, at p. 1-2.

169.    On June 19, 2015, Richardson forwarded the email she had sent to Shannon to Regional Manager Gough, seeking an explanation why Gough had told her not to report overtime. Richardson/Shannon/Gough Email Chain, Exhibit P-44, at p. 1.

170.    Richardson did not receive any response from either Shannon or Gough in response to her complaint. Richardson Interrogatory Responses, No. 2.

171.    A summary of Richardson's hours reported in the Time and Attendance system shows that from July 6, 2014 through May 3, 2015, Richardson recorded a single week with 37 hours and all the rest (43 weeks) with exactly 40 hours.

172.    For a few month, from the week of May 10, 2015, Richardson began regularly reporting overtime hours until her final three weeks of employment in July and August 2015. *See* Defendant's Summary of Hours Distribution for Named and Opt-In Plaintiffs, Exhibit D-9; *see* Additional Summary Exhibit of Clare Richardson's Reported Hours, *attached hereto as* Exhibit 1.

### iii.   Ahmad Naji (Dec. 2014-March 2015)

173.    Named Plaintiff Ahmad Naji was employed as an MLO in Michigan from December 22, 2014 through March 16, 2015. Naji Deposition Designations, ECF Doc. No. 387-10, 12:06-10; Joint Stipulations, ECF Doc. No. 357, ¶ 9.

174.    Naji's manager Sam Ammar told Naji that he should not report more than 40 hours a week, and he should just enter a standard 9 AM-5 PM every single weekday. Naji Deposition Designations, ECF Doc. No. 387-10, 36:14-21.

175.    Naji told Sam Ammar that he thought it was unfair he was not to report overtime, and Ammar told Naji that the instruction to not report overtime came from Ammar's higher-ups. Naji Deposition Designations, ECF Doc. No. 387-10, 36:21-37:02.

176.    Regional Manager Christopher Gough also told Naji not to report more than 40 hours. Naji Deposition Designations, ECF Doc. No. 387-10, 38:05-09, ECF Doc. No. 388-17, 38:10-39:14.

177.    Naji did not believe the work of an MLO at Citizens could successfully be completed in 40 hours or less. Naji Deposition Designations, ECF Doc. No. 387-10, 46:18-21.

178.    Naji typically worked around 50 hours per week. Naji Deposition Designations, ECF Doc. No. 387-10, 18:03-06.

179.    Naji quit because he was told he was not allowed to record his real hours worked. Naji Deposition Designations, ECF Doc. No. 387-10, 111:03-23.

### d.   ILLINOIS MLO OVERTIME PRACTICES

### i.   Illinois Management during the Relevant Period

180.    Todd Crisman worked as a Regional Sales Manager in Illinois from Citizens Bank from March 2010 through March 2013. Todd Crisman, Linkedin Page, *available at https://www.linkedin.com/in/todd-crisman-44855411/*.

181.    In March 2013, Regional Sales Manager for Illinois Todd Crisman reached out to the PSMs who report to him, Dan Brady, John Cashner, Wade Meitz, and Tom Schweighardt, and asks them to review a report on the overtime usage for the MLOs for the past few months. With respect to a MLO referred to as Ken, most likely Ken Schmidt, Crisman stated to Dan Brady that "he is working his a…s off but "not sure we can continue to pay this kind of OT," that Brady needs to keep an eye on MLO Porter's OT, and questioning why OT is needed for other MLOs. Crisman/Brady/Pemberton Email Chain, Exhibit P-72, CITIZENS_ESI00205019.txt, at p. 1.

182.    After Crisman left, David Brockman was the regional/area manager from at least December 2013 through October 2014. Jarzembowski Deposition Designation Errata, at 8:02-07; Dal Pino Deposition Designations, ECF Doc. No. 387-2, 50:15-18.

183.    From October 2014 through August 2015, the Illinois PSMs and MLOs reported directly to Division Manager Robb Sutton. Jarzembowski Deposition Designation Errata, at 9:02-17.

184.    Dan McGuire was Area Manager in Illinois from August 2015 through May 2017. Sutton Deposition Designation Errata, 13:10-15. Dan McGuire, LinkedIn, *available at https://www.linkedin.com/in/damcguire/*.

### ii.   Valerie Dal Pino (July 2008-April 2016)

185.    Plaintiff Valerie Dal Pino was formerly employed by Citizens as an MLO in Illinois from March 1990 to February 12, 2007, and from July 7, 2008 to April 19, 2016. Joint Stipulations, ECF Doc. No. 357, ¶ 8.

186.    As an MLO during her second tenure, Dal Pino reported to PSM Dan Brady and then Area Manager Dan McGuire after Brady left in 2015. Dal Pino Deposition Designations, ECF Doc. No. 387-2, 49:25-13.

187.    Dal Pino's area/regional managers to whom she indirectly reported were Todd Crisman and David Brockman, and the divisional manager to whom she reported was Robb Sutton. Dal Pino Deposition Designations, ECF Doc. No. 387-2, 50:15-18.

188.    Dal Pino primarily worked at a Citizens branch location in Hinsdale, Illinois, at the direction of her manager Dan Brady. Dal Pino Deposition Designations, ECF Doc. No. 387-2, 34:04-18.

189.    Dal Pino received instruction from the National Sales Director Ellen Steinfeld on a national conference call with all MLOs around the time that MLOs first had to start using timesheets that MLOs should not record more than 40 hours per week and that any overtime had to be preapproved by the MLO's manager. Dal Pino Deposition Designations, ECF Doc. No. 387-2, 51:13-20, 52:13-12.

190.    Dal Pino did not ask for or record overtime because been informed that her PSM Dan Brady informed other MLOs, including Ken, that they were not approved for overtime. Dal Pino Deposition Designations, ECF Doc. No. 387-2, 55:03-23, 58:22-59:02. This conversation is corroborated by the email Regional Manager Crisman sent to PSM Dan Brady saying that he did not know whether the company could keep paying Ken overtime. Crisman/Brady/Pemberton Email Chain, Exhibit P-72, CITIZENS_ESI00205019.txt, at p. 1.

191.    While working as an MLO at Citizens, Dal Pino typically worked 45-50 hours per week, typically staying at her office until 6:00 PM to 8:00 PM, and typically coming in to her office between 9:00 AM and 10:00 AM, regularly working Saturday mornings and occasionally

also working on Sundays. Dal Pino Deposition Designations, ECF Doc. No. 387-2, 67:14-68:22; ECF Doc No. 388-2, 70:17-19.

192.     Not long after MLOs were reclassified as non-exempt under federal overtime law i.e. post-April 2012, Dal Pino overheard Regional Manager Crisman tell an MLO that the MLO was not permitted to record overtime, and Dal Pino related this conversation to her peers Matt Porter, Ken Schmidt, and Brad Knutson. Dal Pino Deposition Designations, ECF Doc. No. 387-2, 122:22-124:08.

193.     Dal Pino's time and attendance records show that it was her practice to block-report her time to show 40-hour workweeks by having the exact same start and end time each day without ever showing additional work in the morning, evening, or weekends. Dal Pino Attendance Records, Exhibit P-34, CITIZENS0013396-13410, CITIZENS0009267-0009298.

### iii.  Melita Randolph (March 2012-February 2013)

194.     Melita Randolph worked for Citizens as an MLO in the Chicago, IL, area from in or around April 2012 through February 2013, and reported to PSM Wade Meitz. Defendants' Interrogatory Responses, No. 1 and 2, Exhibit P-39.

195.     Early in her employment, Randolph reported to her manager working more than 40 hours in a week. In response, Meitz told Randolph she was not permitted to record more than 40 hours per workweek, and that overtime was not paid. Randolph Interrogatory Responses, No. 2.

196.     Randolph estimates she worked between 70-80 hours per workweek, and this consists of 35 hours at Citizens' branch offices, 30 hours at home, and 15 hours at locations other than Citizens' offices and her home. Randolph Interrogatory Responses, Nos. 3 and 14.

### iv.  Timothy Gerrity (March 2014-June 2015)

197.    Timothy Gerrity worked as an MLO in the suburbs of Chicago, Illinois from March 2014 through June 2015, and reported to several different managers. Defendants' Responses to Interrogatories, No. 1 and No. 2, Exhibit P-39; Gerrity Interrogatory Responses, No. 10.

198.    When Gerrity was hired, it was made known to him during onboarding that MLOs were only to record 40 hours per week on their timecards that overtime would have to be preapproved, but that overtime should not be requested, and that each every time card had exactly 40 hours. Gerrity concluded Management understood that Gerrity was not reporting his overtime because none of his timecards had any variance in their time. Gerrity Interrogatory Responses, No. 2.

199.    Gerrity estimates that he worked between 60-70 hours per workweek, and this consisted of 40 hours in Citizens' mortgage office, 10 hours at home, and 15 hours at locations other than Citizens' offices or at home. Gerrity Interrogatory Responses, Nos. 3 and 14.

e.    **CENTRAL AND WESTERN PENNSYLVANIA MLO OVERTIME PRACTICES**

i.    **Area Manager Lowell "Tom" Kullman (May 2012-Present)**

200.    Lowell "Tom" Kullman is currently employed by Citizens Bank as an Area Sales Manager. Kullman Testimony, 12/9 Transcript, 3:11-17.

201.    Kullman was hired as a non-producing sales manager in May 2012, and then approximately two years after that, Kullman became the Regional Sales Manager for Western Pennsylvania, and then in 2017, his title changed to Area Sales Manager. Kullman Testimony, 12/9 Transcript, 4:05-19.

202.    For the first two years of his employment as a non-producing sales manager, Kullman had approximately 10-15 MLOs reporting directly to him. Kullman Testimony, 12/9 Transcript, 5:06-14.

203.     Kullman testified that loan officers did not work a particular scheduled shift. Kullman testified MLOs worked during the day, evenings, and on the weekends.  Kullman testified that because realtors were a main source of business for MLOs and a lot of realtors worked nights and weekends, MLOs typically made  their schedules available for night and weekend work. Kullman Testimony, 12/9 Transcript, 7:21-8:09.

204.     Kullman testified he believed Citizen's compensated MLOs on a commission-only pay computation.  Kullman testified that because MLOs need to earn commission, they scheduled themselves in the best way to generate business. Kullman Testimony, 12/9 Transcript, 7:25-8:04.

205.     Kullman testified that the PSMs do need to provide a lot of "direct" supervision, i.e., line-of-sight supervision, over the MLOs because the MLOs are "commission only," so "they're driven to produce results, themselves." Kullman Testimony, 12/9 Transcript, 8:10-18.

206.     Kullman testified that notwithstanding the pre-approval policy which required MLOs to email their direct manager when they see that they're going to have overtime involved in the week, when an MLO is working on the weekend or on a night that they did not plan on, the MLO should record that time even without getting it pre-approved, and when that time is submitted, the managers will approve it and the time will be paid. Kullman Testimony, 12/9 Transcript, 16:09-23. However, in an email he wrote to MLO Renee Staiger, copying Lance Fultz, he wrote the following: "LO's are expected to work a 40hr workweek. If overtime is needed you must request approval from your PSM prior to working. In this case an email to Lance is required requesting the amount of overtime need and business reason for overtime. Once you receive approval the overtime can be worked for the week." *See* Kullman Impeachment Exhibit, CITIZENS_ESI00189322, attached hereto as Exhibit 1.

39

207.    Kullman testified during his deposition that in his calls about overtime with the MLOs, he communicated to the MLOs that they were expected to be working 40-hour weeks. Kullman Testimony, 12/9 Transcript, 61:23-06.

208.    Kullman's policy for preapproval of overtime was that PSMs could only approve overtime up to a cap, which varied over the class period from 5 to 10 hours. Above that cap, the PSMs were required to email Kullman that the MLO had requested time in excess of the cap. Kullman Testimony, 12/9 Transcript, 59:05-18.

209.    Kullman testified that an MLO might need overtime because they were busy originating loans, but that even MLOs who are not quite as busy may need overtime, because they were new, or they are engaging in efforts to improve their production through activities or events. Kullman Testimony, 12/9 Transcript, 21:06-19.

210.    Kullman testified that he did not ensure that the PSMs who reported to him, including Jackie Brinker, Alex Reinig, and Goerge Dillinger, were complying with Citizens time sheet policy to check attendance records for actual in and out times as opposed to block reporting because it was not his responsibility to check the PSM's approvals and "there was no process for him to do that." Kullman Testimony, 12/9 Transcript, 41:09-42:10.

211.    Kullman testified that he believed—but had no basis for believing—that the time reports reviewed by PSMs under his supervision should confirm that the MLOs put down their actual time worked on their timesheets, and would reflect the true time in and the time out on a daily basis. Kullman Testimony, 12/9 Transcript, 43:05-13.

212.    Kullman testified that in his calls with the PSMs who reported to him, he was sure that he would have covered that the PSMs had to ensure that the time sheet policy—including

MLOs entering their actual times worked—was being complied with by the MLOs they supervised. Kullman Testimony, 12/9 Transcript, 43:14-19.

213.     Kullman did not regularly review the overtime that was being reported by the MLOs for whom he was responsible because he did not believe that it was significant or important. Kullman Testimony, 12/9 Transcript, 43:14-19.

214.     Despite not having reviewed their reported hours, Kullman was sure that the MLOs were meeting with customers and attending open houses, and maintaining flexible schedules to allow them to work in the evening and weekends. Kullman Testimony, 12/9 Transcript, 44:06-15.

215.     At the time of Kullman's deposition on March 10, 2016, Kullman understanding of how overtime and hourly pay interacted with the commission was that the hourly wage of $11.50 multiplied by however many hours they worked was offset against MLOs' commission. Kullman Testimony, 12/9 Transcript, 44:06-15.

216.     Upon being shown Robert Soda's attendance records, Kullman agreed that Robert Soda's attendance records are a perfect example of block reporting of time. Kullman Testimony, 12/9 Transcript, 50:12-51:15; Robert Soda Attendance Records, Exhibit P-11.

217.     Kullman confirmed that block reporting is prohibited, but when asked whether a PSM under his supervision who saw this block reporting after a week or two should communicate to the MLO that the MLO's block reporting violated the time reporting policy, Kullman stated: "**I couldn't answer that. You would have to ask the PSM**." Kullman Testimony, 12/9 Transcript, 52:08-17.

218.     Kullman admitted his conversations with PSMs about reviewing timesheets were typically "just on the totals, not the individual hours logged." Kullman Testimony, 12/9 Transcript, 52:18-22.

219.    Kullman testified that it was possible for PSMs to approve time sheets without looking at the actual entry times, i.e., the PSMs could just look at the totals. Kullman Testimony, 12/9 Transcript, 70:17-20.

220.    Kullman testified that he could not control whether MLOs actually followed the time reporting policy of putting in their actual hours worked. Kullman Testimony, 12/9 Transcript, 53:19-54:01.

### ii.  PSM George Dillinger

221.    In May 2013, Pennsylvania PSM George Dillinger was provided minutes of a focus group of MLOs which detailed that MLOs had to work late at night and on the weekends and that the additional need to support retail bank branches was causing overtime issues. Kuhn Bank Partnership Email, Exhibit P-36, CITIZENS_ESI00226402.txt, at p. 1.

222.    On February 7, 2017, PSM George Dillinger emailed Tom Kullman and Lance Fultz asking whether either of them "have anything in writing that indicates what portion of the OT does the [loan officer] payback or do they not pay any of the OT back? This is not addressed in the LO comp plan. I [can't] find anything addressing overtime." Dillinger/Kullman/Fultz Email Chain, Exhibit P-52, CITIZENS_ESI00189009.txt. In a follow-up email only to fellow PSM Lance Fultz, Dillinger stated "I thought now would be a good time ask for this since we have to manage it. We did have something at one time but I will bet they don't that out in the public[.]" *Id.*

223.    On February 9, 2017, Dillinger expressed said "Oh my" when he received an email from one of his MLOs reporting that he needed overtime because he had spent an hour on the phone a customer the night before. In response, the MLO said "Is this not what you want to hear or see? I thought I was documenting it for you. Sorry." Dillinger/Zagorac Email Chain, Exhibit P-53, CITIZENS_ESI00189035.txt at p. 1.

### iii.  PSM Lance Fultz (Aug. 2012-Present)

224.     Lance Fultz worked as a PSM for Citizens Bank in Pennsylvania since August 2012. Fultz Testimony, 12/9 Transcript, 127:14-21.

225.     Fultz supervises MLO Tom Coronato who works in South Dakota and is not assigned any bank branches. Fultz Testimony, 12/9 Transcript, 129:17-23.

226.     Fultz described the compensation an MLO receives as "straight commission." Fultz Testimony, 12/9 Transcript, 131:20-132:01.

227.     MLOs have standard minimum productions established by the company. Fultz Testimony, 12/9 Transcript, 132:22-133:05.

228.     In addition to Coronato, Fultz also supervised James Sutcliffe, Peter Jones, and David Bouder. Fultz Testimony, 12/9 Transcript, 135:02-08

229.     Fultz reviewed the attendance records MLOs submitted in the Time & Labor System but did not do anything to verify the timesheets for accuracy. Fultz Testimony, 12/9 Transcript, 141:20-142:13.

230.     Fultz testified that it was a red flag for a loan officer to record the same start and stop time every day during the workweek.  Similarly, in an email he sent to his MLOs on February 25, 2016, he stated that "considering the nature of our business, rarely should it be the exact same hours being worked every day." Fultz Testimony, 12/9 Transcript, 141:20-142:13.

231.     Fultz testified that he has had many successful MLOs who do not report any time in the evenings, and many successful MLOs who do not report any time worked on the weekends, but he did not know the actual days and times the MLOs were working. Therefore, Fultz did not know if they were reporting all their time. Fultz Testimony, 12/9 Transcript, 166:02-18.

43

232.     Fultz agreed that in the course of an MLO's career, after hours calls will happen, and he would expect to see at least some instances of evening calls on their timesheets, assuming the MLO took the call. Fultz Testimony, 12/9 Transcript, 167:14-18.

233.     Fultz emailed and received emails from his MLOs after regular business hours, but did not check that the after-hour work was reflected in the MLOs' timesheets. Fultz Testimony, 12/9 Transcript, 168:19-22.

234.     Fultz agreed that contrary to his earlier testimony in which he testified that Citizens did not take back any overtime earnings from commissions, Citizens Bank in fact claws back the first five hours of overtime worked at the MLOs' hourly rate. Fultz Testimony, 12/9 Transcript, 169:06-172:05.

235.     Fultz agreed that the MLOs' compensation plans contradict Gamache's statement in his December 2015 memorandum that overtime earnings would not be offset against gross commissions. Fultz Testimony, 12/9 Transcript, 176:09-16.

236.     Fultz testified that he was not trained to take reasonable efforts to ensure that the time records he accepted from MLOs were accurate, but that he was instead trained that he should rely on the timesheets as if they were accurate. Fultz Testimony, 12/9 Transcript, 178:06-15.

### iv.  Stephanie Joy Moyer (Feb. 2006-October 2014)

237.     Stephanie Joy Moyer worked as an MLO in Western PA from April 2003 through July 2004, and from February 2006 through October 2014.  She reported to PSM George Dillinger. Defendants' Interrogatory Responses, No. 1 and 2, Exhibit P-39.

238.     PSM George Dillinger told Moyer and other MLOs through emails, telephone calls, and weekly conference calls that they should only submit 40 hours per week and that any overtime needed to be preapproved prior to submitting such hours on a timesheet. Requesting overtime in advance was not practical because Defendant required Moyer to be available during days,

evenings, and weekends to respond to customer inquiries, provided Moyer's cell phone to customers, and instructed Moyer to return customer calls the same day she received them, i.e., follow the "sundown rule." Moyer understood that any overtime hours would be deducted from her monthly commissions. Accordingly, Moyer did not report the overtime she worked on her timesheets. Moyer Interrogatory Responses, Nos. 2 and 8.

239.    Moyer typically worked between 40-45 hours per workweek, and occasionally would work between 45-50 hours when volume was high. Moyer Interrogatory Responses, No. 3 and 14.

240.    Moyer remained in regular communication with Dillinger during regular business hours, at night, and on weekends, and therefore, Dillinger would have known that Moyer's hours were inconsistent with the hours she reported. Moyer Interrogatory Responses, No. 8.

241.    Moyer was aware that her fellow MLOs Judy Rambo, David Bouder, and James Sutcliffe worked more than 40 hours per workweek. Moyer Interrogatory Responses, No. 6.

### v.  Alex Reinig (Dec. 2013-Sept. 2015)

242.    Plaintiff Alex Reinig ("Reinig") was formerly employed by Citizens as a MLO in Pittsburgh, Pennsylvania from December 2013 to March 2015. In March 2015, Mr. Reinig was promoted to the position of Assistant Producing Sales Manager. In July 2015, Mr. Reinig was promoted to the position of Producing Sales Manager ("PSM"), and he continued in that position until his separation from Citizens in September 2015. Joint Stipulations, ECF Doc. No. 357, ¶ 2.

243.    Reinig testified that during orientation, Citizens provided its policy that stated MLOs were required to record all hours worked on a daily basis in Citizens' electronic time-keeping system. Reinig Testimony, 12/7 Transcript, 140:06-19.

244.    As an MLO, Reinig reported to PSM Jackie Brinker. Reinig Testimony, 12/7 Transcript, 112:06-07.

245.     Reinig was promoted to APSM in July of 2015. Joint Stipulations, ECF Doc. No. 357, ¶ 2.

246.     After being promoted to APSM, Reinig reported to Regional Sales Manager Tom Kullman. Reinig Testimony, 12/7 Transcript, 112:17-25.

247.     When Reinig reported to Kullman as an APSM, Kullman communicated to Reinig Citizens' official overtime and timekeeping policies. Reinig Testimony, 12/7 Transcript, 140:03-05.

248.     Kullman reported to Divisional Manager Robb Sutton. Reinig Testimony, 12/7 Transcript, 113:05-06.

249.     As an MLO, Reinig performed most of his work in downtown Pittsburgh at either a Citizens retail branch or at Citizens Bank tower. Reinig Testimony, 12/7 Transcript, 113:12-18.

250.     As an MLO, Reinig typically worked 50 hours per week. Reinig Testimony, 12/7 Transcript, 117:17-20.

251.     While Reinig was an MLO, his manager PSM Jackie Brinker knew that Reinig was working while the bank branches were open, on the weekend, and at night after the bank branches closed. Reinig Testimony, 12/7 Transcript, 118:02-14.

252.     Reinig did not report any overtime from the time he was hired in December 2013 until April 5, 2015. Reinig Hours and Overtime Summary, Exhibit P-10.

253.     From April 5, 2015 until he became a PSM in July 2015, Reinig only ever reported either exactly 40 or exactly 45 hours worked. Reinig Hours and Overtime Summary, Exhibit P-10.

254.     Reinig testified MLOs were pre-authorized to work/report overtime as long as it was less than five hours, and because of this, he began putting down five hours of overtime even

though he was working more than five hours of overtime. Reinig Testimony, 12/7 Transcript, 125:08-16, 141:06-19.

255.    Reinig believed overtime was completely recaptured from commissions, and questioned other managers and Tom Kullman about overtime being deducted from his commissions. These managers confirmed Citizens recaptured overtime, but that he could nevertheless report overtime, but keep it under five hours. Reinig Testimony, 12/7 Transcript, 125:17-126:12. This is corroborated by Dillinger's email in February 2017 where he did not know whether overtime was or was not recaptured in the commissions. Dillinger/Kullman/Fultz Email Chain, Exhibit P-52, CITIZENS_ESI00189009.txt.

256.    During the technology shift to the .Net system, the time it took the MLOs reporting to Reinig to do their job significantly increased. Reinig Testimony, 12/7 Transcript, 128:13-15.

257.    The MLOs advised Reinig, and Reinig advised Kullman that the technology transition was causing MLOs to take longer to do their jobs. Reinig Testimony, 12/7 Transcript, 129:13-21.

258.    Kullman told Reinig he could approve only up to 5 hours of overtime; anything beyond that needed to be approved by Kullman directly. Reinig Testimony, 12/7 Transcript, 130:25-131:10.

259.    Reinig communicated to the MLOs who reported to him that he could only approve up to 5 hours of overtime. Reinig Testimony, 12/7 Transcript, 131:11-15, 155:19-22.

260.    As an MLO, Reinig put the exact same start and stop time of 9:00 AM and 5:00 PM, Monday through Friday, on his attendance records, and was never questioned about same by his manager or by anyone else at Citizens Bank. Reinig Testimony, 12/7 Transcript, 133:03-134:01; Reinig Attendance Records, Exhibit J-8.

261.     As a PSM, Reinig was responsible for reviewing MLOs' attendance records, but he did not recall reviewing the actual date and time that the MLOs clocked-in or clocked-out. Reinig Testimony, 12/7 Transcript, 134:02-16.

262.     Instead, he would only scrutinize the total hours reported, approving up to 45 hours, and taking anything above 45 hours to Kullman to discuss. *Id.*

263.     Reinig testified that as a PSM, he never explicitly told MLOs that the MLOs should not record overtime hours that they had actually worked, only that he could not approve any overtime beyond five hours. Reinig Testimony, 12/7 Transcript, 137:23-25, 131:11-15, 155:19-22.

### vi.   Robert Soda (Feb. 2014-Dec. 2015)

264.     Plaintiff Robert Soda was formerly employed by Citizens as a MLO in Pittsburgh, Pennsylvania from February 2014 to December 2015. Joint Stipulations, ECF Doc. No. 357, ¶ 4.

265.     As an MLO, Soda reported to PSM Jackie Brinker when he was first hired, and reported to her for approximately a year and a half. Soda Testimony, 12/7 Transcript, 158:21-22, 159:07-13.

266.     Soda next reported to PSM Alex Reinig for several months. Soda Testimony, 12/7 Transcript, 159:16-19.

267.     After Reinig, Soda reported to PSM George Dillinger for a few months until Soda left Citizens Bank. Soda Testimony, 12/7 Transcript, 159:20-23.

268.     Soda typically worked 50-60 hours per week at Citizens. Soda Testimony, 12/7 Transcript, 165:25-166:04.

269.     Four out of five of the weekdays of Soda's typical workweek, he arrived at a bank branch by 8:00 AM, where he would participate in the morning huddle. For two of those days, he would work at the branch where he did the huddle. On the other two days, he would perform the

huddle and then leave to visit other branches. On the fifth day, Soda worked from home. Soda Testimony, 12/7 Transcript, 163:11-22.

270.    On the four days a week Soda went to a bank branch, he would usually leave those locations at around 5:00 PM, unless he was at a branch that stayed open until 7:00 PM, in which case he would stay until 7:00 PM. Soda Testimony, 12/7 Transcript, 163:23-164:04.

271.    After leaving the bank branches, he would typically work two to three evenings a week, for up to 1.5 hours, talking to customers and potential customers by phone. Soda Testimony, 12/7 Transcript, 164:07-23.

272.    Soda also worked on the weekends. He would typically communicate with customers one to three hours on the weekend, and would work open houses twice a month, which required another three hours, excluding travel time. Soda Testimony, 12/7 Transcript, 165:03-24.

273.    Despite working 50-60 hours per week, Soda only reported 40 hours per week on his electronically-submitted timesheet. Soda Testimony, 12/7 Transcript, 166:05-10.

274.    When Soda was hired, his manager Jackie Brinker explained that he should fill out his timesheet 8:00 AM to 12:00 PM and then 1:00 PM to 5:00 PM, Monday through Friday, unless there was a holiday. If there was a holiday, he was instructed not to report anything on the holiday and to report ten hours on the other four days. Soda Testimony, 12/7 Transcript, 166:11-24.

275.    Soda "block-reported" his time, i.e., he entered the same start and end times in his attendance records consistent with the instructions he had received from Brinker. Soda Testimony, 12/7 Transcript, 167:04-168:13; Soda Attendance Records, Exhibit J-10.

276.    No manager ever questioned Soda for "block-reporting" his time or almost always only reporting 40 hours per week or for reporting the same number of hours worked each week. Soda Testimony, 12/7 Transcript, 174:03-09.

277.     Soda understood he was paid $11.50/hour which was treated as a draw to be deducted from his commissions. Soda Testimony, 12/7 Transcript, 168:14-22.

278.     Near the end of his tenure at Citizens, Soda participated in a phone call with other MLOs and with Area Manager Kullman. During this call, MLO Patrick Kernick asked whether the MLOs could get overtime, and Kullman responded "Per company policy, you're to report overtime." To Soda, Kullman came across as very uncomfortable when he communicated this. Soda Testimony, 12/7 Transcript, 169:02-70:03.

279.     Subsequently, Soda received a call from Julie McGuire in HR, shortly after Reinig left, in which she communicated that there had been a complaint from Patrick Kernick about overtime, and McGuire asked whether Reinig had told the MLOs that the MLOs could not get overtime. Soda responded that to his knowledge, the MLOs did not collect overtime and that he did not report his overtime, because it was his understanding that overtime was frowned upon. McGuire directed Soda that he should start reporting his overtime. Soda Testimony, 12/7 Transcript, 170:06-171:12.

280.     In the pay period after he spoke with McGuire, Soda reported three hours of overtime.  In response, his manager George Dillinger emailed him and demanded to know why Soda had submitted overtime. Soda Testimony, 12/7 Transcript, 171:13-22.

281.     Soda understood Dillinger's questioning of him to reinforce his judgment that MLOs' managers did not want the MLOs to report overtime. Soda Testimony, 12/7 Transcript, 171:25-172:03.

282.     Soda could not perform the job of an MLO at Citizens Monday working only 40 hours per week and not working on the weekend. Soda Testimony, 12/7 Transcript, 175:12-17.

283.     Soda's managers were aware of the time-demands of the job, including that he met with clients at night, worked at night responding to calls, and that he worked on the weekends, and that he was working more than 40 hours on a regular basis. Soda Testimony, 12/7 Transcript, 175:18-176:20.

### vii.   Ryan Strickler (March 2014-Aug. 2014)

284.     Opt-In Plaintiff Ryan Strickler worked as a loan officer for Citizens from March 31, 2014 through August 22, 2014, in Citizens' Offices located in Pennsylvania and reported to Tom Kullman and Lance Fultz. Defendants' Interrogatory Responses, Nos. 1 and 2, Exhibit P-34; Strickler Interrogatory Responses, No. 12.

285.     Strickler was told by Fultz and Kullman to only record 40 hours per week, and that overtime would have to be preapproved, but seeking advance approval for overtime was not possible because the overtime was needed to address unexpected customer inquiries. Strickler Interrogatory Responses, No. 2.

286.     Additionally, during a training session at the beginning of his employment in which Strickler was being taught how to log hours, he was told that MLOs were unable to log anything over 40 hours. Strickler Interrogatory Responses, No. 2.

287.     When requests for overtime were conveyed by MLOs, the managers stated that because the MLOs were commissioned employees, there was no reason to put the overtime because it would simply be paid back out of the commissions. Strickler Interrogatory Responses, No. 2 and 8.

288.     Strickler worked between 55 and 60 hours per workweek, and this consisted of 50 hours of work at home, and 15 hours at locations outside of his home. Strickler Interrogatory Responses, Nos. 3 and 14.

### viii.   Kenneth Gritz (Nov. 2014-Oct. 2015)

289.    Ken Gritz was formerly employed by Citizens as a MLO in Pittsburgh, Pennsylvania from November 2014 to October 2015. Joint Stipulations, ECF Doc. No. 357, ¶ 3.

290.    Gritz reported to Alex Reinig while working for Citizens, except for about six weeks after Reinig resigned, when Gritz reported to Lance Fultz. Gritz Testimony, 12/7 Transcript, 70:23-25, 71:06-13.

291.    Gritz's Regional Manager (whom he reported to through Alex Reinig) was Lowell "Tom" Kullman. Gritz Testimony, 12/7 Transcript, 71:01-05.

292.    Gritz would physically perform his work at home, in the retail bank branches, and at meetings with business partners or closings. Gritz Testimony, 12/7 Transcript, 72:21-73:07.

293.    Gritz typically worked 50-60 hours per week. Gritz Testimony, 12/7 Transcript, 74:01-02.

294.    On weekdays, Gritz began working between 7:00 AM and 8:00 AM. If he had a morning huddle at a bank branch, he would arrive at the bank branch at 8:00 AM. Gritz Testimony, 12/7 Transcript, 74:03-10. After the huddles, he would regularly stay in the branches, until he had another meeting or appointment somewhere else.  Gritz Testimony, 12/7 Transcript, 75:19-76:08. Gritz would also regularly work from home in the evenings, taking and making calls, such that he was often busy from 5:30 PM to 8:30 PM. Gritz Testimony, 75:23-76:24.

295.    Gritz only reported 40 hours on his time sheet, Monday through Friday, 8 hours a day. Gritz Testimony, 12/7 Transcript, 77:05-07.

296.    Gritz testified that Reinig told Gritz that Reinig could only approve up to three hours of overtime, and that Citizens frowned on anything over 40 hours. Gritz Testimony, 12/7 Transcript, 77:08-12.

297.    Gritz testified that he could not do his job working 40 hours a week, Monday through Friday. Gritz Testimony, 12/7 Transcript, 78:18-25.

298.    Gritz testified that Reinig knew that he was working in the banks on weekdays and that he was working on weekends doing marketing at open houses. Gritz Testimony, 12/7 Transcript, 80:03-07.

299.    Reinig never questioned Gritz about not recording time on the weekend, time at night, or about recording exactly 40 hours per week every week until April 19, 2015. Gritz Testimony, 12/7 Transcript, 83:14-22.

300.    Gritz believed that any overtime he recorded and was paid by Citizens would just be deducted from his commission earnings later. Gritz Testimony, 12/7 Transcript, 100:22-101:01.

### ix.  David Bouder (Jan. 1991-Present)

301.    David Bouder worked for Citizens Bank from January 1991 to present. He certified in a Declaration that despite working 60 hours per week, he only reported 40 hours because of the admonishment from Ellen Steinfeld that the MLOs should only be working 40 hours. Bouder Certification, Exhibit P-154.

302.    Bouder began reporting to PSM Lance Fultz at the end of February 2016. Fultz Testimony, 12/9 Transcript, at 158:10-23.

303.    In the hours and overtime records Defendant produced in this matter, Bouder never recorded any overtime from November 25, 2012 through December 25, 2016, and in almost every case reported exactly 40 hours. Bouder Hours and Overtime Summary, Exhibit P-153.

### f.   UPSTATE NEW YORK MLO OVERTIME PRACTICES

#### i.   PSM Edwin Negron

304.   PSM Edwin Negron, who worked in Buffalo, NY, testified that MLOs' schedules changed every week. Joint Stipulations, ECF Doc. No. Negron Deposition Designations, ECF Doc. No. 387-28, 129:20-130:22.

305.   Negron confirmed that MLOs were prohibited from block-reporting their hours worked on their attendance sheets. Negron, Deposition Designations, ECF Doc. No. 387-28, at 123:13.

306.   Despite this, Negron accepted block-reported time, and never questioned any MLOs about their block-reported time in which their schedules and total hours worked never varied. Negron Deposition Designations, ECF Doc. No. 387-28, at 124:03-06, 131:13-138:17, 164:06-165; Negron Deposition Exhibits, Exhibit P-174, at p. 1-18.

307.   Negron testified that he never questioned the hours the MLOs block-reported without showing any night or weekend work because MLOs set their own hours and "if they chose not to enter their hours, that's their prerogative." Negron Deposition Designations, ECF Doc. No. 387-28, at 164:21-165:17.

308.   Negron testified that he did not know why MLOs would not be accurate in their time and attendance records, but in March 2013, Negron emailed MLO Timothy Collins, and 'cc'd Division Manager Bob Meyer, that Collins had logged 8 hours of OT without obtaining prior approval. Negron instructed Collins "in the future ALL OT hours need to be approved prior too. Please do not **_log_** the hours until they are approved." (emphasis added). Collins responded "the monies come from commissions anyways and are not pd by the bank. Did not realize it was an issue. **Ill just _log_ 40 every week to make it easy**." Negron/Collins Email Chain, Exhibit P-86, CITIZENS_ESI00223267.txt (emphasis added).

309.    In May 2013, Negron was provided minutes of a MLO focus group which detailed that MLOs had to work late at night and on the weekends and that the additional need to support retail bank branches was causing overtime issues. Kuhn Bank Partnership Email, Exhibit P-36, CITIZENS_ESI00226402.txt, at p. 1.

### ii.  PSM Jill Allen

310.    Jill Allen worked as a PSM in Albany, NY from 1995 (for a predecessor bank) through January 1, 2019. *See* Allen Deposition Designations, ECF Doc. No. 387-23, at

311.    Allen confirmed that she expected her MLOs to work a 40-hour workweek, but that she also expected her MLOs to work nights and weekends, and that she regularly talked to MLOs in the evening. Allen Deposition Designations, ECF Doc. No. 387-23, 47:17-48:03, 76:09-12.

312.    When Allen approved MLOs time sheets, she did not review the actual in and out times the MLOs are entering, and she claimed that the screen on which she approved time did not show this information. Allen Deposition Designations, ECF Doc. No. 387-23, 59:10-60:02.

313.    Allen took about 20-30 seconds to approve an MLO's time sheet. Allen Deposition Designations, ECF Doc. No. 387-23, 61:12-18.

314.    Allen only reviewed the actual hours inputted if the MLO put in more or less than 40 hours per week. Allen Deposition Designations, ECF Doc. No. 387-23, 62:01-12.

### iii.  Peter Smith (April 2011-Sept. 2013)

315.    Named Plaintiff Smith worked as a loan officer for Citizens from April 2011 through September 2013, in Citizens' Offices located in Albany, New York. Smith Interrogatory Responses, No. 11.

316.    Smith was instructed by his PSM Paula Haberland that he was required to work out of the branches and to assist the branches in hitting their goals. Smith Deposition Designations, ECF Doc No. 387-18, 59:24-60:18.

317.     While an MLO at Citizens, Smith typically worked close to 60 hours a week. Smith Deposition Designations, ECF Doc No. 387-18, 108:24-109:05.

318.     Smith was instructed as to Citizens' 40-hour standard and overtime preapproval requirement, and considered it unreasonable because the MLOs all worked more than 40 hours a week and the managers all knew the MLOs worked more than 40 hours per week. Smith Deposition Designations, ECF Doc No. 387-18, 88:02-15.

319.     Smith did not ask for blanket preapproval for overtime because he was led to believe that it would not be approved. Smith Deposition Designations, ECF Doc No. 387-18, 88:16-22.

320.     Smith did not believe it was possible for an MLO at Citizens to do the job in 40 hours or less. Smith Deposition Designations, ECF Doc No. 387-18, 105:20-23.

### iv.  Cynthia Nostro (April 2011-Nov. 2014)

321.     Cynthia Nostro worked for Citizens as an MLO in the suburbs of Buffalo, New York, from April 2011 through November 2014, and reported to PSM Edwin Negron. Nostro Interrogatory Responses, No. 11 and 12.

322.     PSM Negron told Nostro that she should only record 40 hours per week, and any overtime needed to be preapproved. Negron provided these instructions though he knew or should have known that Nostro was working more than 40 hours per week because Nostro kept in regular communication with Negron during regular business hours, at night, and on the weekends. Nostro Interrogatory Responses, No. 2 and 8.

323.     Negron would not approve any overtime, and when Nostro reported working more than 40 hours per week to Negron, he counseled her and told her she was not to report more than 40 hours. Nostro Interrogatory Responses, No. 8.

56

324.    Nostro worked between 45-55 hours per workweek. Nostro Interrogatory Responses, No. 3 and 14.

### v.  Mark Anthony Ross (Aug. 2004-Dec. 2005, April 2015-Jan. 2016)

325.    Mark Anthony Ross worked as an MLO in the Buffalo, NY area across two tenures, August 2004 to December 2005, and again from April 2015 through January 2015, reporting to PSM Edwin Negron. Defendants' Interrogatory Responses, Nos. 1 and 2, Exhibit P-39.

326.    Negron told Ross that he should only record 40 hours per week on his timecard, and that overtime needed to be preapproved. However, Ross was also expected to be available at regular business hours, weekends and evening to respond to customer inquiries, and he was expected to return customer calls the same day pursuant to the sundown rule, making it difficult or not impossible for Ross to even be able to request overtime in advance of needing it. Ross Interrogatory Responses, No. 2.

327.    Moreover, Negron knew or should have known that Ross was working more hours than he was reporting on his timesheet because Ross was in regular contact with Negron during regular business hours, evenings, and on the weekend. Negron never discussed with Ross that Ross' reported hours were inconsistent, and Negron never encouraged Ross to report his actual hours worked. Ross Interrogatory Responses, No. 8; Negron Deposition Exhibit 3, Exhibit P-174, pp. 19-24.

328.    Negron would not approve any overtime, making it impossible to record actual hours worked and be in compliance with Negron's directive that all overtime had to be preapproved. Ross Interrogatory Responses, No. 8.

329.    Ross estimates he worked an average of 55-60 hours per workweek, and this consisted of 25 hours at Citizens' mortgage offices, 15 hours at Citizens' branch offices, 10 hours

at home, and 7 hours at locations other than Citizens' offices or at home. Ross Interrogatory Responses, Nos. 3 and 12.

### g.  NORTH CAROLINA MLO OVERTIME PRACTICES

#### i.  David Howard (Aug. 2014-June 2016)

330.    Plaintiff David Mark Howard was formerly employed by Citizens as a MLO in North Carolina from August 9, 2014 to June 19, 2016. Joint Stipulations, ECF Doc. No. 357, ¶ 12.

331.    Howard worked 55 or more hours in a typical workweek. Howard Deposition Designations, ECF Doc. No. 387-8, 51:02-54:23.

332.    At the outset of his employment, Howard discussed overtime with Porath, and was informed that overtime was allowed as long as it was kept to five hours. Accordingly, Howard would report five hours of overtime during the first several months of his employment. Howard Deposition Designations, ECF Doc. No. 388-9, 100:16-101:19.

333.    Approximately halfway through his employment, Howard spoke with his manager Samuel Holmes about overtime, in which Howard disclosed that he was working more hours than he was recording, and Holmes told him that he could not record overtime. Howard Deposition Designations, ECF Doc. No. 387-8, 51:02-54:23.

334.    On April 11, 2015, Howard received an email from PSM Keith Johnson, with the subject "Time Sheet," in which Johnson asked Howard to "fix" his time-sheet because it was showing "9 hours every day….should be eight." Johnson further stated that if Howard was in fact intending to report overtime, he had to contact Regional Manager John Porath for approval, but that overtime was "currently not allowed." Howard/Johnson Email Chain, Exhibit P-42, CITIZENS_ESI00043852.txt, at p. 1-2.

335.    After receiving this email, Howard had a follow-up conversation with Johnson in which Johnson told Howard "We can't have overtime anymore." Howard Deposition Designations, ECF Doc. No. 387-8, 176:03-177:03.

336.    Howard had regularly recorded 5 hours of overtime between November 2014 and April 5, 2015; however, starting in the April 12, 2015 pay period, consistent with Johnson's directive that overtime was not allowed, Howard never recorded any overtime for the remainder of his employment. Combined Attendance and Hours Worked Summaries, Exhibit P-37, at p. 105-106.

### C. <u>NEW ENGLAND MORTGAGE LOAN OFFICER OVERTIME PRACTICES</u>

#### a. **NEW ENGLAND MANAGEMENT**

##### i. **Division Manager Bruce Ocko (2006-Sept. 2014)**

337.    Bruce Ocko was the Senior Vice President, New England, Divisional Sales Director for approximately 8 years, from 2006 to September 2014. Ocko Deposition Designations, ECF Doc. No. 388-18, 8:07-8:20.

338.    Ocko recalled a company-wide conference call with National Sales Director Ellen Steinfeld where she stated that MLOs would now be hourly employees and would have to report their time. Ocko Deposition Designations, ECF Doc. No. 388-18, 25:17-25:25.

339.    Ocko confirmed that managers are responsible for verifying timesheets were accurate and complete.  He testified they can do this by using common sense, and they should not approve the timesheet if they cannot verify that the information is accurate and complete. Ocko Deposition Designations, No. 387-27, 37:17-22, 44:08-14.

340.    Ocko confirmed that if a PSM reviews a questionable time entry, he or she should have a conversation with the MLO to review the accuracy of the time. Ocko Deposition Designations, No. 387-27, 54:17-23.

341.    Ocko testified that he would be surprised if there was never a single time an MLO worked an evening or a weekend. Ocko Deposition Designations, No. 387-27, 56:09-19.

342.    Ocko testified that he would be surprised if an MLO entered the same start and end time for three months in a row, and that he would be potentially surprised if he saw that pattern for even a single month. If he saw that pattern, he claims he would have a discussion with the manager to determine whether the records were accurate. Ocko Deposition Designations, No. 387-27, 58:03-59:21.

### ii.   RSM Nancy Monbouquette (June 2010-March 2021)

343.    Nancy Monbouquette was employed by Citizens from June 2010 through March 2021, and was the Regional Sales Manager for New England for her entire tenure. Monbouquette Testimony, 12/8 Transcript, 188:07-17; Monbouquette Deposition Designations, ECF Doc. No. 387-21, 10:13-20.

344.    When she began, her region was limited to Massachusetts, and then New Hampshire, Maine, and Vermont were added. Subsequently, Rhode Island was added, and a few years later, the Connecticut market was added as well. Monbouquette Testimony, 12/8 Transcript, 188:18-23; 190:08-14; Monbouquette Deposition Designations, ECF Doc. No. 387-21, 11:03-18.

345.    Monbouquette oversaw all of New England from after Bruce Ocko left until Chace Gundlach assumed control over the division as divisional manager, and had other regional managers reporting to her. Monbouquette Deposition Designations, ECF Doc. No. 387-21, 14:02-24.

346.    As Regional Sales Manager, she had both PSMs and Area Managers reporting to her. Monbouquette Testimony, 12/8 Transcript, 190:15-21.

347.    Monbouquette did not recall being involved in developing Citizens' expectation that MLOs should complete their work in a 40-hour week; rather, that expectation was

communicated to her from Citizens, specifically by Ellen Steinfeld, Bruce Ocko, and Chace Gundlach.  Monbouquette Deposition Designations, ECF Doc. No. 387-21, 72:16-25.

348.    Monbouquette recalled a national sales call with all MLOs held by Ellen Steinfeld in which overtime was discussed. Monbouquette Deposition Designations, ECF Doc. No. 387-21, 140:07-23.

349.    Monbouquette testified that the overtime preapproval process changed over the course of her tenure, that at first, an MLO would simply ask the PSM to pre-approve overtime, and the PSM would do so based on what the MLO was doing. Later, Monbouquette testified that PSMs were only allocated a certain number of hours, and beyond that, they would have to go to her for approval, and above a certain number of hours for that, they would have to go to her supervisor for approval. Monbouquette Testimony, 12/8 Transcript, 200:01-11.

350.    Monbouquette testified that no loan officer ever communicated that they worked more than 40 hours but did not record all those hours in the time-keeping system, and Monbouquette responded that she did not remember such an incident, but if it had happened, she would have told the loan officer to go back and change their time card and to report all the hours they worked. Monbouquette Testimony, 12/8 Transcript, 199:12-18. However, on April 1, 2013, PSM Jeff Page forwarded Monbouquette an email from Robert Barrientos in which he stated that when he requests 5 hours of overtime, he is in fact working many more hours than that, and Page told Monbouquette that he didn't see "**why a few hours of OT is a big deal with us. The good LO's are usually working well over 40 + hours, just don't bother to report it**," and in which Monbouquette did not tell Jeff to tell Barrientos he should go back and change his time card to report all the hours Barrientos actually worked. Monbouquette/Page/Barrientos Email, Exhibit P-73, CITIZENS_ESI00205886.txt.  On being shown this email, Monbouquette testified that she

didn't know "if that's an actual correct statement that Jeff made" and that he "didn't give me a specific name of someone that was working off the clock and not submitting it," despite Page forwarding the email from Barrientos in which he states he is working off the clock. Monbouquette Testimony, 12/8 Transcript, 210:04-11.

351.    On May 2013, Monbouquette emailed Alex Cohen, 'cc'ing Cohen's PSM Chuckie Braid and Division Manager Bruce Ocko, and said "I see you put overtime in the system," chastising him for not requesting overtime in advance, and informing him that "based on your production, you are not eligible for overtime." Monbouquette/Cohen Email Chain, Exhibit P-49, CITIZENS_ESI00186953.txt, at p. 2. In response, Cohen stated that he did not have time management issues; he was given numerous leads. He stated that the law stated he was to be paid overtime if he worked it, that he needed to work overtime to manage his pipeline and service his branches, and that business was heating up. Cohen then asked for Monbouquette to reconsider, and approve him to work overtime. In response, Monbouquette told him that Citizens would pay the overtime he already worked, but going forward, he would need permission from Division Manager Bruce Ocko. *Id.* at p. 1.

352.    In response to these emails with Cohen, his PSM Chuckie Braid emailed Monbouquette on May 13, 2013 stating "He knows his rights as an employee….I have been down with this road with him in the past…..He can be quite the nuisance[.] Let me know if you need me to do anything." Braid/Monbouquette Email Chain, Exhibit P-74, CITIZENS_ESI00206457.txt.

353.    Monbouquette testified that she does not recall a MLO ever complaining to her that the preapproval process was unrealistic. Monbouquette Deposition Designations, ECF Doc. No. 387-21, 73:24-74:12. However, MLO Alexander Cohen complained in April 2014 that he believed the preapproval process was unfeasible because of the need to take unexpected calls and inquiries

from business partners and he believed it was a ploy by Citizens to get MLOs to not record their overtime. Monbouquette/Roussel Email Chain, Exhibit P-41, CITIZENS_ESI00030512.txt, at p. 2. Upon receiving this email, Monbouquette wrote to her manager Bruce Ocko "[I'm] not responding to this." Monbouquette/Ocko Email Chain, Exhibit P-80, CITIZENS_ESI00208436.txt.

354.    Monbouquette testified that she did not really track hours and it would be up to the PSM to identify any suspicious number of hours in the time records and speak with the MLO about it. Monbouquette Deposition Designations, ECF Doc. No. 387-21, 77:11-78:01. However, in June 2013, she emailed MLOs Carrie Polys and George Bissias stating "I approved your overtime cards this week. In the future please request permission in advance as Bruce Ocko requires his approval for overtime hours." Monbouquette/Bissias Email Chain, Exhibit P-77, CITIZENS_ESI00207373.txt.

355.    Monbouquette testified that she never told any Citizens Bank manager reporting to her that Citizens had a policy or practice regarding overtime or time recording different than the official preapproval policy and the official requirement that MLOs record all time worked regardless of whether preapproval had been granted,  Monbouquette Testimony, 12/8 Transcript, 201:02-07, and that she **never** told her managers they should rarely approve overtime. Monbouquette Testimony, 12/8 Transcript, 206:19-22. However, on December 21, 2015, she sent an email to the PSMs who worked for her, Lance Adie, Joseph Boynton, Claudia Carr, Michael Pelosi, Anthony Rao, and Eric Hayes, in which stated "We need to have all overtime approved prior to being worked. We rarely approve overtime." Monbouquette 12/21/15 Email, Exhibit P-69. In response to being shown this email contradicting her sworn testimony, Monbouquette testified that December 2015 was a different timeline and the market was different and the volume

was different and the amount of overtime Citizens was approving was less, and that, in fact, Citizens "may not have been approving overtime in that particular month" and that "policies and procedures had changed, too, since then." Monbouquette Testimony, 12/8 Transcript, 207:24-208:05.

356.    Monbouquette testified that she never denied pre-approval to a loan officer for overtime. Monbouquette Testimony, 12/8 Transcript, 210:12-14. However, on May 13, 2013, Alex Cohen asked approval to work overtime, and she told him he was not eligible for overtime, and she would take away some of his bank branches so that he would not need overtime. Monbouquette/Cohen Email Chain, Exhibit P-49, CITIZENS_ESI00186953.txt, at pp. 1-2.

357.    On February 14, 2014, PSM Steven Roussel asked Monbouquette to approve two hours of overtime on behalf of his loan officer Kathleen McGahan so she could speak at a first-time buyer class approximately a month later, and Monbouquette responded to McGahan asking her to manage that week by working less one day because "we are not at a volume level of approving overtime." Monbouquette/Roussel/McGahan Email, Exhibit P-82. In response to being shown this email, Monbouquette testified that she did not deny the request, she simply said "we're not at a volume level of approving overtime," and confirmed that she stated this because "we were not at a point where we were approving overtime." Monbouquette Testimony, 12/8 Transcript, 211:06-19.

358.    On March 20, 2014, PSM Robert Franklin forwarded a request for overtime from MLO Ben Cartagena who had worked 36.5 hours by Thursday, and was asking for preapproval to work overtime. In response, Monbouquette wrote back that "We are not supporting overtime based on the volume." Monbouquette/Franklin/Cartagena Email Chain, Exhibit P-79, CITIZENS_ESI00208383.txt.

359.     On November 23, 2015, Monbouquette emailed PSM Lance Adie, who reported to her, and Tom Gamache, the National Sales Director, and told Adie that there was "no revenue to pay overtime to Marty and Kosta." Monbouquette/Adie Email, Exhibit P-47.

360.     Monbouquette testified that she told her PSMs in December 2015 that "we rarely approve overtime. Don't let this get out of control" because that "may have been the policy at the time coming to me." Monbouquette Testimony, 12/8 Transcript, 212:22-213:03.

361.     On March 22, 2017, Monbouquette testified that she had been provided a list of MLOs who record overtime but that didn't review overtime of her MLOs, "in general." She testified "I don't even really remember. I just remember, you know, we were watching the overtime. To some extent, someone else was, and we had to make sure the PSMs were getting preapproved." In response to when this occurred, she then replied "Honestly, it's been ongoing. But you said in the more recent regime with Chace leading us, you know, with his direction, that's what we've been doing." Monbouquette Deposition Designations, ECF Doc. No. 387-21, 85:01-86:20.

362.     When Monbouquette worked as an MLO, she admitted she worked more than 40 hours per week and admitted the job was not a 9-5 job. Monbouquette Deposition Designations, ECF Doc. No. 387-21, 60:17-61:16.

363.     Monbouquette encouraged MLOs to work evenings because that was often a better time to talk to a customer. Monbouquette Deposition Designations, ECF Doc. No. 387-21, 54:15-57:10.

364.     Monbouquette encouraged MLOs to work on weekends and work open houses. Monbouquette Deposition Designations, ECF Doc. No. 387-21, 107:02-20.

365. Monbouquette has reviewed MLOs' time records. When she did, she did not review the actual hours the MLO inputs, she only looked at the aggregate number they report. Monbouquette Deposition Designations, ECF Doc. No. 387-21, 149:08-150:05.

366. Monbouquette agreed that she would be able to identify discrepancies between what MLOs report and what they actually work if she reviewed the actual days and times being reported, because she sometimes knew about the work an MLO performs on the weekend. Monbouquette Deposition Designations, ECF Doc. No. 387-21, 169:06-23.

367. Despite all of the above, Monbouquette falsely testified she never refused to preauthorize overtime for an MLO, she was not aware of any manager refusing to preauthorize overtime for an MLO, she never instructed an MLO to only report preauthorized overtime, she never instructed any MLO to only work 40 hours, and she was not aware of any manager ever instructing an MLO to only work 40 hours. Monbouquette Deposition Designations, ECF Doc. No. 387-21, 186:12-187:18.

## b. NEW HAMPSHIRE MORTGAGE LOAN OFFICER OVERTIME PRACTICES

### i. Robert Pedersen (Sept. 2008-Feb. 2014)

368. Robert Pedersen worked as an MLO for Citizens Bank starting in September 2008 and ending in February 2014. Pedersen Testimony, 12/7 Transcript, 23:10-13; Joint Stipulations, ECF Doc. No. 357, ¶ 10.

369. Robert Pedersen resided in and physically worked in New Hampshire when he worked for Citizens Bank. Pedersen Testimony, 12/7 Transcript, 42:08-43:

370. Robert Pedersen's first manager was Dennis Cote, his second manager was Karen Mayrand, and his third manager was Jason Ludwick. Pedersen Testimony, 12/7 Transcript, 23:14-16.

371.     Pedersen's managers all reported to Bruce Ocko. Pedersen Testimony, 12/7 Transcript, 23:19-24.

372.     Bruce Ocko was the Regional Manager of the New England area. Pedersen Testimony, 12/7 Transcript, 24:07-10.

373.     In the first years Pedersen worked for Citizens as an MLO, he worked approximately 60 hours per week; in the final two to three years, he worked approximately 80 hours per week. Pedersen Testimony, 12/7 Transcript, 24:11-21.

374.     Pedersen performed his work at home, at the two Citizens Bank retail branches he was assigned, at two real estate office branches operated by Roche Realty where Citizens had negotiated a business partnership, as well as in the field. Pedersen Testimony, 12/7 Transcript, 24:22-25:01.

375.     Pedersen's field work included soliciting other realtors, meeting with clients, and attending or leading seminars. Pedersen Testimony, 12/7 Transcript, 25:02-05.

376.     Pedersen typically worked seven days a week, starting his work at either 6:00 AM or 7:00 AM, from home, and check emails, phone messages, return phone calls, and plan the rest of his day. Pedersen Testimony, 12/7 Transcript, 25:06-18. Four days a week, Pedersen would then go to a bank branch and arrive by 8:15 AM. One day per week, Pedersen would go to Roche Realty for their morning meeting, and arrive there by 8:15 AM as well. Pedersen Testimony, 12/7 Transcript, 25:19-26:01. If he was at a bank branch, he would stay there for one to two hours and then go to Roche Realty. Pedersen Testimony, 12/7 Transcript, 26:06-11. If Pedersen did not have a meeting or event to go to that required him to leave earlier, he would leave the Roche Realty branches at approximately 6:00 PM. Pedersen Testimony, 12/7 Transcript, 27:06-10. Approximately three days a week he would go to a broker open house, either in the afternoon or

the evening. Pedersen Testimony, 12/7 Transcript, 27:08-24. Pedersen would do additional work at home in the evening during the workweek, approximately one to two hours a night, up until 9:00 PM or 10:00 PM, except on evenings in which he had a late open house ending at 10:00 PM. Pedersen Testimony, 12/7 Transcript, 27:25-28:18. On Saturdays, Pedersen had a radio show about mortgage origination at 10:00 AM for which he would begin preparing at 9:00 AM, after which he would go to Roche Realty and work until around 6:00 PM, and then work from home in the evening. On Sunday, Pedersen went to Roche Realty at 10:30 AM and would work there until 6:00 PM, and would continue to work from home after that. Pedersen Testimony, 12/7 Transcript, 28:24-29:05.

377.     Pedersen's managers knew what hours Pedersen was working. Pedersen Testimony, 12/7 Transcript, 29:06-15.

378.     With respect to Pedersen's manager Jason Ludwick, Ludwick knew the hours Pedersen was working because Pedersen would regularly contact him in the evenings and weekends for help with work assignments; Ludwick also knew that Pedersen was working during the day at the branches and at Roche Realty because of forms Pedersen filled out, conversations about Pedersen's work that Ludwick would have with the bank branch managers, visits Ludwick would make to the bank branches, and conversations with the Roche Realty management and visits to Roche Realty. Pedersen Testimony, 12/7 Transcript, 29:23-31:08.

379.     Regional Manager Bruce Ocko repeatedly instructed Pedersen and other MLOs that MLOs were not allowed to record more than 40 hours, communicating this in both one-on-one meetings with Pedersen and in group meetings with other MLOs, including meetings with all MLOs in New Hampshire and Massachusetts.  Pedersen Testimony, 12/7 Transcript, 33:16-34:02.

380.     PSM Jason Ludwick told Pedersen many times not to report anything over 40 hours. Pedersen Testimony, 12/7 Transcript, 34:03-08.

381.     In response to Ludwick's instruction that Pedersen should not report more than 40 hours of work, Pedersen told Ludwick that he was uncomfortable with that, because his job took longer than that and because Ludwick knew Pedersen was working more hours than that. In response, Ludwick told Pedersen "this is the way the game is played." Pedersen then asked if he was still expected to do his full job. Ludwick told Pedersen that Pedersen was still expected to do his job fully, but not to record more than 40 hours. Pedersen Testimony, 12/7 Transcript, 34:13-24.

382.     Ludwick explained to Pedersen and the other MLOs how they should fill out their timesheets to only show 40 hours, reporting 8 hours per day for 5 days a week, except on weeks with a holiday, reporting 10 hours per day for the 4 non-holiday days of the week. Pedersen Testimony, 12/7 Transcript, 37:12-38:04.

383.     Consistent with Ludwick's instructions, Pedersen only recorded 40 hours per workweek, 8 hours per day for five days per week on weeks without a holiday, and 10 hours per day for the four non-holiday days on weeks with a holiday. Pedersen Testimony, 12/7 Transcript, 34:25-35:02, 38:11-39:03; Pedersen Hours & Overtime Summary, Exhibit P-21; Pedersen Attendance Records, Exhibit P-20.

384.     On a single occasion, for the workweek of January 5, 2014, Pedersen recorded 1.5 hours of overtime. Pedersen testified that he did so in error, and that he was reprimanded for doing so by Ludwick. In response, Pedersen again told Ludwick that he felt uncomfortable, and that maybe Pedersen would go to HR. In response, Ludwick said "Good luck with that one." Pedersen Testimony, 12/7 Transcript, 36:15-37:09.

385. Bruce Ocko knew the amount of hours that Pedersen was working, because on at least three occasions, Ocko met with Pedersen and the president of Roche Realty, and during these meetings, the president of Roche Realty disclosed that Pedersen was in the Roche Realty offices seven days a week. Pedersen Testimony, 12/7 Transcript, 40:09-23.

386. Bruce Ocko knew that Pedersen had a Saturday morning radio show, because he had to approve it and give Pedersen permission to do the show. Pedersen Testimony, 12/7 Transcript, 40:24-41:05.

### ii. Konstantinos Karametros (Feb. 2015-April 2016)

387. Opt-In Plaintiff Konstantinos Karametros was formerly employed by Citizens as a MLO in Massachusetts and New Hampshire from February 27, 2015 to April 25, 2016. Joint Stipulations, ECF Doc. No. 357, ¶ 19.

388. Karametros testified that MLOs were discouraged from reporting over 40 hours. Karametros Deposition Designations, ECF Doc. No. 387-13, 56:08-13.

389. Karametros worked overtime, and reported about half the overtime hours he actually worked. Karametros Deposition Designations, ECF Doc. No. 387-13, 57:21-58:02.

390. Karametros was cautioned that if he reported too much overtime and went negative as to his commissions, his job would be at risk. Karametros Deposition Designations, ECF Doc. No. 387-13, 59:05-12.

391. When Karametros reported overtime, his manager PSM Lance Adie confronted him about it. Karametros asked Adie how Karametros could do his job without overtime, since loan officers worked 50-60 hours per week, seven days a week. Adie responded that it did not matter, the overtime would be denied. Karametros Deposition Designations, ECF Doc. No. 387-13, 59:21-60:12.

70

392.    On November 23, 2015, RSM Nancy Monbouquette denied a request from PSM Lance Adie, who worked out of the Andover, MA office, to let a shared Loan Officer Assistant work overtime, but stated that "there is no revenue to pay overtime to [Marty] or Kosta," i.e., Konstantinos Karametros. Tom Gamache, 'cc'd on this email responds that he "trusts you can all figure this out." Gamache/Monbouquette/Adie Email, Exhibit P-47, CITIZENS_ESI00174125.txt, at p. 1-2.

393.    During a meeting with Regional Manager Nancy Monbouquette, Monbouquette told Karametros and the Andover team of MLOs that Citizens was not doing overtime any more, and that any overtime had to get preapproved by management. Karametros Deposition Designations, ECF Doc. No. 387-13, 63:19-64:02.

394.    Karametros questioned Adie about the overtime preapproval process, specifically how Karametros could get spot preapproval to take specific calls he might have to do on a weekend, when Karametros would not know in advance what customer demands he might have on the weekend once he had hit his 40 hours. In response, Adie told Karametros that he did not know how it was possible to get preapproval, but that Karametros should do what he had to do to get the sales. Karametros responded by saying that if he worked overtime, he was going to put it on his timesheet, and in response to that, Adie told Karametros that if he had too much overtime and not enough loans closed, he could go negative and be on probation. Karametros Deposition Designations, ECF Doc. No. 387-13, 64:06-65:09.

395.    Karametros did not believe that he could perform his job as an MLO for Citizens in a 40-hour workweek. Karametros Deposition Designations, ECF Doc. No. 387-13, 117:15-18.

### c. RHODE ISLAND MLO OVERTIME PRACTICES

#### i. Regional Manager John Kraus

396.    On June 27, 2014, Incentives Analyst Andrew McNally sent an email to Strategic Production Manager Tim McKeever, Regional Sales Manager John Kraus and Divisional Manager Bruce Ocko with subject line "June Overtime – Patricia Smith," in which he stated "I noticed significant OT being submitted" and detailed how MLO Patricia Smith had reported 6 hours of OT in the first week of June and 10 hours of OT in each of the remaining weeks of June. Ocko responded by sending an email to Kraus asking, "Who has been approving her time sheet?" *See* Ex. 1-H(1), ECF Doc. No. 120-7, at CITIZENS_ESI00195222, *attached hereto as* Exhibit 1,

397.    Kraus responded to Ocko that this was his failure because he had failed to train PSM DeBarros in the "OT philosophy." *Id.* Ocko responded that Kraus should investigate further.

398.    Kraus did so by emailing DeBarros, stating that 1-3 hours a week is okay, but that 6-10 hours is excessive, and "LO's really shouldn't be booking this kind of OT unless they are doing 15 apps a month!" and "In these situations . . . I usually explain to the LO . . . being "available for work" doesn't necessarily mean you are working!!. Just because your laptop is on and you are ready to answer your blackberry isn't necessary's actively working." He goes on "**OT should be limited to just high producing LO's or for unique circumstances like working a scheduled home show**." DeBarros responds by saying he would talk to Smith. *Id.*

#### ii. Daniel Kolenda (May 2014-Aug. 2015)

399.    Daniel Kolenda was formerly employed by Citizens as a MLO in Rhode Island from May 2014 through August 2015. Joint Stipulations, ECF Doc. No. 357, ¶ 7.

400.    During Kolenda's first month of employment, Kolenda's manager, PSM Anthony Rao, advised Kolenda that he could not put in more than 40 hours per week. Kolenda Deposition Designations, ECF Doc. No. 357-9, 69:12-70:25.

401.    Kolenda could not perform the job of a MLO at Citizens in 40 hours a week or less, nor was he aware of any MLOs who could do the job in 40 hours or less. Kolenda Deposition Designations, ECF Doc. No. 357-9, 84:14-02.

402.    As an MLO for Citizens, Kolenda typically worked 50-60 hours per week. Kolenda Deposition Designations, ECF Doc. No. 357-9, 85:03-07.

403.    As an MLO, Kolenda's schedule would vary from week to week. Kolenda Deposition Designations, ECF Doc. No. 66:16-24.

### iii.   Cheryl Roach (Jan. 2010-July 2015)

404.    Opt-In Plaintiff Cheryl Roach was formerly employed by Citizens as a MLO in Rhode Island from October 23, 2000 to January 6, 2007, and from January 4, 2010 to July 12, 2015. Joint Stipulations, ECF Doc. No. 357, ¶ 22.

405.    In 2012, at a meeting at the Capital Center in Providence, Rhode Island, National Sales Director Ellen Steinfeld met with Cheryl Roach and the other MLOs working in Rhode Island to introduce the change in exemption status for MLOs and the need to track time and MLOs' eligibility for overtime. Roach Deposition Designations, ECF Doc. No. 387-5, 26:14-27:22. Roach's direct supervisor PSM Mike Pelosi and Regional Manager John Kraus were also in attendance, and Roach assumed that New England Divisional Manager Bruce Ocko was there as well. Roach Deposition Designations, ECF Doc. No. 387-5, 30:02-12.

406.    Roach's understood from the meeting that Citizens did not really pay overtime on the first 45 hours reported because it came out of the draw against commission. Roach understood the bank was required to pay overtime for hours beyond 45, but the MLOs were told that they needed to get prior approval to work the overtime. Roach asked how MLOs should handle unexpected additional work that might come up at the end of the week where there would not be sufficient time to get prior approval for overtime. In response, Ellen Steinfeld told Roach and the

other MLOs that when she had worked as a loan officer in New York, she closed over $80 million in a year and never had to do it with overtime hours, i.e., was always able to do it within 40 hours a week. Steinfeld said that if the MLOs were not able to complete the job in 40 hours, the MLO in question clearly had an issue with time management and she would refer them to their managers for counseling and training on better time management skills. Roach Deposition Designations, ECF Doc. No. 387-5, 30:13-32:02.

407.    Roach never asked for overtime because it was clear from Steinfeld's comments and tone that Citizens Bank did not want MLOs to report overtime. Roach Deposition Designations, ECF Doc. No. 387-5, 56:03-57:08.

408.    Roach discussed overtime with her manager who questioned her on whether she really worked overtime, and Roach understood from this that he did neither wanted to approve nor discuss overtime; he just wanted Roach to do her job. Roach Deposition Designations, ECF Doc. No. 387-5, 75:11-76:02.

409.    Roach did not believe that she could complete her job working only 40 hours a week. Roach Deposition Designations, ECF Doc. No. 387-5, 104:03-06.

410.    It was rare for Roach to average less than 50 hours worked per week. Roach Deposition Designations, ECF Doc. No. 388-23, 114:04-18.

### d.  MASSACHUSETTS MLO OVERTIME PRACTICES

#### i.  PSM Steven Roussel

411.    PSM Steven Roussel was a PSM in Massachusetts reporting to Nancy Monbouquette. On April 8, 2014, RSM Nancy Monbouquette emailed managers and 'cc'd her boss, Divisional Manager Bruce Ocko, that "Normal work week is 40 hours, overtime needs to be approved in advance," and "If a loan officer adds overtime without approval we need to approve

it address the situation." Monbouquette/Roussel Email Chain, Exhibit P-41, CITIZENS_ESI00030512.txt, at p. 2.

412.    In response, Massachusetts PSM Steven Roussel forwarded Monbouquette's email to his MLOs, including Alexander Cohen.  Cohen complained that his understanding was that "you must pay [MLOs] overtime if [they] work these hours." He stated that he needed to work overtime to do his job, that the preapproval requirement could not be followed because MLOs got unexpected phone calls from business partners and customers, and that he believed the preapproval rule is in place to "stop us from putting in for these hours." Monbouquette/Roussel Email Chain, Exhibit P-41, CITIZENS_ESI00030512.txt, at p. 1-2. In response, Roussel wrote back that while the policy is to pay the hours worked, "At the current level of originating production[,] [w]e ask all loan officers to manage your time and to work the best 40 hours. …The rule has always been to work your best 40 hours" but if there is a "circumstance that requires to work over time" the loan officer "must request this time to the management team" and "the management team will evaluate the request." *Id.*

413.    In response, Monbouquette stated that Roussel should not have forwarded her email to the loan officers. Roussel responded that Cohen worked overtime without requesting it from him, and went on to say that he thought it was important to let the MLOs know that at the current level of production, he does not have the authority to approve overtime. Roussel stated that he has been asked about this plenty of times and have "communicated the policy we were issued over three years ago." Monbouquette responded that Cohen had not requested overtime form her. Roussel emailed Bruce Ocko and Nancy Monbouquette back the following day stating that he was talking to Cohen "now" and "explaining our position to work the best 40 hours. He is insisting to

be paid hours worked." Roussel/Ocko/Monbouquette Email, Exhibit P-76, CITIZENS_ESI00207225.txt.

### ii. PSM Lisa Oakley

414. In May 2013, Massachusetts PSM Lisa Oakley was provided minutes of a focus group of MLOs which detailed that MLOs had to work late at night and on the weekends and that the additional need to support retail bank branches was causing overtime issues. Kuhn Bank Partnership Email, Exhibit P-36, CITIZENS_ESI00226402.txt, at p. 1.

### iii. PSM Lance Adie

415. On December 15, 2016, PSM Lance Adie emailed MLO Aris Dimitrakopolos to ask him not to report double weeks in his time and attendance, but also told him that "No overtime is approved." Adie/Dimitrakopolos Email, Exhibit P-45, CITIZENS_ESI00174054.txt. Aris responded by telling Adie that "Every week I work 50+ hours and only put down 40-45. With the rate spike rates I plan on working even more hours." Adie/Dimitrakopolos, Exhibit P-48, CITIZENS_ESI00176588.txt, at p. 1.

416. On January 18, 2017, PSM Adie questioned MLO Edwin Zygmunt about entering 88 hours overtime, and told him "You should only be entering 40 per week?" Adie/Zygmunt Email, Exhibit P-46, CITIZENS_ESI00174047.txt.

### iv. PSM Joseph Boynton (Jan. 2011-Feb. 2013, April 2015-Present)

417. Joseph Boynton had three tenures with Citizens Bank, the first, from December 1999 through June 2004, the second, from January 2011 until February 2013, and the third, from April 30, 2015 through the present. Boynton Testimony, 12/9 Transcript, 105:09-14. In his second two tenures, he served as a PSM. Boynton Testimony, 12/9 Transcript, 105:17-106:05.

418.    Boynton testified that initially, when he started reviewing MLOs' hours, he could not actually see what the hours worked were, and would therefore only review the hours to see if they were past 40 hours or about 40 hours. Boynton Testimony, 12/9 Transcript, 112:07-13.

419.    Boynton did not do anything to verify the accuracy of the hours the MLOs recorded in the Time & Labor System. Boynton Testimony, 12/9 Transcript, 112:17-21.

420.    Boynton testified the only three ways one could verify the accuracies of the hours the MLOs input would be to speak with them, take a look at the hours being input, or shadow them an entire week. Boynton Testimony, 12/9 Transcript, 112:22-113:03.

421.    Boynton testified that he received training in how to review the time reported by the MLOs from Citizens Bank. Boynton Testimony, 12/9 Transcript, 116:21-117:02.

422.    Boynton testified at his March 2017 deposition that as a PSM approving MLO's time, up to and through March 2017, he could not see the actual in and out times that MLOs were entering into the system. Boynton Testimony, 12/9 Transcript, 117:09-118:18.

423.    As a PSM, Boynton did nothing to verify that the hours being entered into the time sheet were correct. Boynton Testimony, 12/9 Transcript, 120:15-17.

424.    Boynton testified that he never received any instructions from management contrary to the policy to approve the overtime that MLOs ask for, Boynton Testimony, 12/9 Transcript, 121:07-11.

425.    However, on March 14, 2016, he sent an email to Regional Manager Nancy Monbouquette and his Area Manager Chris Craig that George Bissias was working a lot of overtime, and in response, Monbouquette wrote back that "This will be a problem. If he is working too much overtime, we have to take branches from him." Boynton/Monbouquette Email, Exhibit P-100; Boynton Testimony, 12/9 Transcript, 122:08-19.

426.     Boynton's biggest incentive as a PSM is to comply with the directives of the New England Regional Manager. Boynton Testimony, 12/9 Transcript, 122:20-23.

### v.  Marie Seufert (Nov. 2012-Aug. 2013)

427.     Opt-In Plaintiff Seufert worked as a loan officer for Citizens in Massachusetts from October 12, 1999 to January 1, 2010, and again from November 23, 2012 through August 30, 2013, and reported to PSM Lisa Oakley. Defendants' Interrogatory Responses, No. 1 and 2.

428.     Seufert was instructed by Oakley and Division Manager Bruce Ocko to only record 40 hours per workweek and that any overtime would require preapproval, which could not be obtained in advance due to client needs. Seufert Interrogatory Responses, No. 2.

429.     Moreover, early in her employment, she reported overtime and was told by Oakley and Ocko that she was not permitted to report more than 40 hours per workweek. Seufert Interrogatory Responses, No. 2.

430.     Seufert estimates she typically worked between 55-60 hours per week. Seufert Interrogatory Responses, No. 3.

### vi.  William Kinsella (Oct. 2009-Dec. 2013)

431.     Opt-In Plaintiff William Kinsella was formerly employed by Citizens as a MLO in Massachusetts from May 30, 2000 to October 25, 2003, and from October 5, 2009 to December 19, 2013. Joint Stipulations, ECF Doc. No. 357, ¶ 20.

432.     Kinsella's manager at the time the MLOs switched over to recording time told him not to record all the hours he actually worked. Kinsella Deposition Designations, ECF Doc. No. 387-11, 61:23-63:02.

433.     Kinsella never requested preapproval to work more than 40 hours because she was told by more senior MLOs told not to bother. Kinsella Deposition Designations, ECF Doc. No. 387-11, 68:14-19.

434.     The fewest number of hours Kinsella ever worked as an MLO for Citizens was 40, and the greatest number of hours he worked was 65. Kinsella Deposition Designations, ECF Doc. No. 387-11, 103:07-24.

### vii.   William Ziminsky (June 2012-Dec. 2013)

435.     Opt-In Plaintiff William Ziminsky was formerly employed by Citizens as a MLO in Massachusetts from June 2012 through December 2013. Joint Stipulations, ECF Doc. No. 357, ¶ 25.

436.     Ziminsky worked 60-70 hours in a typical workweek. Ziminsky Deposition Designations, ECF Doc. No. 387-16, 79:12-16.

437.     Ziminsky's manager Charles Braid told Ziminsky that approval was needed from his manager Nancy Monbouquette prior to working overtime. Ziminsky Deposition Designations, ECF Doc. No. 387-16, 91:10-22.

438.     Ziminsky understood the overtime directions of his manager Charles Braid to mean that if an MLO worked overtime which had not been pre-approved, that it was not valid, and therefore should not be inputted. Ziminsky Deposition Designations, ECF Doc. No. 387-16, 93:08-94:18.

439.     Charles Braid was aware that Ziminsky was working extra hours after 5pm and on the weekends. Ziminsky Deposition Designations, ECF Doc. No. 387-16, 199:10-200:08.

440.     After learning about the overtime preapproval policy, Ziminsky discussed these policies with other MLOs in the Woburn, MA office, and the general understanding of the MLOs was that even if overtime hours were inputted, they would have been recouped via the recoverable draw. Ziminsky Deposition Designations, ECF Doc. No. 388-28, 96:13-97:15.

### viii.   Louis Belezos (March 2008-Nov. 2013)

441.    Louis Belezos worked as an MLO in Massachusetts from March 2008 through November 2013. Belezos Interrogatory Responses, No. 10; Defendants' Responses to Interrogatories, No. 1, Exhibit P-39.

442.    Belezos' direct supervisor was Jeffrey Page. Defendants' Responses to Interrogatories, No. 2, Exhibit P-39.

443.    Belezos estimated that he typically worked between 65-75 hours per workweek, and this time consisted of approximately 25 hours in Citizens' mortgage offices, 25 hours in Citizens' branch offices, 10 hours at home, and 10 hours at other locations such as realtor's offices, open houses, etc. Belezos Interrogatory Responses, Nos. 3 and 13

444.    Belezos participated in a conference call with his manager Jeffrey Page and with National Sales Director Ellen Steinfeld, he was told that he should only record 40 hours per week on his time-card, that overtime would have to be pre-approved, but that Citizens did not want the MLOs to ask for more than 40 hours and that overtime hours would not be preapproved if asked for. Belezos Interrogatory Responses, No. 2.

### ix.   Dale Lawrence (May 2011-March 2014)

445.    Dale Lawrence worked as an MLO in Massachusetts from May 2011 through March 2014, and directly reported to Joseph Boynton, Nancy Monbouquette, and Eric Hayes. Defendants' Interrogatory Responses, Nos. 1 and 2, Exhibit P-39.

446.    Dale Lawrence was instructed by Boynton, Monbouquette, and Hayes to only record 40 hours per week and any overtime would have to preapproved, while also communicating that they would not approve overtime. Lawrence Interrogatory Responses, Nos. 2, 7 and 8.

447.    Lawrence typically worked between 50-60 hours per workweek. Lawrence Interrogatory Responses, Nos. 3 and 13.

### e. CONNECTICUT MLO OVERTIME PRACTICES

#### i. Mary Lou Gramesty (July 2000-Oct. 2014)

448.   Plaintiff Mary Lou Gramesty was formerly employed by Citizens as an MLO in Connecticut from July 2000 to October 2014. Joint Stipulations, ECF Doc. No. 357, ¶ 5.

449.   As an MLO, Gramesty reported to PSM Jim Marong for most of her employment, and to PSM Polly Curtin for a short time at the end of her employment. Gramesty Deposition Designations, ECF Doc. No. 388-3, 59:19-59:20, 71:08-71:24.

450.   Gramesty was told that the expectation was that the position was a 40-hour per week job. Gramesty Deposition Designations, ECF Doc. No. 388-3, 74:05-74:11.

451.   Gramesty attended a sales meeting or conference call where an MLO named Margarone had submitted more than 40 hours, and had been told that it was only a 40-hour week job, and that's what should be reflected on the timesheet. Gramesty Deposition Designations, ECF Doc. No. 388-3, 74:12-75:20.

452.   Gramesty understood that MLOs had to get special permission to submit overtime. Gramesty Deposition Designations, ECF Doc. No. 388-3, 78:22-79:10.

453.   Gramesty was never explicitly advised by her manager Marong that she could not report more than 40 hours even if she worked more than 40 hours, but believed that the two had a "silent understanding" where they both knew what the policy was and they both did what they thought the policy dictated. Gramesty Deposition Designations, ECF Doc. No. 388-3, 80:22-81:25.

454.   Early when time-tracking for MLOs began, Gramesty told Marong that she was working different hours than she was recording, and that she not comfortable putting down the hours in on the timesheet because she felt it was not a true reflection of the hours she worked. Gramesty Deposition Designations, ECF Doc. No. 388-3, 82:16-83:18, 85:21-24.

455.    Marong's response was words to the effect of "It's a 40-hour workweek and that's what's supposed to be on your timecard." Gramesty Deposition Designations, ECF Doc. No. 388-3, 84:15-85:07.

456.    Gramesty's time and attendance records show that she block-reported her time by having the exact same start and end time each day without ever showing additional work in the morning, evening, or weekends. Gramesty Attendance Records, Exhibit P-32, CITIZENS0013415-13429.

457.    A summary of Gramesty's overtime hours reported shows that she never reported more than 40 hours per workweek, she most commonly would report exactly 40 hours per workweek, and every single one of her aggregate hours totals except one is perfectly divisible by 8. Gramesty Hours and Overtime Summary, Exhibit P-33.

### D.  NORTH EAST  DIVISION MLO OVERTIME PRACTICES

#### i.  National Sales Director and Former Division Manager Chace Gundlach (Dec. 2008-Present)

458.    Chace Gundlach has worked with Citizens Bank since December 2008. Gundlach Testimony, 12/8 Transcript, 52:12-17.

459.    Gundlach became a Senior Vice President and North East Division Manager on January 1, 2016. Gundlach Testimony, 12/8 Transcript, 52:18-20.

460.    Gundlach is currently the National Sales Director of Citizens' home mortgage division. Gundlach Testimony, 12/8 Transcript, 52:21-23.

461.    As Division Manager, Gundlach's territory included Maryland, Washington DC, Virginia, Pennsylvania, Delaware, New Jersey, metropolitan New York, and all of New England where Citizens has branches. Gundlach Testimony, 12/8 Transcript, 52:24-53:16.

462.    As Division Manager in 2016, Gundlach oversaw Regional Managers in New England, New York, and Philadelphia. Gundlach Testimony, 12/8 Transcript, 53:17-19.

463.    On February 2, 2017, National Sales Director Tom Gamache forwarded Gundlach an email chain with the subject line "FW: Overtime," between Gamache, CFO Stephen Dator, and the President of the Mortgage Division Chris Nard in which the national leadership was seeking to lower MLO overtime reporting. Dator/Nard/Gamache/Gundlach Email Chain, Exhibit P-50, CITIZENS_ESI00188459.txt, at pp. 1-3.

464.    In response, Gundlach forwarded the chain to his direct reports Chris Craig, Tom Drew, Tom Knee, Tom Kullman, Nancy Monbouquette, and Ace Watanasuparp, and said "This [overtime] needs to be managed better and I'm betting 90%+ didn't receive prior manager approval. I need each of you to report back with a plan." Dator/Nard/Gamache/Gundlach Email Chain, Exhibit P-50, CITIZENS_ESI00188459.txt, at p. 1.

465.    Gundlach testified that he never told any Citizens Bank manager reporting to him that loan officers could only record overtime if it was pre-approved or to deny the overtime if it had not been preapproved, and that he never encouraged any of the managers on his team to deny a request for overtime.   He was impeached during the hearing by an email he sent on February 27, 2017, to PSM Eric Hayes, copied to Regional Manager Nancy Monbouquette, where he told Hayes that "all OT beyond 5 hrs needs preapproval or deny it after reminding your people what the policy is." Gundlach Testimony, 12/8 Transcript, 120:06-09, 129:13-15; Gundlach/Hayes Email, Impeaching Exhibit 1, CITIZENS_ESI00192880.

466.    Gundlach admitted that contrary to his prior testimony, he had in fact told PSM Eric Hayes to deny overtime unless it was pre-approved. Gundlach Testimony, 12/8 Transcript, 138:12-14.

467.     In February 2, 2017, in response to Gundlach forwarding the high OT users report from the President of the Mortgage division and telling his reports they had to manage overtime better, Monbouquette emailed her supervisor Chace Gundlach "I have no one on the list. I do more units than any region in the company and I have the fewest assistants. DO NOT PUT ON A LIST SAYING I NEED TO MANAGE IT. They can all call me and I teach the 101 management class they need." Gundlach forwarded this email to the other Area and Regional Managers reporting to him, joking about the font size but also stating "she does make a valid point fellas." Dator/Nard/Gamache/Gundlach/Monbouquette Email Chain, Exhibit P-84.

### b. EASTERN PENNSYLVANIA MLO OVERTIME PRACTICES

#### i. Carol Waterhouse (Aug. 2014-Dec. 2015)

468.     Opt-In Plaintiff Carol Waterhouse was formerly employed by Citizens as a MLO in Pennsylvania from August 20, 2014 to December 18, 2015. Joint Stipulations, ECF Doc. No. 357, ¶ 24.

469.     As an MLO for Citizens, Waterhouse worked 50 hours on average in a typical workweek. Waterhouse Deposition Designations, ECF Doc. No. 387-15, 31:09-12.

470.     Approximately a month into her employment, Waterhouse had started to get business and she informed her PSM Raymond Pool that she was working 50 hours a week so that she wanted to put in ten hours of overtime, and he responded that she better get it out of there. Waterhouse Deposition Designations, ECF Doc. No. 387-15, 44:24-45:16, 59:10-20.

471.     As an MLO for Citizens, Waterhouse was not able to complete her work in 40 hours a week or less. Waterhouse Deposition Designations, ECF Doc. No. 387-15, 82:02-07.

472.      A summary of the hours Waterhouse reported in the Time and Attendance system confirms that on a single occasion three weeks into her employment, for workweek September 14, 2014, she reported 10 hours of overtime, and after that, she never reported any overtime again and

reported exactly 40 hours worked for each week. Combined Attendance and Hours Worked Summaries, Exhibit P-37, at p. 95.

### ii.  PSM Raymond Pool (2009-2012, 2013-2018)

473.    Raymond Pool worked for Citizens as from the end of 2009 until 2012, and again from late 2013 until his retirement in 2018. Pool Testimony, 12/9 Transcript, 72:16-22, 95:22-24.

474.    In his first tenure, Pool worked as an Area Sales Manager, and in his second tenure, as an Area Sales Manager and as a Producing Sales Manager (PSM). Pool Testimony, 12/9 Transcript, 72:23-73:06.

475.    Pool had periodic conversations with MLOs about overtime. He would ask the MLO the reason for the overtime, and if the MLO had a specific reason for the request and Pool thought it was justified, Pool would generally approve the overtime. Pool Testimony, 12/9 Transcript, 76:20-77:08.

476.    Pool has denied requests for overtime, and would not grant MLOs carte blanche to apply overtime all the time; he would instead have a discussion with them about why they are so busy they cannot get their work done in 40 hours. Pool Testimony, 12/9 Transcript, 77:02-77:08.

477.    Pool did not typically look at the hours that were recorded as he delegated an administrator to approve his MLOs' hours. Instead, reported hours would only be brought to his attention if "they saw something extraordinary." Pool Testimony, 12/9 Transcript, 77:12-17.

478.    Pool testified that there was a number of MLOs who would block report their time and just put in 8 hours a day. Pool Testimony, 12/9 Transcript, 94:07-13.

479.    When Pool returned to work for Citizens, he reported to Chace Gundlach. Pool Testimony, 12/9 Transcript, 95:25-02.

480.    Pool testified that he did not track the time that MLOs were working, and that it was not his responsibility to track their time. Pool Testimony, 12/9 Transcript, 96:09-19.

481.     Pool further testified that it was not his responsibility to review the time that MLOs entered in Time & Attendance, because he delegated that task to Deborah Wolfgang, Gundlach's assistant. Pool Testimony, 12/9 Transcript, 96:20-97:04, 97:11-16.

482.     Pool admitted that because he did not regularly review the time entries of the MLOs, he would only be able to identify that an MLO was block reporting their time if it was brought to his attention, and he has no recollection of it ever being brought to his attention. Pool Testimony, 12/9 Transcript, 95:25-02.

483.     Pool did not know if Wolfgang reviewed the actual in and out times being reported by the MLOs on their attendance records. Pool Testimony, 12/9 Transcript, 97:21-98:01.

484.     Pool had a better sense of what his MLOs were doing than Wolfgang. Pool Testimony, 98:02-07.

485.      It was permissible under Citizens' policies for a PSM to delegate the responsibility to verify the time and attendance records of the MLO to an administrative assistant, despite the administrative assistant having less ability to verify those hours than the PSM. Pool Testimony, 12/9 Transcript, 98:08-13.

486.     Pool testified that if an MLO reported a set schedule of 9:00 PM to 5:00 PM for weeks at a time, it was likely that they were receiving and sending emails and taking and making calls at night but they were not reporting this work. Pool Testimony, 12/9 Transcript, 100:08-19.

487.     Pool testified that it was not his responsibility to ensure that the MLOs were reporting all the hours that they worked. Pool Testimony, 12/9 Transcript, 101:07-17.

488.     On March 18, 2014, MLO Zaq Harrison emailed Pool in which he stated that Pool had told him he "can't file overtime, that the company has said just stop working at 40 hours when we all know that Los work well beyond that. We all know the expectation on commission is to

work long hours to be successful it takes an excess of forty hours a week. Forty hours a week is a fantasy." Pool/Harrison Email Chain, Exhibit P-87, CITIZENS_ESI00233175.txt.

### c. METROPOLITAN NEW YORK MLO OVERTIME PRACTICES

#### i. Michael Troy Farrell (April 2015-Oct. 2015)

489.    Michael Troy Farrell worked as an MLO in New York City from April 2015 through October 2015, and reported to PSM Ron Riemer and (indirectly) to Area Manager Victor Shaio. Defendant's Interrogatory Responses, No. 1 and 2, P-39; Farrell Interrogatory Response, Nos. 2 and 10.

490.    Farrell was told by his managers that request for overtime had to be preapproved, and that they had they had to be approved prior to Farrell working any overtime. However, because of the unexpected need to talk to customers, it was difficult or impossible to request overtime hours in advance. Farrell Interrogatory Responses, No. 2.

491.    On about two occasions during his early employment, Farrell reported overtime. In response, Reimer and Shaio told Plaintiff was not allowed to record more than 40 hours per workweek at all. Farrell Interrogatory Responses, No. 2.

492.    Farrell estimated that he typically worked between 55-60 hours per workweek and that this consisted of 25 hours at Citizens' mortgage offices, 10 hours at home, at 25 hours at locations other than Citizens' offices or at home. Farrell Interrogatory Responses, No. 3 and No. 14.

Respectfully submitted,

*/s/ Joshua S. Boyette*
Joshua S. Boyette, Esq.
**SWARTZ SWIDLER, LLC**
1101 Kings Hwy N, Ste. 402
Cherry Hill, NJ 08034
Phone: (856) 685-7420

Fax: (856) 685-7417

COUNSEL FOR THE PLAINTIFFS

Dated: January 13, 2022