IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALEX REINIG, KEN GRITZ, BOB SODA, MARY LOU GRAMESKY, PETER WILDER SMITH, WILLIAM KINSELLA, DANIEL KOLENDA, VALERIE DAL PINO, AHMAD NAJI, ROBERT PEDERSON, TERESA FRAGALE, DAVID HOWARD, DANIEL JENKINS, MARK ROSS, <br><br> Plaintiffs, <br><br> v. <br><br> RBS CITIZENS, N.A., <br><br> Defendant. | 2:15-CV-01541-CCW |

## **OPINION**

Before the Court is Plaintiffs' Renewed Motion for Class Certification.  ECF No. 277.  For the reasons that follow, Plaintiffs' Renewed Motion will be DENIED.

## I.    **Background**

Because of the extensive litigation in this case to date, the Court will only briefly recount necessary procedural and factual background related to Plaintiffs' Renewed Motion.

Plaintiffs, a group of current and former Mortgage Loan Officers ("MLO") employed by Defendant RBS Citizens, N.A.[1] ("Citizens"), allege that, notwithstanding Citizens' official

---

[1] In its filings, Citizens identifies itself as "Citizens Bank, N.A."  Noting this discrepancy, before the class certification hearing the Court entered a text-only Order on the electronic docket directing the parties to confer and, if appropriate, file a motion to correct the case caption.  *See* ECF No. 367 ("ORDER re Case Caption. The docket in this case identifies Defendant as 'RBS CITIZENS, N.A.'  The Court notes, however, that in its Witness List and Offers of Proof, ECF No. 354, for example, Defendant identifies itself as 'Defendant Citizens Bank, N.A. (incorrectly sued as RBS Citizens, N.A., and hereinafter referred to as "Citizens" or "Defendant").'  Accordingly, the parties are hereby ordered to meet and confer regarding the correct name for Defendant and, if appropriate, file a consent motion to

timekeeping policy, which requires MLOs to report all hours worked, Citizens maintained an unofficial policy of discouraging MLOs from reporting overtime, thereby resulting in MLOs working off the clock. Plaintiffs' claims for unpaid overtime resulting from the alleged unofficial policy span from November 24, 2013 to the present (a period of nearly a decade) and apply to a putative class of more than 1,400 MLOs[2] spread across ten states.[3] *See* ECF No. 277-1; ECF No. 397 ¶ K.A.6 (summary chart of putative class). Plaintiffs claim that they and the putative class members are entitled to damages for unpaid overtime wages.

In a two-volume report, covering motions for summary judgment and motions for class and collective certification, the Special Master recommended that Plaintiffs' first Motion for Class Certification should be granted, and that the 10 state subclasses proposed by Plaintiffs should be certified. *See* ECF Nos. 179 & 180. United States District Judge Arthur Schwab, then presiding, adopted the Special Master's Report and Recommendation, and certified this case as a class action under Rule 23(b)(2) and Rule 23(b)(3). *See* ECF No. 216. Citizens timely appealed the class certification order under Rule 23(f). *See* ECF No. 261 (notice of appeal); *see also* ECF No. 258 (order granting petition for allowance of appeal under Rule 23(f)).

---

modify the case caption."). No such motion has been filed; but, in any case, the Court will simply refer to Defendant as "Citizens."

[2] According to evidence submitted by Citizens, the putative class totaled approximately 1,009 MLOs as of March 2017 but has since grown to more than 1,400 MLOs. *See* ECF No. 397 ¶ K.A.6. The Court notes that Plaintiffs dispute whether Citizens' class-summary table, *see id.*, can be considered, and argue that it should be excluded under Rule 37 because Citizens failed to disclose either the summary itself or the underlying information, pursuant to Federal Rule of Evidence 1006, earlier in the case. *See* ECF No. 401 at 2–3. But the bare fact of the number of MLOs in the putative class, or the number of supervisors those putative class members report(ed) to, cannot be prejudicial to Plaintiffs here—if granted, Plaintiffs' Motion would certify a class that includes all of the 1,400-odd MLOs in Citizens' summary. Furthermore, Citizens points out, contrary to Plaintiffs' assertion that they would have taken discovery from some or all of the managers identified in the data underlying Citizens' summary table, *see* ECF No. 401 at 3, under the parties' agreed-upon discovery plan, that "Plaintiffs voluntarily agreed at the outset of the litigation to limit discovery regarding managers to only those managers who supervised the Named Plaintiffs and Discovery MLOs." ECF No. 404 at 3. The Court finds that Citizens' failure to disclose its summary is essentially harmless, and therefore the evidence is not excludable under Rule 37.

[3] The state sub-classes which Plaintiffs are seeking to certify are: Connecticut, New York, Massachusetts, Ohio, Pennsylvania, Illinois, North Carolina, Rhode Island, Michigan, and New Hampshire. *See* ECF No. 277-1.

The Third Circuit concluded in a precedential opinion that, based on the record as it then existed, it could not "make a definitive determination as to whether Plaintiffs' representative evidence is sufficient to satisfy Rule 23's commonality and preponderance requirements." *Reinig v. RBS Citizens, N.A.*, 912 F.3d 115, 129 (3d Cir. 2018). The Court of Appeals therefore vacated the class certification order and remanded "with instructions that the District Court conduct a 'rigorous' examination of the factual and legal allegations underpinning Plaintiffs' claims before deciding if class certification is appropriate." *Id.* at 130. On remand to the District Court, Plaintiffs filed their Renewed Motion, *see* ECF No. 281, and, after another appeal to the Third Circuit for reasons not directly relevant to the resolution of the pending Renewed Motion, the case was transferred to the undersigned.

Following transfer to the undersigned, the Court promptly requested and received a joint report from the parties regarding the status of the case, and held a conference. *See* ECF Nos. 346, 347, & 349. After discussion with the parties, the Court scheduled a class certification hearing. *See* ECF No. 350. Mindful of its obligation to conduct a "'rigorous' examination of the factual and legal allegations underpinning Plaintiffs' claims," *Reinig*, 912 F.3d at 130, the Court held a three-day evidentiary hearing on Plaintiffs' Renewed Motion. *See* ECF Nos. 371, 372, & 374. During the hearing, the Court heard testimony (including live and in-person, live via videoconference, by way of video deposition, and by reading of deposition designations) from more than 20 witnesses, including numerous current and former MLOs, Producing Sales Managers ("PSM") (the position within Citizens that directly supervises MLOs), and other current and former Citizens' managers. *See* ECF No. 378. And, in addition to the briefing and exhibits originally submitted with Plaintiffs' Renewed Motion in 2019, the parties further submitted voluminous exhibits and proposed findings of fact and conclusions of law for the Court's

consideration.  *See* ECF Nos. 379, 381, 387–389, 393, 396–98, 401, 404, 407.  Plaintiffs' Renewed

Motion is, therefore, ripe for disposition.

## II.    Standard of Review

A lawsuit may only be certified as a class action if the requirements of Federal Rule of

Civil Procedure 23 are satisfied.  *See Reinig v. RBS Citizens, N.A.,* 912 F.3d 115, 124 (3d Cir.

2018) (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 348 (2011)).  In general, "[c]ourts

determine whether class certification is appropriate by conducting a two-step analysis."  *Id.* at 124–

25.  First, the court must assess whether plaintiff has satisfied the prerequisites of Rule 23(a), and

then it must determine whether plaintiff has met the requirements of either Rule 23(b)(1), (2), or

(3).  *See In re Modafinil Antitrust Litig.*, 837 F.3d 238, 248 (3d Cir. 2016) (quoting *Marcus v.*

*BMW of N.A., LLC*, 687 F.3d 583, 590 (3d Cir. 2012)).

In order to satisfy Rule 23(a), plaintiff must show:

> (1) the class is so numerous that joinder of all members is impracticable;  (2) there
> are questions of law or fact common to the class;  (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class;  and (4) the
> representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4).  Here, Plaintiffs seek certification under Rule 23(b)(3) only,[4] *see* ECF

No. 281, which requires a finding "that the questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is

superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed.

R. Civ. P. 23(b)(3).  Because "[t]he commonality and predominance requirements are closely

linked, …'where an action is to proceed under Rule 23(b)(3), the commonality requirement [in

Rule 23(a)(2)] is subsumed by the predominance requirement.'"  *Ferreras v. Am. Airlines, Inc.*,

---

[4] The Court notes that in their first Motion for Class Certification, Plaintiffs sought to have this case certified as a class action under both Rule 23(b)(2) and Rule 23(b)(3).  After those classes were certified, *see* ECF No. 216, the Third Circuit vacated the district court's certification order.  *See Reinig*, 912 F.3d at 133.  On remand, Plaintiffs' Renewed Motion now only seeks certification under Rule 23(b)(3).  *See* ECF No. 281.

946 F.3d 178, 185 (3d Cir. 2019) (quoting *Danvers Motor Co., Inc. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008)).  This is so because the predominance factor "'imposes a more rigorous obligation upon a reviewing court to ensure that issues common to the class predominate over those affecting only individual class members.'"  *Reinig*, 912 F.3d at 127 (quoting *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 297 (3d Cir. 2011)).

Next, "the decision to certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met.'"  *In re Modafinil*, 837 F.3d at 248–49 (quoting *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008)).  Accordingly, in resolving a motion for class certification under Rule 23, the district court "'must resolve all factual or legal disputes relevant to class certification, even if they overlap with the merits—including disputes touching on elements of the cause of action.'"  *Id.* at 249 (quoting *In re Hydrogen Peroxide*, 552 F.3d at 307).  Therefore, "[c]lass certification is proper only if the district court is satisfied, 'after a rigorous analysis,' that the plaintiffs 'established each element of Rule 23 by a preponderance of the evidence.'"  *Reinig*, 912 F.3d at 125 (quoting *Marcus*, 687 F.3d at 591)).

The Court notes that Plaintiffs take issue with Citizens' assertion that they must present "convincing" evidence in order to prevail on their Renewed Motion.  *See* ECF No. 296 at 1.  To the extent Citizens suggests that the Court should apply some kind of heightened evidentiary standard (e.g., "clear and convincing evidence"), Plaintiffs are correct—no such heightened standard applies—Plaintiffs need only demonstrate by a preponderance of the evidence that the requirements under Rule 23 are met.  *See, e.g.*, *Reyes v. Netdeposit, LLC,* 802 F.3d 469, 495 (3d Cir. 2015) (finding district court erroneously applied heightened standard of "absolute proof" to class certification).  However, as the Supreme Court and the Third Circuit have both explained,

Rule 23 does not set out a mere pleading standard. *See Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard."); *see also In re Hydrogen Peroxide*, 552 F.3d at 316 ("[T]he requirements set out in Rule 23 are not mere pleading rules.") (citation omitted). Rather, as noted above, Plaintiffs bear the burden of demonstrating, by a preponderance of the evidence, that each of the Rule 23(a) and, in this case, Rule 23(b)(3) factors have been met. *See Reinig*, 912 F.3d at 125. In plain terms, Plaintiffs must present evidence sufficient to *convince* the Court it is more likely than not, for example and as relevant here, that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

## III.     Discussion

### A.       Rule 23(b)(3)'s Predominance Requirement

Because the Rule 23(b)(3) predominance requirement subsumes Rule 23(a)'s commonality factor, *Ferreras,* 946 F.3d at 185 (citation omitted), and because class certification will be denied, the Court will consider here only Rule 23(b)(3)'s predominance factor. *See Reinig*, 912 F.3d at 129 ("Based on the District Court's analysis before us, we cannot make a definitive determination as to whether Plaintiffs' representative evidence is sufficient to satisfy Rule 23's commonality and preponderance requirements").

The predominance requirement "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation,'" and as such "calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). The Supreme Court has explained the distinction between individual and common questions as follows:

> An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

*Id.* (quoting 2 W. Rubenstein, Newberg on Class Actions §4:50, pp. 196-197 (5th ed. 2012)). Accordingly, "[a]t the class certification stage, the predominance requirement is met only if the district court is convinced that 'the essential elements of the claims brought by a putative class are capable of proof at trial through evidence that is common to the class rather than individual to its members.'" *Reinig*, 912 F.3d at 127–28 (quoting *Gonzalez v. Corning*, 885 F.3d 186, 195 (3d Cir. 2018)). "In practice, this means that a district court must look first to the elements of the plaintiffs' underlying claims and then, 'through the prism' of Rule 23, undertake a 'rigorous assessment of the available evidence and the method or methods by which [the] plaintiffs propose to use the evidence to prove' those elements." *Id.* at 128 (quoting *Marcus*, 687 F.3d at 600). Where "'proof of the essential elements of the [claim] requires individual treatment, then class certification is unsuitable.'" *Id.* (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 259 F.3d 154, 172 (3d Cir. 2001)).

**B.   The Essential Elements of Plaintiffs' Putative Class Claims**

In its decision vacating the earlier class certification order in this case, the Third Circuit explained the essential elements of Plaintiffs' claims, and the resulting showing they must make to prevail on their Renewed Motion:

> To satisfy their wage-and-hour claims, Plaintiffs must show that: (1) pursuant to Citizens' unwritten "policy-to-violate-the-policy," the class MLOs performed overtime work for which they were not properly compensated; and (2) Citizens had actual or constructive knowledge of that policy and of the resulting uncompensated work. *See Kellar v. Summit Seating Inc.*, 664 F.3d 169, 177 (7th Cir. 2011) (citing *Reich v. Dep't of Conservation & Natural Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994)); *see generally Davis v. Abington Memorial Hosp.*, 765 F.3d 236, 240-41 (3d Cir. 2014). Thus, to satisfy the predominance inquiry, Plaintiffs must demonstrate (1) that Citizens' conduct was common as to *all* of the class members, *i.e.*, that Plaintiffs' managers were carrying out a "common mode" of

conduct vis-à-vis the company's internal "policy-to-violate-the-policy," and (2) that Citizens had actual or constructive knowledge of this conduct. *See Sullivan*, 667 F.3d at 299; *Dukes*, 564 U.S. at 358; *see also Tyson Foods, Inc.*[, 577 U.S. at 454] (explaining that, although a plaintiff's suit may raise "important questions common to all class members," class certification is proper only if proof of the essential elements of the class members' claims does not involve "person-specific inquiries into individual work time [that] predominate over the common questions").

*Id.* at 128.  In explaining its decision, the Third Circuit expressed "serious doubts whether the evidence tendered by Plaintiffs is sufficiently representative of the class as a whole" to satisfy the predominance requirement.  *Id.* at 130.  In doing so, the Court highlighted in particular that "not only were Plaintiffs' experiences confined to interactions with specific managers in distinct offices, but their statements are dissimilar and oftentimes ambiguous, reflecting in many instances nothing more than typical workplace concerns about MLO work ethic and effectiveness" and also that "in contrast to the plaintiffs' proffered evidence in *Tyson*, Plaintiffs['] evidence here comes not from a similarly situated group of MLOs but from individual employees who worked in distinct offices at various times throughout the relevant class period."  *Id.* at 129–30.

## C.    The Predominance Requirement Has Not Been Met

With the above framework in mind, the Court has undertaken a rigorous review and analysis of the record relevant to class certification.  The Court reviewed the parties' 2019 briefing and exhibits relating to Plaintiffs' Renewed Motion for class certification.  In addition, the Court observed and heard three days of testimony during the evidentiary hearing on class certification.  Twenty witnesses testified, including current and former MLOs and other current and former Citizens' managers.  Following the hearing, the Court reviewed the parties' voluminous post-hearing briefing, exhibits, and proposed findings of fact and conclusions of law, as well as the hearing transcript.

Having evaluated the evidence under the applicable law, the Court concludes that Plaintiffs have not satisfied their burden to demonstrate predominance by a preponderance of the evidence, such that "'the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Tyson Foods, Inc.*, 577 U.S. at 453 (quoting 2 W. Rubenstein, Newberg on Class Actions §4:49, at 195-196).

In the Court's view, there are multiple, interlocking factors (discussed further below) endemic to Plaintiffs' purportedly representative evidence that point towards the conclusion that individual questions predominate here.  For example:  (1) the MLO position entailed a high degree of flexibility and self-direction afforded to individual MLOs to set their own schedules;  (2) most of Citizens' managers had little day-to-day oversight regarding the day-to-day activities of the MLOs who reported to them;  and (3) MLOs gave varied and inconsistent reasons for not recording all of the hours they claimed to have worked.  Ultimately, these issues establish that Plaintiffs' representative evidence is insufficient to demonstrate injury on a class wide basis.

### 1.     Representative Evidence Must Be Capable of Proving the Individual Claims of Absent Class Members

"At the certification stage, the Court must be assured that the determination of whether the defendant's conduct caused injury to each class member can be made at the class level and without identifying damages that are not the result of the wrong."  *Wilson v. Consol. Rail Corp. (In re Paulsboro Derailment Cases)*, No. 13-784 (RBK/KMW), 2014 U.S. Dist. LEXIS 115542, at *43 (D.N.J. Aug. 20, 2014) (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 37 (2013)).  To be sure, "[p]roof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury)."  *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 259 F.3d 154, 188 (3d Cir. 2001).  And, although individualized damages calculations will not typically stand in the way of class certification, *see Neale v. Volvo Cars of N.*

9

*Am., LLC*, 794 F.3d 353, 374–75 (3d Cir. 2015) ("'[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal.'") (quoting *Comcast*, 569 U.S. at 42 (Ginsburg, J. & Breyer, J., dissenting), "[w]here proof of damages is essential to liability, the need for 'individualized proof of economic loss,' instead of through a formulaic calculation, can defeat predominance." *Wilson*, 2014 U.S. Dist. LEXIS 115542, at *43–44 (quoting *Newton*, 259 F.3d at 188).

Indeed, the representative evidence at issue in *Tyson* provides a useful counterpoint to the "mosaic" of evidence discussed below.  In *Tyson*, plaintiffs brought claims for unpaid overtime wages resulting from defendant's failure to compensate them for time spent donning and doffing protective equipment. *See* 577 U.S. at 448–49.  To prove their claims at trial, plaintiffs introduced representative evidence consisting of "employee testimony, video recordings of donning and doffing at the plant, and, most important, a study performed by an industrial relations expert, Dr. Kenneth Mericle" who "conducted 744 videotaped observations and analyzed how long various donning and doffing activities took." *Id.* at 450.  Defendant challenged plaintiffs' use of representative evidence, and the Supreme Court, although endorsing the use of such evidence in *Tyson*, declined to draw a bright-line rule, instead finding that "[a] representative or statistical sample, like all evidence, is a means to establish or defend against liability.  Its permissibility turns not on the form a proceeding takes—be it a class or individual action—but on the degree to which the evidence is reliable in proving or disproving the elements of the relevant cause of action." *Id.* at 454–55.  Thus, the Supreme Court concluded that "the [Mericle] study here could have been sufficient to sustain a jury finding as to hours worked if it were introduced in each employee's individual action." *Id.* at 459.  This was so because the plaintiffs—employees of a meat packing plant—were all similarly situated as to the activities in question (donning and doffing protective

gear), and the variation within the class as to those activities was quite low.  *See id.* ("[I]n this case each employee worked in the same facility, did similar work, and was paid under the same policy. As *Mt. Clemens* confirms, under these circumstances the experiences of a subset of employees can be probative as to the experiences of all of them.").  However, the Court cautioned, "[t]his is not to say that all inferences drawn from representative evidence in an FLSA case are 'just and reasonable.'  Representative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate of the uncompensated hours an employee has worked."  *Id.* (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U. S. 680, 687 (1946)).

### 2.  Absent Class Members Could Not Rely on Plaintiffs' Representative Evidence

Turning now to the evidence before the Court, as discussed above, Plaintiffs' claims hinge on the contentions that (1) Citizens' MLOs worked unpaid overtime hours, and (2) Citizens had at least constructive knowledge of the unpaid overtime being worked by its MLOs.  *See* ECF No. 396 at 1–2 ("Accordingly, the elements of an unpaid overtime claim under the state wage and hour law analogues to the Fair Labor Standards Act are:  (1) did an individual perform uncompensated work as a non-exempt employee;  and (2) did the employer have actual or constructive knowledge of the work.") (citing *Reinig*, 912 F.3d at 121, 128;  and 29 C.F.R. § 785.11).  Plaintiffs cannot prove these allegations using evidence from a purportedly representative sample of the proposed class, as they propose to do here, unless "each class member could have relied on that sample to establish liability if he or she had brought an individual action."  *Tyson Foods, Inc.*, 577 U.S. at 455.  Plaintiffs' evidence fails to meet that requirement.

To be sure, there is some evidence in the record tying together the claims of the Testifying MLOs (*i.e.* those whose testimony was presented at the class certification hearing).[5]  For example, the Testifying MLOs generally reported that they were paid for overtime hours that they actually recorded.  *See, e.g.*, ECF No. 383 at 184:2–19 (C. Waterhouse commenting, "Oh, my overtime is showing, so it did pay me.");  *see also id.* at 252:8–255:9 (A. Naji testifying regarding overtime hours paid).  Next, the Testifying MLOs claimed that they worked, on average, more than 40 hours per week, ranging from a high of 85 hours per week, *see, e.g.*, ECF No. 382 at 43:13–14 (R. Pedersen testifying "I did 80 to 85"), to a low of about 45 to 50 hours a week.  *See, e.g.*, ECF No. 382 at 207:19 (V. Dal Pino testifying "I would say 45 to 50" hours worked in a typical week);  *id.* at 212:9 (A. Naji testifying he worked "[p]robably around 50" hours in a typical workweek);  *id.* at 59:24–60:2 (L. Heydon testifying that he "probably averaged 44 to 52" hours per workweek);  *id.* at 117:17–20 (A. Reinig testifying that, as a loan officer, he worked "at least about 50 hours a week.").  And, in general, most Testifying MLOs also said they believed the MLO job could not be done in less than 40 hours a week.  *See, e.g.* ECF No. 382 at 14:8-10 (testimony of M. Fiorello).  But, limited and generalized similarities aside, closer examination of Plaintiffs' evidence shows that an individual class member would not be able to rely on Plaintiffs' purportedly representative sample to prove his or her claim because the meaningful and significant variation *within* Plaintiffs' sample evidence—which, as noted above, is supposed to support the claims of more than 1,400 class members, spread across 10 states, and cover nearly a decade—does not allow for extrapolation to the specific claims of individuals *outside* of the sample.

---

[5] As noted above, the Court has considered the entire record as it relates to Plaintiffs' Renewed Motion.  That said, in discussing the merits of Plaintiffs' Renewed Motion here, the Court will primarily rely on the testimony and exhibits presented at the Class Certification Hearing, at which the Court had the benefit of the parties' presentations of their best—and most condensed, given the voluminous record—cases for and against class certification.

With respect to hours worked, a number of Testifying MLOs said that they worked some weeks above, and others below, the overtime threshold. *See, e.g.,* ECF No. 383 at 30:24–31:6 (C. Roach testifying that "there are slow times in January or during a snowstorm where no one is calling you…So…were there weeks that I probably worked less than 40?  Yes.  Are they few and far between?  Yes.").  Some Testifying MLOs further said that they believed an MLO's job *could* be done in 40 hours a week or less—depending on, for example, the abilities of the particular MLO in question, whether an MLO only met their contractual minimum in terms of loan production, whether the MLO was provided administrative/operational support (which some, but not all, MLOs enjoyed), and/or whether the market was "slow."  *See, e.g.*, ECF No. 383 at 250:19–23 (testimony of A. Naji, "Q:  As a mortgage loan officer for Citizens Bank was it possible to perform your job in 40 hours a week or less?  A:  That's a good question.  In a normal loan officer's day – see, I'm trained to do it.  You know, I can do it in less.") and 251:12–15 ("Q:  So you're saying whether or not it's possible to perform the job in 40 hours depends on the individual?  A:  Yes."); *Id.* at 31:2–32:2 (testimony of C. Roach, that "if you were a loan officer that just did the required contractual $6 million a year…you could definitely do your job in less than 40 hours a week" and that, for loan officers with assistants "taking on the role of the operational pieces of it, then I think a loan officer could probably do their job in 40 hours."); *Id.*at 183:21 (testimony of C. Waterhouse, although not specific to Citizens, "Q:  During your career as a mortgage loan officer, have you been able to perform you job in 40 hours a week or less?  A:  Sometimes, yes;  sometimes, no."); *and id.* at 224:2–14 (testimony of V. Dal Pino that "Q:  As a mortgage loan officer for Citizens Bank was it possible to perform your job in 40 hours or less?  A:  During a slow time, yes" and that there was a slow purchase market from 2013 until she left Citizens in 2016).  Testifying MLO K. Karametros said that, during his onboarding period—which lasted approximately four weeks—

he in fact did only work 40 hours per week "because [he] was told to not focus on sales right now, focus on learning." *Id.* at 14:11–13.

And some Testifying MLOs also acknowledged that they had little to no insight into the work habits or hours of their colleagues. *See, e.g.*, *id.* at 183:19-20 (C. Waterhouse testifying that "I really didn't know anybody there, because I was at home all the time.  I didn't really meet anybody.").  Finally, testimony from named Plaintiff Alex Reinig indicated that, unsurprisingly, the kind of personal qualities needed to successfully meet or exceed contractual minimum production as an MLO were not universal;  in particular, that there is a "type" in the industry known as a "jumper"—that is, a loan officer who takes a job for the guaranteed advance, makes little or no effort to originate or close loans, and then "jumps" (*i.e.* quits) after a few months.  *See* ECF No. 382 at 151:1–19 (A. Reinig deposition testimony regarding K. Gritz, "So he didn't even originate one loan?  Answer: Not one loan.  Question:  He was just there for the guarantee? Answer: Yeah. Question: Does that surprise you? Answer:  Nope.  In our business, as a manager, people take advantage of that a lot.")

In short, in addition to other meaningful differences between the day-to-day work situations of the Testifying MLOs—for example, some MLOs worked a portion of their week out of one or more assigned branch bank locations;  others worked out of Citizens' mortgage offices with no assigned branches, *compare, e.g.*, ECF No. 383 at 217:11–218:7 (M. Fiorello testifying that "I never worked out of a mortgage loan office" and listing assigned branches) *and id.* at 180:10 and 183:19–20 (C. Waterhouse listing branches and noting that "I was at home all the time.") *with* ECF No. 382 at 219:18–220:12 (G. Cremeans testifying that he did not work from retail branches, but did most of his work from a mortgage loan office), the record evidence shows that the time demands of the MLO position varied person to person.  In other words, while the Testifying MLOs'

evidence may be sufficient to show that they themselves worked unpaid overtime hours as a matter of "just and reasonable inference," *Mt. Clemens*, 328 U.S. at 687, the same does not apply to an absent class member.  Indeed, even assuming the average for the proposed class of approximately 17 hours of overtime per week, *see* ECF No. 281-1 at 9 (averaging weekly hours estimates of opt-in and named Plaintiffs) proposed by Plaintiffs is an accurate "average" of the hours worked by the MLOs as a class, the parties' joint "Summary of Class Hours Worked Data" spreadsheet, *see* ECF No. 355 at Joint Ex. 7, shows that such a generalization is likely not applicable at the level of an individual absent class member.  For example, according to the spreadsheet,  (1) MLO tenure with Citizens ranged from a low of one pay period to a high of 280, with an average of about 61 weeks and a median of about 43 weeks;  (2) roughly one-third of all putative class members recorded some overtime (and, for more than 70 class members, overtime amounted to more than 10% of their total hours worked);  and (3) the regular hours recorded by MLOs in the set range from a low of zero to a high of over 11,000—which, again, is all to say that the "averages" Plaintiffs derive from their sample evidence are little more than rough abstractions that do not suffice to show that common issues predominate over individual ones.

Plaintiffs' evidence fares no better on the other element of their claim—namely, that Citizens had at least constructive knowledge that unpaid overtime hours were being worked.  In short, owing to the independence and flexibility afforded to MLOs, Citizens' front-line managers (so-called "Producing Sales Managers" or "PSMs") had little direct oversight of the day-to-day activities and schedules of the MLOs who reported to them.  As such, notwithstanding some vague assertions that PSMs must have known MLOs worked more than 40 hours per week, *see, e.g.*, ECF No. 382 at 175:18– 21 (testimony of R. Soda, "Q:  Were your managers that you worked for aware of the time demands of the job?  A:  They had to be.  They had to know it takes more than 40 hours

to do that job."), and examples of individual MLOs voicing concerns about their hours at particular times and to particular managers, the evidence does not permit the general inference that Citizens had constructive knowledge that the class as a whole was working off the clock. Even assuming that some managers, in some places, at discrete times within the class period, had actual or constructive knowledge that an individual MLO worked some off-the-clock hours, no generalized inference as to what Citizens knew or should have known about other MLOs, who reported to other PSMs, at different places, and at times within the class period, can be drawn. The Testifying MLOs generally (1) reported that they typically only communicated with their direct supervisor(s) by phone or e-mail;[6] (2) estimated that contact with their supervisors amounted to only a few hours a week, at most, and that weeks could go by, on occasion, with no such contact;[7] (3) conceded that their direct supervisors would have no way of knowing their actual schedule and hours except as reported by the MLO each week;[8] and (4) provided varying reasons for not reporting all hours worked, ranging from a vague sense that overtime was "frowned" upon to an incorrect belief that overtime wages were recouped by Citizens from an MLO's commissions— and therefore underreported in an attempt to realize greater commission-earnings.[9] In other words, the Testifying MLOs' evidence suggests that the issue of whether Citizens had constructive knowledge of off-the-clock work, far from being resolvable on a class-wide basis, is rife with individual questions that turn on, for example, what a given MLO communicated to his or her

---

[6] *See, e.g.*, ECF No. 383 at 176:1–177:20 (testimony of C. Richardson); ECF No. 382 at 65:20–66:25 (testimony of L. Heydon); *See, e.g.*, ECF No. 383 at 255:13–17 (testimony of A. Naji, "Q: Is it fair to say that other than the hours you reported in the Time & Labor system, your managers had no way of knowing the total number of hours you worked in any given workweek? A: Yes."); *Id.* at 226:17–229:18 (testimony of V. Dal Pino).

[7] *See supra* note 6.

[8] *See supra* note 6.

[9] *See, e.g.,* ECF No. 382 at 224:14–15 (G. Cremeans testifying that, "But here is the thing, since you're commission, you know, you pay it [overtime] back with your commissions."); ECF No. 383 at 47:8–11 (W. Ziminsky testifying that "it was a general understanding that I believed at the time that even if I were to input my overtime hours, that they would have been recouped via the recoverable draw that Citizens paid me."); ECF No. 382 at 77:8–12 (K. Gritz testifying that Alex Reinig told him Citizens "frowned on anything over 40").

16

manager, when such communication occurred, and what the content and context of that communication was.

Plaintiffs' attempts to corral the individual questions on the constructive knowledge issue into a common, predominating issue—namely, that Citizens maintained an unofficial policy to discourage overtime reporting—fail because the evidence shows that no such policy (if it even existed) was consistently applied by Citizens' managers.  For example, Alex Reinig (based in Pittsburgh) testified that when he held Assistant PSM and PSM positions, the policy he applied allowed MLOs to record up to five hours of overtime without preapproval.  *See* ECF No. 382 at 132:15–17 (A. Reinig testifying that "[b]ut whoever did ask for overtime, my immediate response was, 'You're allowed to get up to five hours of overtime that I can approve").  Other PSMs appear to have followed a similar rule at various times.  *See id.* at 223:22–224:2 (G. Cremeans testifying that he overheard his managers comment that "to only have five hours of overtime so you don't appear on a report.  Any time you go over 45 hours, you get on this report.");  *see also* ECF No. 383 at 138:7–11 (describing e-mail from C. Gundlach to other managers that "All OT beyond five hours needs your pre-approval or deny it after reminding your people what the policy is.").  On the other hand, New England regional manager Nancy Monbouquette's testimony suggests that, based on market factors, some amount of overtime may not have been subject to preapproval in her region at certain times.  *See* ECF No. 383 at 207:24–208:5 ("This is a different timeline.  That was December of 2015.  So back then, when the market was different and the volume was different and the amount of overtime we were approving was less, I mean, you could go back – I'm sure you have looked at the volume at that time.  And typically this number – those were slower months, so we may not have been approving overtime in that particular month.").  This testimony is consistent with Mr. Karametros's testimony that his PSM, Lance Adie, at some points told him

overtime would not be preapproved, and at other times—for example, when his production volume was high—told him to report his overtime because it would be paid.  *See* ECF No. 383 at 12:12–16 (recounting Mr. Adie saying, in or around November 2015, "'[i]f you do [put in overtime], it's going to get denied.'"), 13:3–4 ("I mean, the weeks I really, really grinded it, he said, 'Report it, man.  We'll approve it.'").

Furthermore, while it is true that some Testifying MLOs reported that, after recording significant overtime, they were subject to heightened scrutiny from management, *see, e.g.*, ECF No. 382 at 16:7–17:12 (testimony of M. Fiorello);  *see also* ECF No. 355 at Pl.'s Ex. 25, and a few in isolated incidents received mixed or ambiguous messages from their managers about overtime recording, *see, e.g., id.* at Pl.'s Exs. 41 and 65, to the extent that MLO overtime reporting drew the attention of higher-level management, the evidence falls short of showing that Citizens had a company-wide unofficial policy to restrict overtime reporting;  rather, the evidence on balance suggests that Citizens' management was focused on legitimate business objectives, such as MLO time-management and efficiency—i.e. limiting the amount of overtime *worked*—so as to reduce overtime expenses and to ensure overtime costs aligned with loan production.  *See id.* at Pl.'s Exs. 22, 59 (management observing disconnect between overtime and loan production) and 71 (no indication manager had prior knowledge of claimed overtime).  That is, discouraging an employee from *working* overtime, when an employer has an affirmative duty to inquire into and regulate overtime worked on its behalf, is not the same as discouraging an employee from *reporting* overtime the employee actually worked.  And, indeed, without exception, the Testifying MLOs reported that Citizens paid them for the overtime hours that they actually recorded.  *See, e.g.*, ECF No. 382 at 69:3–7 (testimony of L. Heydon);  ECF No. 382 at 91:13–16 (testimony of K. Gritz); ECF No. 383 at 33:6–34:4 (testimony of C. Roach).

In sum, then, common questions with respect to both essential elements of Plaintiffs' claims—i.e. (1) whether and to what extent any given MLO actually worked unpaid overtime hours and (2) whether and when Citizens had at least constructive knowledge that a given MLO had worked unpaid overtime—do not predominate over individual issues, making class certification inappropriate in this case.

## IV.    Conclusion

For the reasons set forth above, Plaintiffs' Renewed Motion for Class Certification is hereby DENIED.

DATED this 12th day of July, 2022.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record